# United States Court of Appeals

*for the*

# Federal Circuit

EMBLAZE LTD.,

*Plaintiff-Appellant,*

– v. –

APPLE INC.,

*Defendant-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:11-CV-01079-PSG
HONORABLE PAUL S. GREWAL

## BRIEF ON BEHALF OF PLAINTIFF-APPELLANT

MARTIN B. PAVANE
LISA A. FERRARI
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
(212) 883-4900

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTEREST

*Emblaze Ltd. v. Apple Inc.*, 2014-1734, 2015-1400, 2015-1557

Counsel for appellant, Emblaze Ltd., certifies that:

1.    The full name of each party represented by me is:

     Emblaze Ltd., now named B.S.D. Crown Ltd.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     B.S.D. Crown Ltd.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     B.S.D. Crown identifies BGI Investments (1961) Ltd. ("BGI") as a publicly-held corporation owning 10% or more of B.S.D. Crown's stock. BGI is publicly traded on the Tel Aviv Stock Exchange.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:

     Martin B. Pavane, Lisa A. Ferrari, Marilyn Neiman and Darren S. Mogil of Cozen O'Connor (and formerly of Cohen Pontani Lieberman & Pavane LLP); Andrew Nemiroff and Nathan Dooley of Cozen O'Connor; Mark Isola of Rehon & Roberts; Martin L. Fineman of Davis Wright Tremaine LLP.

                    COZEN O'CONNOR

May 28, 2015            By: */s/Martin B. Pavane*
                         Martin B. Pavane
                         Attorneys for Appellant Emblaze Ltd.

i

# TABLE OF CONTENTS

<div align="right">**Page**</div>

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES .....................................................................v

I.  STATEMENT OF RELATED CASES ........................................ viii

II.  JURISDICTIONAL STATEMENT .................................................1

III.  STATEMENT OF THE ISSUES PRESENTED ...........................2

IV.  STATEMENT OF THE CASE .......................................................3

V.  STATEMENT OF FACTS ..............................................................5

    A.  Introduction ...........................................................................5

    B.  Emblaze Develops a Novel Way to Live Stream Over the Internet...................................................................................6

    C.  Emblaze's '473 Patent...........................................................7

    D.  Problems Solved by Emblaze's Invention ...........................10

    E.  Emblaze Implements its Invention.......................................13

    F.  Apple's Infringing Live Streaming Technology ..................14

    G.  Apple Induces MLB at Bat and Others to Infringe the '473 Patent ..................................................................................16

    H.  Commencement of Suit and Pretrial Proceedings...............18

    I.  Claim Construction .............................................................19

    J.  Trial .....................................................................................20

        1.  "real-time broadcasting" ...........................................21

        2.  "each slice having a predetermined data size associated therewith"........................................................27

        3.  "upload[] the sequence [of files] to a server . . ." .....30

    K.  Other Trial Issues ...............................................................38

        1.  Apple Patents ............................................................38

2.    Jury Instruction Concerning Direct Infringement of System Claims................................................................39

L.    Jury Verdict and Post-Trial Motions................................40

VI.    SUMMARY OF THE ARGUMENT .........................................41

VII.    ARGUMENT..............................................................................43

A.    Standard of Review ......................................................43

1.    JMOL ................................................................43

2.    Jury Instructions...............................................44

3.    New Trial ..........................................................44

B.    The Law of Infringement .............................................45

1.    Direct Infringement...........................................45

2.    Indirect Infringement ........................................45

a.    Induced Infringement ..............................46

C.    Emblaze Proved Direct Infringement...........................46

a.    Apple's Argument That Emblaze Failed to Prove Direct Infringement Was Based on Three Claim Limitations .................................................47

i.    "real-time broadcasting" .....................48

ii.    "each slice having a predetermined data size associated therewith" ...................53

iii.    "upload[] the sequence [of files] to a server" ...............................................54

D.    Jury Instruction Concerning Infringement of Apparatus Claims 28, 37 and 40..........................................................56

E.    This Court Should Enter Judgment That Implementation of the Accused Streams Directly Infringes Claims 23, 28, 37 and 40 ...............................................................................59

F.    Emblaze Established That Apple Induced Infringement ...................59

        a.     Apple Was Aware of the '473 Patent and That the Acts it Induced Constituted Patent Infringement ................................................................. 60

        b.     Circumstantial Evidence Established that Apple Knew that it was Inducing Direct Infringement of Emblaze's Patent ........................................................ 62

   G.    In The Alternative, Emblaze Is Entitled To A New Trial .................. 64

   H.    The District Court's Costs Award Should be Vacated ....................... 66

VIII.  CONCLUSION ............................................................................. 67

IX.    STATEMENT OF ORAL ARGUMENT ...................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ...................................................45

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*,
    Appeal Nos. 2009-1372, -1380, -1416 and -1417, 2015 U.S. App.
    LEXIS 7856 (Fed. Cir. May 13, 2015)........................................58

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
    Appeal Nos. 2014-1335, 2015-1029, 2015 U.S. App. LEXIS 8096
    (Fed. Cir. May 18, 2015) ..........................................43, 44, 45, 65

*Broadcom Corp. v. Qualcomm, Inc.*,
    543 F.3d 683 (Fed. Cir. 2008) .....................................................63

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
    631 F.3d 1279 (Fed. Cir. 2011) ...................................................58

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004) ...................................................64

*Commil USA, LLC v. Cisco Sys.Inc.*,
    720 F.3d 1361 (Fed. Cir. 2013), *rev'd on other grounds*,
    *Commil USA, LLC v. Cisco Systems, Inc.* No. 13-896, 2015 U.S.
    LEXIS 3406, *17-*18  (U.S. May 26, 2015) ...................46, 60, 63

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*,
    246 F.3d 1336 (Fed. Cir. 2001) ...................................................55

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006) ............................................. 60-61

*Duro-Last, Inc. v. Custom Seal, Inc.*,
    321 F.3d 1098 (Fed. Cir. 2003) ...................................................47

*Ericsson, Inc. v. D-Link Sys.*,
    773 F.3d 1201 (Fed. Cir. 2014) ...................................................45

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014) .......................................................65

*Fleming v. Escort Inc.*,
     774 F.3d 1371 (Fed. Cir. 2014) ..................................................43

*Free Motion Fitness, Inc. v. Cybex Int'l*,
     423 F.3d 1343 (Fed. Cir. 2005) ..................................................55

*Gantt v. City of Los Angeles*,
     717 F.3d 702 (9th Cir. 2013) ......................................................44

*Global-Tech Appliance, Inc. v. SEB S.A.*,
     131 S. Ct. 2060 (2011) ...............................................................46

*Hangarter v. Provident Life & Accident Ins. Co.*,
     373 F.3d 998 (9th Cir. 2004) ......................................................43

*i4i Ltd. P'ship v. Microsoft Corp.*,
     598 F.3d 831 (Fed. Cir. 2010) ....................................................47

*Innogenetics, N.V. v. Abbott Labs.*,
     512 F.3d 1363 (Fed. Cir. 2008) ..................................................65

*Jansen v. Rexall Sundown, Inc.*,
     342 F.3d 1329 (Fed. Cir. 2003) ..................................................46

*Joy Techs., Inc. v. Flakt, Inc.*,
     6 F.3d 770 (Fed. Cir. 1993) ........................................................46

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
     134 S. Ct. 2111 (2014).................................................................20

*MGM Studios Inc. v. Grokster, Ltd.*,
     545 U.S. 913 (2005).....................................................................61

*Molski v. M.J. Cable, Inc.*,
     481 F.3d 724 (9th Cir. 2007) ......................................................64

*Murphy v. Long Beach*,
     914 F.2d 183 (9th Cir. 1990) ......................................................64

*Oatey Co. v. IPS Corp.*,
     514 F.3d 1271 (Fed. Cir. 2008) ..................................................52

*RF Del., Inc. v. Pac. Keystone Techs., Inc.*,
     326 F.3d 1255 (Fed. Cir. 2003) ..................................................45

*Shum v. Intel Corp.*,
     633 F.3d 1067 (Fed. Cir. 2010) ............................................59, 60

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004) ...................................................................44

*Swinton v. Potomac Corp.*,
    270 F.3d 794 (9th Cir. 2001) .......................................................................44

*United States v. Necoechea*,
    986 F.2d 1273 (9th Cir. 1993) .....................................................................64

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
    944 F.2d 870 (Fed. Cir. 1991) .....................................................................66

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ...................................................................52

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1).....................................................................................1

28 U.S.C. § 1331 ..............................................................................................1

28 U.S.C. § 1338(a) .........................................................................................1

35 U.S.C. § 271(b) ....................................................................................45, 46

Fed. R. Civ. P. 50(a).......................................................................................59

Fed. R. Civ. P. 59 ...........................................................................................64

# I.     STATEMENT OF RELATED CASES

On August 11, 2014, defendant Apple Inc. ("Apple") filed a Notice of Appeal with the District Court, challenging the merits judgment that U.S. Patent No. 6,389,473 ("the '473 patent") is not invalid.  That appeal has been assigned Appeal Number 14-1734.

On February 25, 2015, plaintiff Emblaze Ltd. ("Emblaze") filed a Notice of Appeal challenging the merits judgment that the '473 patent was not infringed. That appeal has been assigned Appeal Number 15-1400.

On April 8, 2015, plaintiff Emblaze filed a Notice of Appeal challenging the District Court's costs award.  That appeal has been assigned Appeal Number 15-1557.

This Court has consolidated Appeal Numbers 14-1734, 15-1400 and 15-1557.

## II.    JURISDICTIONAL STATEMENT

A Notice of Appeal for Appeal No. 2015-1400 was timely filed on February 25, 2015, from the Order Denying Motions for Judgment as a Matter of Law and for New Trial ("JMOL Order") entered January 29, 2015 (A00001-A00016), including all interlocutory decisions and orders subsidiary thereto and subsumed therein, including the Jury Verdict entered July 11, 2014 (A00017-A00021), the Judgment in a Civil Case entered July 11, 2014 (A00022) and the Claim Construction Orders entered April 19, 2013 (A00023-A00025), and October 9, 2014 (A00026-A00056).

A Notice of Appeal for Appeal No. 2015-1557 was timely filed on April 8, 2015, from the Order Granting-In-Part Motions Seeking Review of Clerk's Taxation of Costs entered March 20, 2015 (A00087-A00101), including all interlocutory decisions and orders subsidiary thereto and subsumed therein.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) over the case from which Appeal Nos. 2015-1400 and 2015-1557 are taken.  This Court has jurisdiction over Appeal Nos. 2015-1400 and 2015-1557 pursuant to 28 U.S.C. § 1295(a)(1), because the orders appealed from are final judgments in a civil action for patent infringement.

## III.  STATEMENT OF THE ISSUES PRESENTED

The issues presented on this appeal are:

1.  Whether the District Court erred in denying Emblaze's motion for judgment as a matter of law ("JMOL") that certain third parties directly infringed claims 23, 28, 37, and 40 of Emblaze's '473 patent.

2.  Whether the District Court erred in not granting Emblaze's motion for JMOL that Apple induced infringement of claims 23, 28, 37 and 40 of Emblaze's '473 patent.

3.  Whether the District Court erred in denying Emblaze's motion for a new trial.

## IV.    STATEMENT OF THE CASE

On July 28, 2010, Emblaze sued Apple for infringement of the '473 patent in the Southern District of New York.  A02662-A02688.  On Apple's motion for change of venue, in February 2011 the case was transferred to the Northern District of California, where Apple is headquartered.  A02689-A02695.  The case was ultimately assigned to Magistrate Judge Paul S. Grewal for all purposes, including trial.

Emblaze's second amended complaint asserted that Apple directly infringed the '473 patent and induced infringement of the '473 patent, and that Apple's infringement was willful.  A02971-A03004.

Prior to trial, Emblaze limited its claims for infringement to claims 23, 28, 37, and 40 of the '473 patent ("the Asserted Claims").   A jury trial was held from June 30, 2014 to July 10, 2014, and on July 11, 2014, the jury returned a verdict finding that the Asserted Claims were not directly infringed and were not invalid. A0017-A0021.  Because the jury found no direct infringement, it did not reach the issues of Apple's inducement of infringement or damages.

On August 8, 2014, Emblaze moved for JMOL or, in the alternative, for a new trial on the issue of direct infringement and for JMOL on the issue of induced

3

infringement ("Emblaze's JMOL Motion," D.E. 628, D.E. 631[1]) and, that same day, Apple moved conditionally for JMOL or for a new trial on the issue of invalidity ("Apple's JMOL Motion," D.E. 630).  On January 29, 2015, the District Court denied Emblaze's JMOL Motion and, therefore, did not reach Apple's conditional JMOL Motion.  A00001-A00016.

On March 20, 2015, the District Court taxed costs of $199,184.09 against Emblaze.  A00087-A00101.

---

[1] Unless stated otherwise, "D.E. __" refers to docket entries in Case No. 5:11-cv-01079-PSG (N.D. Cal.).

## V.     STATEMENT OF FACTS

### A.     Introduction

The technology disclosed and claimed in the '473 patent enables live streaming of audiovisual data of a live event, such as a baseball game, over the internet to millions of users using only standard HTTP servers, *i.e.*, without requiring dedicated, specialized (and expensive) servers for maintaining a separate session with each client device.  The '473 patent issued in 2002, and since then the live-streaming technology claimed in the patent has become ubiquitous.

As explained more fully below, in 2007, in an effort to stay ahead of the competition, Apple decided to add live streaming capability to its devices (*e.g.*, iPhones, iPad, iPod Touch, Apple TV and Macbook).  To that end, Apple developed its HTTP Live Streaming ("HLS") technology, which included both Apple software incorporated in the operating systems of Apple devices for receiving and playing live streams, and a protocol that Apple distributed to content providers (*e.g.*, sports leagues) and others that instructed how to configure live streams for compatibility with Apple's software.  Apple first introduced this technology in its devices in 2009, more than a decade after Emblaze applied for the '473 patent.  A01269; A01306; A01331.

5

By the time of trial in 2014, hundreds, if not thousands, of live streams were available for streaming to Apple devices. Emblaze focused on seven streams at trial, namely live streams from ABC News, the PGA, MLB at Bat, NFL Preseason, ESPN, the iTunes Festival, and certain live streams of Apple keynote addresses (collectively, "Accused Streams").   Relying on the Accused Streams, Emblaze conclusively showed at trial that Apple's HLS technology as implemented by the third party providers of the Accused Streams was identical to the technology covered by the Asserted Claims, and that Apple, by distributing its HLS protocol and otherwise, induced those third parties to infringe the Asserted Claims.

## B.    Emblaze Develops a Novel Way to Live Stream Over the Internet

Emblaze, an Israeli corporation founded in 1994 by four principals, develops and markets innovative, high-tech telecommunications technologies and products.   A00498; A00502-A00506.   Among other things, in 1999 Emblaze provided Samsung with technology that enabled Samsung's phones to receive and display video. A00517-A00518. Emblaze is publicly traded on the London Stock

Exchange, and at its height had a market value of nearly five billion dollars. A00504-A00505.[2]

In the mid-1990's, when the internet was in its infancy, Emblaze worked on more effective ways to use the internet for transmitting information, and in 1997 Emblaze began developing a way to stream live events over the internet that would simplify and expand the ability to make live events accessible in real time to virtually limitless numbers of viewers. A00505-A00507. That successful development resulted in the groundbreaking technology embodied in Emblaze's '473 patent.

Emblaze's live-streaming invention was so innovative that Emblaze was invited to the White House in April 1998 where Emblaze successfully executed the first ever live-streaming of the White House's annual Easter Egg Roll to hundreds of thousands of people worldwide over the internet. A02966-A02969.

### C.    Emblaze's '473 Patent

Emblaze's '473 patent issued on May 14, 2002, from an application filed in Israel in 1998. A00182-A00202. The '473 patent discloses and claims methods

---

[2] The trial transcript erroneously states that Emblaze's market value in 2000 "was between about $4-$5 million." The error is evident from the immediately preceding testimony which states that "In the beginning of the year 2000, [Emblaze] raised [an] additional $430 million on the [London] Stock Exchange." A00505.

and systems for streaming live audio and video to multiple devices having

differing available bandwidths, and without requiring devoted streaming servers.

A00200-A00201.

At trial, Emblaze accused Apple of infringing the Asserted Claims, *i.e.*,

claims 23, 28, 37, and 40, which read as follows:[3]

> 23. A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:
>
> providing at the transmitting computer a data stream having a given data rate;
>
> dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;
>
> encoding the slices in a corresponding sequence of files, each file having a respective index; and
>
> uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate
>
> wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith.

> 28. Apparatus for real-time broadcasting of a data stream having a given data rate over a network, comprising:
>
> a transmitting computer, which divides the stream into a sequence of slices, each slice having a predetermined data size associated therewith, and encodes the slices in a corresponding sequence of files, each file having a respective index, and

---

[3] All of the Asserted Claims are dependent claims. For ease of reference, they are presented with the limitations of the claims from which they depend.

which uploads the sequence to a server at an upload rate generally equal to the data rate, such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate

wherein the one or more client computers decode the sequence and play back the data stream responsive to the indices thereof, at a data replay rate generally equal to the data rate

wherein the one or more client computers download the sequence using an Internet download protocol

wherein the Internet download protocol is selected from a group consisting of HTTP, UDP and RTP.

37.  Apparatus for real-time broadcasting of a data stream having a given data rate over a network, comprising:

a transmitting computer, which divides the stream into a sequence of slices, each slice having a predetermined data size associated therewith, and encodes the slices in a corresponding sequence of files, each file having a respective index, and

which uploads the sequence to a server at an upload rate generally equal to the data rate, such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate

wherein the data stream comprises multimedia data

wherein the predetermined data size of each of the slices corresponds to a time duration of the slice.

40.  Apparatus for real-time broadcasting of a data stream having a given data rate over a network, comprising:

a transmitting computer, which divides the stream into a sequence of slices, each slice having a predetermined data size associated therewith, and encodes the slices in a corresponding sequence of files, each file having a respective index, and

which uploads the sequence to a server at an upload rate generally equal to the data rate, such that one or more client computers can download the sequence over the

9

> network from the server at a download rate generally equal to the data rate
>
> wherein the slices are encoded at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels.

A00200-A00201.

## D.    Problems Solved by Emblaze's Invention

Methods for live streaming developed prior to the invention of the '473 patent had drawbacks. A00194 at 1:15-47. These earlier methods required specialized servers with specialized software and significant computing power to maintain an individualized two-way communication session with each device receiving the live stream. *Id.*

Emblaze's invention avoids the need for specialized servers and for maintaining a separate session with each device by encoding (*i.e.*, compressing) a live stream, breaking the live stream into individual media segments on the fly, converting those segments into individual media files, and streaming those individual files from a server over the internet together with an index file that is continuously updated with a sequential listing of available media files, such that client devices (*e.g.*, smartphones, tablets, laptop computers) can download the index file and, based thereon, continuously download media files and updated index files as they become available on the server whereby the client devices can

10

play back the media files in the correct sequence.  *See, e.g.*, A00194 at 1:51-54; 2:1-21.

Emblaze's invention also recognizes, and all of the Asserted Claims require, that to maintain a live experience the upload rate of the sequence of media files from the transmitting computer to the server should be generally equal to the data rate of the stream as assigned at the transmitting computer, and that the download rate to the client devices should also be generally equal to the data rate assigned at the transmitting computer.  In other words, to maintain a continuous live streaming experience, the target data rate assigned to the incoming stream at the transmitting computer should be generally equal to both the upload rate to the server and the download rate to the client devices. *See, e.g.*, A00194 at 2:56-59

This is especially critical when the link between the server and the client device is a wireless link, such as for a smartphone or a tablet, as wireless links often have limited bandwidths that restrict the amount of data that can be transmitted as compared to the bandwidth available over a hard-wired connection. A00687-A00688.  For example, if each media file represents 10 seconds of a live event, to maintain a "live" experience on a client device, each media file must be transmitted to the device in 10 seconds or less.  If it takes longer than 10 seconds to send media files to the device, eventually the device will have played the most

11

recent 10-second file, but will not have received the next 10-second file.    That will cause the display on the device to stall, destroying the live experience. A01962-A01963.

Emblaze also recognized that the bandwidth of the link from the server to a client device may change during the live broadcast, for example, when the user moves to a new location where the link is better or worse.    A00689-A00691. When the bandwidth changes, the amount of data that can be transmitted over a given time interval, *e.g.*, 10 seconds, also changes, increasing if the bandwidth improves, or decreasing if the bandwidth deteriorates.    To address this issue, Emblaze incorporated adaptive bit rate streaming into its live streaming solution (Asserted Claim 40), *i.e.*, instead of streaming a live event at only one target data rate, multiple streams having different target data rates are streamed, each having its own index file, whereby a client device can select the appropriate stream based on the bandwidth of its link to the server, with higher data rate streams providing a higher quality image than lower data rate streams. *See, e.g.*, A00195, 3:5-23 and 4:39-47.

If the link between the device and the server can handle a high data rate, the device automatically selects the highest quality stream it can handle, *i.e.*, the one with the most data and, therefore, the clearest picture. *Id.*  If the link bandwidth

deteriorates, the device detects that change and switches to a lower data rate stream, thereby maintaining the live experience, albeit at a lower picture quality. *Id.*

Emblaze also recognized that when a user's device switches between streams, it must begin playing the new stream at exactly the point it had dropped the old stream, otherwise the user will experience a discontinuity. *Id.* Emblaze solved this problem by slicing the streams into media files based on time duration, *e.g.*, each slice can represent 10 seconds of a live event.    Consequently, when a device switches between streams, the switchover is seamless. *See, e.g.*, *id.*

## E.    Emblaze Implements its Invention

As mentioned above, Emblaze (f/k/a GEO Interactive)[4] first demonstrated its live streaming technology when it live streamed the Easter Egg Roll over the internet from the White House lawn in April 1998. A00567-A00568.  Attended by President Clinton and the First Lady, Emblaze's live stream was a "rousing success," with "[m]any firsts" occurring . . . as current and future technologies met the 120-year-old annual event . . ." (A02957-A02965), and with President Clinton addressing reporters about the remarkable innovation of live-streaming: ". . . the

---

[4] Emblaze changed its name several times during the events here at issue.  For simplicity, the entity is consistently referred to as Emblaze.

13

most important thing today you need to know is that for the very first time hundreds of thousands of young people will be experiencing the White House Egg Roll through the internet . . .” A03006 (video played at trial). *See also* A00574, A02969[5].

Beginning in 1999, Emblaze employed the invention of the '473 patent in its Webradio.com service, which live streamed music and other content from hundreds of radio stations throughout the U.S. A00511-A00517. Emblaze also implemented its patented invention in a platform provided to Wind, an Italian telecommunications company, that enabled the delivery of live video. *Id.*; A00540-A00544.

## F.     Apple's Infringing Live Streaming Technology

Apple is a world-renowned California-based corporation that, among other things, makes and sells smartphones, tablets and computers. About a decade after Emblaze's invention of the '473 patent, Apple began working on a live streaming technology for its devices. A00607-A00608; A01297; A02323-A02324. Apple, which had already developed an on-demand streaming technology, was anxious to

---

[5] Documents having page numbers within the ranges A2263-A2367, A2464-A2484 and A02966-A02970 contain deposition testimony that was played for the jury during trial, but which was not transcribed and, therefore, does not appear in the trial transcript.

develop a live-streaming solution before its competitors.  A01019-A01029.  Apple recognized that device sales were feature driven, and that if others offered live-streaming solutions first, Apple would lose sales to its competitors.  A02949.

Led by lead developer Roger Pantos, Apple's live-streaming solution, which Apple named HLS (for "HTTP Live Streaming"), is exactly the invention of the '473 patent -- providing a live stream, compressing the stream at multiple target data rates, slicing each stream into individual media files of equal time duration, creating an index file for each stream, and uploading the streams and their index files to a standard HTTP server such that client devices can then download the index files, select the best stream based on the available bandwidth, and play back the selected stream in the correct sequence by continuously referencing the index file. A00607-A00608; A00663-A00875; A00908-A00978; A02323-A02324.

In 2009, Apple began incorporating its HLS software in the operating systems of all its devices, including iPhones, iPads, iTouchs, laptops and desktops, thereby enabling Apple's devices to download and play back live streams in Apple's HLS format and to automatically switch among streams having different data rates based on available bandwidth, all exactly as described and claimed in Emblaze's '473 patent.   A00663-A00875;  A00908-A00978;  A01028-A01029; A01269; A01331.  Apple promoted its HLS software solution as allowing the

15

"[s]treaming [of] live events without special server software," A02432, and advertised that content providers can use HLS to "[s]end [l]ive [s]treams." A02434.

### G.    Apple Induces MLB at Bat and Others to Infringe the '473 Patent

In addition to incorporating HLS software in the operating systems of its devices, Apple published instructions explaining how to create HLS-formatted live streams for play back on Apple's devices.  A00848; A02377-A02385; A02386-A02422; A02426-A02463.  For example, in April 2011, Apple published the "HTTP Live Streaming Overview" ("Overview"), a 37-page document distributed to app developers, content providers (*e.g.*, MLB at Bat, the entity responsible for streaming Major League Baseball games), and others.  A00607-A00608; A00611-A00612; A01504; A02360-A02361; A02426-A02463; A02464.  The Overview explains the steps for creating live streams for playback on Apple devices -- *i.e.*, encoding (compressing) the stream at multiple target data rates for accommodating varying bandwidth connections to Apple devices; segmenting (or slicing) each stream into media files of equal time duration; creating an index file for each stream; and uploading the streams and their index files to an HTTP server such that the index files and the streams are available for download by Apple's devices for

16

live play, typically through the intermediary of a content delivery network ("CDN").[6]    A00611-A00612; A01510-A01511; A01517-A01520; A02426-A02463; A02470-A02483.

The Overview includes the following diagram, wherein the cloud graphic labeled "HTTP" represents a CDN (*i.e.,* the intenet):



A02432.

Apple employees also met with content providers to promote the use of Apple's HLS technology and to discuss their implementation of HLS-compliant streams to ensure compatibility with Apple's devices (A00607-A00608; A00848;

---

[6] A CDN comprises hundreds or thousands of servers deployed in multiple data centers, and serves to transmit data across the internet.

A02334-A02335), and documents in evidence confirmed those meetings. A02485-A02486; A02487-A02489; A02490-A02492.

Apple's efforts have been highly successful; the evidence showed that for MLB at Bat alone, on any given game day approximately 150,000 Apple devices were live streaming baseball games. A00616; A00652; A02316.

### H.    Commencement of Suit and Pretrial Proceedings

On October 29, 2009, shortly after Apple introduced HLS, Emblaze's counsel wrote to Apple offering a license under the '473 patent. A02423-A02425. Apple declined a license and, on July 28, 2010, Emblaze filed a Complaint for patent infringement in the Southern District of New York. A02662-A02688. Apple moved to transfer venue to the Northern District of California, where Apple's Cupertino headquarters are located, D.E. 13, which the court granted. A02689-A02695.

Apple did not produce an opinion of counsel that Apple did not  infringe the '473 patent. Apple did offer two non-attorney Apple employees who testified that they did not believe Apple was infringing Emblaze's patent. However, on cross-examination both admitted that they had never read the '473 patent. A01359-A01360; A01499-A01500.

18

## I.    Claim Construction

The Court issued a claim construction Order on April 19, 2013 (A00023-A00025), subsequently clarified its construction of two terms, (A00057; A00068-A00071), and on October 9, 2014, after trial, issued an Order explaining its claim constructions.  A00026-A00056.   At trial, Apple's non-infringement arguments focused on three claim terms:

| Claim Term | Court's Construction |
|---|---|
| "real-time broadcasting" | "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process" |
| "each slice having a predetermined data size associated therewith" | "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided" |
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" | "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate" |

### J.    Trial

At trial, Emblaze alleged that third parties responsible for implementing the Accused Streams directly infringed the Asserted Claims, and that Apple induced those direct infringements.

Beginning with the MLB at Bat live streams, Emblaze's technical expert, Dr. Vijay Madisetti, a professor at Georgia Institute of Technology and an expert in wireless telecommunications and computer engineering, provided a limitation-by-limitation analysis explaining how the MLB at Bat streams met all of the limitations of all four of the Asserted Claims. *See, e.g.*, A00663-A00875.  Dr. Madisetti then explained how implementation of the other Accused Streams met all of the limitations of Asserted Claims 28, 37, and 40. [7]  *See, e.g.*, A00816; A00825.

For method claim 23, Dr. Madisetti showed that MLB at Bat itself practiced all of the claimed steps (*see, e.g.*, A00696-A00778), for system claim 28, Dr. Madisetti showed that implementation of all of the Accused Streams resulted in direct infringement by the users of client devices who put the infringing system into operation (*see, e.g.*, A00778-A00820; A00826-A00830), and for system claims 37 and 40, Dr. Madisetti showed that implementation of all of the Accused

---

[7] In view of the Supreme Court's decision in *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014), at trial Emblaze asserted method claim 23 only against MLB at Bat.

20

Streams resulted in direct infringement by the content providers who put the claimed system into service. *See, e.g.*, A00778-A00839.

Dr. Madisetti also explained how Apple's Overview and other HLS documentation instructed third parties to implement live streams that meet all of the limitations of the Asserted Claims. *See, e.g.*, A00663-A00839.

As noted above, at trial Apple's non-infringement arguments to the jury focused on the three claim terms:

### 1. "real-time broadcasting"

The District Court's construction of "real-time broadcasting" required the jury to determine whether implementation of the included Accused Streams included "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process." A00023.

Apple argued to the jury that under the District Court's construction, an Accused Stream must be simultaneously received by all client devices, and that because the Accused Streams were not simultaneously received by all client devices there was no direct infringement. *See, e.g.*, A00480-A00482; A01597-A01606; A02160-A02163.

However, nothing in the District Court's claim construction requires simultaneous reception by all client devices.  Rather, the District Court's construction only requires "simultaneous transmission" (sending) of the stream, not simultaneous reception by the client devices.  The simultaneous "transmission" is the upload of data, *i.e.*, the transmission of the stream from the transmitting computer to the server, not the downloading of the stream by the client devices.

The District Court's construction follows the wording of Asserted Claims 23, 37 and 40, which are limited to creating live streams at a transmitting computer and uploading those streams to a server, "such that one or more client computers *can download* the sequence over the network from the server"[8]  (A00200-A00201 (emphasis added)), a point the District Court made in its October 9, 2014, Claim Construction Order:

> As to claim term #9 [*i.e.*, "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate"], Apple makes the additional argument that the "such that" clause requires that the client computers actually download the sequence, and not that clients just have the ability to download the sequence, as proposed by Emblaze. Beginning with the claim language, the court observes that the claim recites "uploading the sequence . . . such that one or more client computers *can* download the sequence . . . ."  The word "can" in the claim explicitly requires only the ability to download the sequence, not actual downloading. Apple does not point to anything in the specification indicating that a third party client must download the data for the method to be

---

[8] Asserted Claim 28 does include downloading a live stream to a client device, but it too nowhere requires simultaneous reception.

> completed. In fact, the first sentence of the summary of the invention section of the '473 patent states that "[i]t is an object of some aspects of the present invention to *provide* substantially continuous, high-bandwidth data streaming over a network using common, existing server and network infrastructure." The '473 patent thus discloses that the invention is principally directed toward providers of the data stream and not clients.

A00055 (footnotes omitted; emphasis in original).

Even Apple's expert agreed that the District Court's construction did not require simultaneous reception of the Accused Streams by the client devices:

> Q. Okay. And, again, just show me again where in the court's claim construction there's a requirement that all of the clients viewing the live event have to see that live event at the same time. Show me where that appears in the claim. What are you relying on for that?
>
> A. Well, what I'm relying on is the simultaneous transmission of data to one or more clients.
>
> Q. Okay. It's simultaneous transmission. Does it say it has to be received by one or more clients at the same time?
>
> A. No.

A01700.

There was simply no basis for Apple's argument to the jury (*see, e.g.*, A00480-A00482; A01597-A01606; A02160-A02163) that the "real-time broadcasting" limitation requires simultaneous reception of the live stream by all client devices.

23

Apple made the additional argument to the jury that the District Court's

construction of "real-time broadcasting" limited the allowable time lapse between

occurrence of a live event and reception of its live stream by client devices, and

that there was no direct infringement because the time lapse for the Accused

Streams exceeded the time lapse allowed by the District Court's claim

construction. *See, e.g.*, A00482-A00484; A01592-A01597; A02156-A02159. The

District Court agreed with Apple on this point, and denied Emblaze's motion for

JMOL on that basis. A00007.

The District Court's JMOL Order states:

> At trial, Apple argued that the accused streams do not
> meet this [real-time broadcasting] limitation because
> Apple's HLS technology includes a built-in delay from
> the time of the live event to the time a client views the
> event. In the art, this delay is referred to as "latency."

A00007.

At trial, Apple's witnesses testified that "latency" for the Accused Streams

varied from 15 to 30 seconds. A01538; A01595-A01596.

On the issue of latency, MLB at Bat's Joseph Inzerillo testified:

> Q. Would you consider HLS to be a realtime
> system?
>
> A. I would. I would consider it to be realtime in
> the sense of, if you don't have a completely external
> frame of reference, then it's live to you, is sort of the way
> it is. I think over time, the reason I would still consider it

24

realtime is that the people, the customer, the public has a whole different concept of time than they used to.

.  .  .

Q. What is your understanding of live streaming?

A. Of --

Q. The term.

A. The term "live streaming"?

Q. Yes.

A. I mean, the term in modern parlance is somewhat of a misnomer. I mean, nothing is exactly live, but live is that when somebody joins within the latency boundaries of the protocol, they can get as close as they would, you know, like to, or in general organically feel like they are as close to the live event as possible as it occurs.

A00616; A00652; A02309; A02320.

Mr. Inzerillo also testified that latency results primarily from the need to "buffer," or store, a few media files in the client device before beginning playback so that the client device will have a cushion of media files for playback in the event the transmission of subsequent media files is delayed.  *See, e.g.*, A00616; A00652; A02300-A02304.

Regarding Apple's second argument, nothing in the District Court's construction of "real-time broadcasting" ("simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the

25

same rate as a physical or external process") addresses the concept of "latency."

For that reason alone, the jury's verdict finding no direct infringement could not

have been correctly based on the 15-30 second latency in the Accused Streams.

However, even if the District Court's construction did include the concept of

latency, the '473 patent recognizes the inclusion of latency as a preferred

implementation of the invention of the patent:

> When one of computers 30 connects to server 36 and
> begins to download the data stream, it first reads the
> index file in order to identify at what point in stream 40
> to begin and to start receiving the data stream
> substantially in real time, **preferably with only a**
> **minimal lag**, as it is transmitted from computer 34.

A00197, 8:1-7 (emphasis added); *see also* A00197, 7:4-17; 8:32-41.

The '473 patent also explains:

> Preferably, uploading the sequence includes uploading
> and updating an index file containing the index of the file
> in the sequence that was most recently uploaded, and the
> one or more client computers read the index file to play
> back the sequence. **In a preferred embodiment,**
> **downloading the sequence includes selecting a file in**
> **the sequence earlier than the file whose index is**
> **contained in the index file and downloading at least a**
> **portion of the sequence of files beginning with the**
> **selected file.**

A00195 at 4:3-11 (emphasis added).  In this preferred embodiment the client

device begins playback from a media file that is older than the most currently

available media file, which results in a delay or latency between the live event and its playback on the client device.

It is evident, therefore, that the preferred embodiment of the '473 patent and the implementation of the Accused Streams are exactly the same – they both introduce latency between the live event and playback by the client device by beginning playback from a media file older than the most current media file.

As such, even if the District Court's construction included the concept of "latency," there was no basis for Apple to argue to the jury, or for jury to find, that a latency of 30 seconds or less was not "real-time broadcasting."

### 2.    "each slice having a predetermined data size associated therewith"

The District Court construed this limitation as "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided." *See, e.g.*, A00062-A00063.

At trial, Apple argued that none of the Accused Streams met this limitation because the number of bits in the Accused Streams varied from slice to slice and because the data size of the slices was not known in advance. *See, e.g.*, A00484-A00487; A01607-A01628; A02163-A02164.

27

However, in its Summary Judgment Order the District Court explained that "the patent simply does not teach always assigning the exact number of bits prior to slice division.  In fact, it teaches the opposite by describing one embodiment in which setting the time duration predetermines the data size of the slice."  A00072-A00073.  The District Court also recognized that nothing in the Asserted Claims requires that the actual data size of each slice is known in advance.  *See* A00073-A00074.

Consistent with the District Court's claim construction, at trial Emblaze showed that for every Accused Stream a time duration for the slices (aka "chunks") is established in advance of the stream being divided.  *See, e.g.*, A00607-A00608; A00663-A00839; A00963-A00978; A02332; A02336.

For example, MLB at Bat's Joseph Inzerillo testified:

> Q. What is the time duration that -- in your environment, what is the time duration for these chunks?
>
> A. You have to be specific about the time frame.
>
> Q. Okay.  2009.
>
> A. Ten seconds.

A00616; A00652; A02298-A02299.

> Q. Has that segment duration changed since then?
>
> A. Yes.
>
> Q. To what?
>
> A. Five seconds.
>
> Q. Is it currently five seconds?

28

> A. It is currently five seconds.

A00616; A00652; A02303.

Consistent with the District Court's claim construction, Dr. Madisetti

testified:

> Q.  . . .  Okay.  First of all, is there -- in your understanding, is there anything in the court's claim construction that requires all of the segments in a particular stream at a particular quality level be of exactly the same size?
>
> A. No, not according to the claim or the claim construction --
>
> Q. Okay.
>
> A. -- because you can set a time duration.

A00971; *see also* A00738-A00740; A00973-A00976; A02368-A02376.

Apple's own expert agreed that the Court's construction did not require all

of the slices to have the same data size:

> Q.  Can you just answer my question? Do they or do they not all have to be the same?
>
> A.  They don't all have to be the same.  They have to be predetermined.
>
> Q.  So that's not in the court's claim construction. We agree on that? They don't have to be the same size?
>
> A.  The court's construction does not require the same size.

A01681.

It is therefore evident that the invention of the '473 patent and Apple's HLS

technology both operate in exactly the same way, *i.e.*, they both predetermine the

data size of the individual slices by establishing in advance a time duration for the slices. As such, and based on the District Court's claim construction, there was simply no basis for Apple's argument to the jury that implementation of the Accused Streams did not result in direct infringement because the number of bits in the Accused Streams varied from slice to slice and because the specific data size (*i.e.*, number of bits) of each slice was not known in advance.

### 3.    "upload[] the sequence [of files] to a server . . ."

The final claim limitation that Apple argued was not met by implementation of the Accused Streams is "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate." The District Court construed "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" to mean "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream," and the District Court construed "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" to mean "such that one or more client computers are able to select

individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate." A00023-A00025.

At trial, Apple argued to the jury that implementation of the Accused Streams does not result in direct infringement unless the client devices download the sequence of files directly from the same server to which the sequence was uploaded from the transmitting computer.

But Apple's argument was contrary to the wording of the claims and contrary to the District Court's claim construction. *See, e.g.*, A02173-A02176. Both the claim language and the District Court's construction expressly recognize that the download is performed "over the network," *e.g.*, a CDN. The claims simply do not require downloading directly from the same server to which the sequence of files has been uploaded. *See* A00200-A00201, claims 1 and 25 (from which all Asserted Claims depend), 14:18-32, 15:63-16:9; A00023-A00025; *see also* A02088.

Moreover, at trial Emblaze showed that implementation of the Accused Streams does include "uploading" a sequence of files to a server and downloading of that sequence by the client devices from the same server. *See* A00616; A00652; A00663-A00875; A00908-A00978; A01663-A01664; A02272-A02273; A02301-A02302; A02377-A02385; A02386-A02422.

31

The evidence at trial showed that Accused Streams were uploaded from the transmitting computer to the server in one of two ways, both of which followed Apple's HLS protocol: the method used, for example, by MLB at Bat, and the method Apple referred to as the Akamai RTMP architecture.  A01952-A01953.

The following diagram illustrates the MLB at Bat architecture:



And the following diagram illustrates Akamai's RTMP architecture:



Figure 2.1.   RTMP to HLS High Level Request Flow

The evidence showed that for both methods, implementation of the Accused

Streams includes uploading a sequence of files to a server such that client devices

can download the sequence from the same server.  *See* A00616; A00652; A00663-

A00875; A00908-A00978; A01663-A01664; A02272-A02273; A02301-A02302;

A02377-A02385; A02386-A02422.

For example, for the MLB at Bat method, Apple's expert agreed that there is

an upload and a download from the same HTTP server:

Q. So here what's happening is filming the game;
we go to the encoder, the encoder is where the

33

compression takes place; then it goes to the segmenter and the segmenter divides it into little files. Right?

A. Yes.

Q. Files?

A. It divides it into segments.

Q. Okay. And then those segments are put on to this HTTP server; right?

A. That's correct.

Q. Okay. And that's an upload. You said that; right?

A. Yeah. I believe Mr. Inzerillo said that, yes.

Q. Okay. And all this is, this blue box, again, is all in Chelsea, New York; right?

A. I believe so.

Q. Okay. And then the client is making a request for a file; right?

A. What do you -- are you talking about when it's doing streaming?

Q. Yeah, it's doing streaming?

A. Yes, it's making requests for files.

Q. Okay. So it's making a request for a file, and when it makes a request for a file, it goes to the edge server; right?

A. Yes, it's in direct communication with the edge server.

Q. Right. But the edge server doesn't have that file; right? If this is the first time this streaming is coming to this client, it's the first time it's going this route, that edge server is not going to have that file; right?

A. That's correct.

Q. Okay. So the edge server is going to make a request back to this server, and this server is going to make a request back to this server, right, and it's going to pull it off that server; right?

A. Yes.

34

Q. Okay. So really the route is not just to here, it's all the way to here; right? So the file gets uploaded to this server, and then it gets downloaded from this server through these other servers back to that client; right?

A. Well, that's how it works.

A01663-A01664.

For the upload method referred to as the Akamai RTMP architecture, the evidence likewise showed that there is an upload and a download from the same server. Referring to the diagram of the Akamai RTMP architecture reproduced above, third party Akamai's corporate representative and Vice President of Engineering, Christopher Knox, testified:

Q. The next box shown in the diagram after the entry point is something called RTMP core. Do you see that?

A. Yes.

Q. And what does the RTMP core box signify?

A. The RTMP core is a software component which leverages the RTMP protocol as a client and is responsible for acquiring the live stream from the entry point and making it available to the Akamai archiver system.

. . .

Q. Okay. So the -- the stream is output from the RTMP core software to the archiver; is that right?

A. Yes.

Q. And what is -- what happens -- withdrawn. Is the archiver a software program?

A. The -- the archiver is a -- a combination of server infrastructure and Akamai-developed software components.

35

Q. Okay. And what -- what transformation of the stream takes place in the archiver, if any?

A. No transformation.

Q. So what is the function of the archiver?

A. The function of the archiver is to store the content sent by the RTMP core and to deliver the content to Akamai GHost software, as well as upload content it receives, if long-term storage is needed, to net storage.

Q. Okay. You said to deliver -- to deliver the content as well as to have the ability to store it for long-term storage. Is that what you said?

A. The -- the role of the archiver is to -- to make the content that it received from the RTMP core available to upstream Akamai systems in the Akamai intermediate format and also to upload content to the Akamai net storage platform in that same intermediate format.

Q. Okay. So if I understood that correctly, the net storage is a long-term storage if the content is going to be archived, essentially?

A. Yes.

Q. But for -- for live streaming, if we're taking a stream and we're going to transmit it live to client devices such as the iPhone and iPad shown here on this diagram, the -- the path is from the archiver through the GHost?

. . .

THE WITNESS: The -- the content would flow from the RTMP core to the archiver, and Ghost would get content from either the archiver or the net storage system depending upon where it's able to get the object from. So if it -- if GHost was unable to reach the archiver system and the content had made its way to net storage, even in a live scenario, it could still get content from -- from net storage.

A00616; A02272-A02273.

At trial, Apple made the additional argument to the jury that the "upload[]

the sequence [of files] to a server" limitation is not met in the Accused Streams

using the Akamai RTMP architecture because the RTMP core creates an

"intermediate" file format for the slices, which is then converted to a different file

format before the files are downloaded to the client devices.  But there is nothing

in the Asserted Claims or the District Court's claim construction that precludes the

use of intermediate file formats.  As Dr. Madisetti explained on cross-examination

by Apple's counsel:

> Q. Good.  Okay.  So you understand that the
> RTMP core creates something called an intermediate
> format; right?
>
> A. It creates an intermediate file format.  It's called
> I.F. – Akamai's intermediate file format, and you note
> that this architecture is used only for two of the streams,
> the PGA and ABC, not for the others.
>
> . . .
>
> Q. Well, that's an interesting observation.  So you
> understand that kind of the secret sauce of Akamai in
> terms of the RTMP architecture is that it uses that
> intermediate file format as a basis of raw materials to
> create not just HLS, but also an adobe -- basically
> something for adobe and also something for Akamai;
> right?  Two other formats?
>
> A. That doesn't affect my answer.  It's still the
> compressed data.  It's still indexed.  It is still the file.
>
> Q. So are you saying that an HLS segment is the
> same as an Adobe segment is the same as the Akamai
> version of the segment, that they're all the same?

> A. Insofar as the claims are concerned, they contain the same slice of compressed data and they contain an index.
>
> How you add sugar or pepper on the top doesn't change what it's supposed to be.

A02089; A02092. *See also* A00616; A02273-A02274.

There was simply no basis for Apple's argument to the jury that implementation of the Accused Streams did not meet the "uploading the sequence [of files] to a server" limitation because the Akamai system converts the files to an intermediate file format.

### K.    Other Trial Issues

### 1.    Apple Patents

Over Emblaze's objection, Apple was permitted to introduce four Apple patents concerning its HLS live streaming technology, *i.e.*, U.S. Patent Nos. 8,301,725 (A02493-A02532), 8,099,473 (A02533-A02572), 8,099,476 (A02573-A02610), and 8,156,089 (A02611-A02661) (collectively, "Apple Patents"); A01144.  Addressing this issue in its JMOL Order, the District Court stated:

> Apple was allowed to use its patents to demonstrate the differences between Emblaze's asserted claims and the accused HLS streams.  By requiring a named inventor on the Apple patents to testify about the Apple patents, **the court ensured that discussion of Apple's patents focused on the subjects to which Apple's patents were relevant: the differences between the asserted claims and Apple's accused technology.**

38

A00015 (emphasis added).

However, at trial none of Apple's witnesses offered any testimony tying the Apple Patents to differences between the Asserted Claims and Apple's accused technology.[9]

## 2. Jury Instruction Concerning Direct Infringement of System Claims

Concerning Emblaze's burden to prove direct infringement of apparatus claims 28, 37 and 40, the District Court gave the following jury instruction: "[t]o prove infringement of claims 28, 37, or 40, Emblaze must persuade you that: (1) it is more likely than not that a single third party put an infringing apparatus into service, that is, controlled the apparatus as a whole and obtained benefit from it . . . ." A02220. Because the District Court did not explain the meaning of "control" in the context of the jury instruction, the instruction was confusing and contrary to this Court's precedent, and left the jury to guess what "control" meant. Emblaze timely objected to that instruction during the jury charge conference. A02009-A02015.

_____

[9] Indeed, until Apple reversed course at trial, during discovery Apple had consistently maintained that its own patents concerning Apple's HLS technology were irrelevant. *See, e.g.*, A02758-A02759; A02766-A02767.

### L.    Jury Verdict and Post-Trial Motions

On July 11, 2014, the jury returned a verdict finding that none of the third parties implementing the Accused Streams directly infringed the '473 patent, and that the '473 patent was not invalid.  A00017-A00021.  Because the jury found no direct infringement, it did not decide whether Apple induced infringement.

On August 8, 2014, Emblaze filed a motion for JMOL or, in the alternative, for a new trial on the issue of direct infringement, and for JMOL on the issue of induced infringement, and Apple filed a conditional cross-motion for JMOL or, in the alternative, a new trial on the issue of patent invalidity.  D.E. 630, D.E. 631.

In an Order dated January 29, 2015, the District Court denied Emblaze's post-trial motion in its entirety, and denied Apple's conditional cross-motion as moot.  A00001-A00016.  The Court based its denial of Emblaze's motion solely on the "real-time broadcasting limitation," concluding that "[b]ecause Apple's noninfringement evidence on the 'real-time broadcasting' limitation is sufficient to support the jury verdict, the court need only address that limitation."  A00007.

On March 20, 2015, the District Court taxed costs of $199,184.09 against Emblaze. A00087-A00101.

## VI.   SUMMARY OF THE ARGUMENT

The District Court erred in denying Emblaze's motion for JMOL or, in the alternative, for a new trial.

The evidence at trial admits of only one reasonable conclusion, *i.e.*, that implementation of the Accused Streams directly infringed the Asserted Claims, and that Apple, with knowledge of Emblaze's '473 patent, actively induced that direct infringement.

At trial, Apple's arguments that there was no direct infringement were based on three limitations present in all Asserted Claims, *i.e.*, (1) "real-time broadcasting"; (2) "each slice having a predetermined data size associated therewith"; and (3) "upload[] the sequence [of files] to a server."  But, in view of the District Court's claim constructions and the evidence presented at trial, no reasonable jury could have concluded that Emblaze did not prove direct infringement, and Emblaze should have been granted JMOL on this issue.

Regarding induced infringement, because Emblaze proved that Apple was aware of the '473 patent and had knowledge that the acts Apple induced would constitute infringement, the District Court also should have granted Emblaze's motion for JMOL that Apple induced infringement of Emblaze's '473 patent.

41

Alternatively, if this Court does not reverse the District Court's denial of Emblaze's motion for JMOL on the issue of infringement, this Court should grant Emblaze a new trial because the jury's verdict of non-infringement is against the weight of the evidence, because the District Court erred in instructing the jury on Emblaze's burden to prove direct infringement of apparatus claims 28, 37 and 40, and that error prejudiced Emblaze, and because the District Court, over Emblaze's objection, allowed Apple to introduce into evidence Apple's Patents relating to Apple's HLS technology, and that evidence prejudiced Emblaze.

Finally, if this Court reverses the denial of Emblaze's motion for JMOL, the District Court's costs award (A00087-A00101) should be vacated and the case should be remanded.

## VII.  ARGUMENT

### A.    Standard of Review

#### 1.    JMOL

This Court "[r]eview[s] the denial of a motion for judgment as a matter of law de novo, applying the same standards as did the District Court in deciding whether the jury verdict must be reversed."  *Fleming v. Escort Inc.*, 774 F.3d 1371, 1375 (Fed. Cir. 2014).

This Court reviews the denial of post-trial motions under the regional circuit's procedural standards.  *See Apple Inc. v. Samsung Electronics Co., Ltd.*, Appeal Nos. 2014-1335, 2015-1029, 2015 U.S. App. LEXIS 8096, *6 (Fed. Cir. May 18, 2015).  "The Ninth Circuit reviews de novo a denial of a motion for judgment as a matter of law."  *Id*. (citations omitted).  "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Id*. (citations omitted). *See also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004) (citations omitted) ("JMOL is appropriate when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue'").

43

##    2.    Jury Instructions

"The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law and is reviewed de novo." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004).  "A jury verdict will be set aside, based on erroneous jury instructions, if the movant can establish that those instructions were legally erroneous, and that the errors had prejudicial effect."  *Id.* (internal quotations and citations omitted).  "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001)).  "In reviewing jury instructions, the full trial record and the jury instructions in their entirety must be examined because instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." *Id.* (internal quotations and citations omitted).

##    3.    New Trial

The Ninth Circuit reviews a denial of a motion for a new trial for an abuse of discretion.  *See Apple Inc. v. Samsung Electronics*, 2015 U.S. App. LEXIS 8096, *6 (citations omitted).  A motion for a new trial will be granted "if the verdict is

against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Id*. at *7 (citation omitted).

## B.    The Law of Infringement

### 1.    Direct Infringement

A patent infringement analysis is a two-step process.  First, the claims at issue are construed as a matter of law to determine their proper scope and meaning. *See ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012).  Second, the properly construed claims are compared to the accused product or process.  *See id.*.

To directly infringe a patent, the accused product or process must include every element recited in at least one claim of the patent.  *See, e.g. Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1215  (Fed. Cir. 2014).

### 2.    Indirect Infringement

A party that does not directly infringe a patent may still be liable for inducing infringement under 35 U.S.C. §§271(b), provided that someone is directly infringing.  *See RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1267 (Fed. Cir. 2003).  "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement."

*Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993); *Jansen v. Rexall*

*Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003) (defendant vendor accused of

indirect infringement based upon allegations that its customers directly infringed

plaintiff's patent).

### a.    Induced Infringement

35 U.S.C. §271(b) provides:

> Whoever actively induces infringement of a patent shall
> be liable as an infringer.

The Supreme Court has explained that "liability for inducing infringement

attaches only if the defendant knew of the patent and that the induced acts

constitute patent infringement." *Commil USA, LLC v. Cisco Systems, Inc.* No. 13-

896, 2015 U.S. LEXIS 3406, *17-*18  (U.S. May 26, 2015)(internal quotations

omitted); *see also Global-Tech Appliance, Inc. v SEB S.A.*, 131 S. Ct. 2060, 2068-

2071 (2011).

### C.    Emblaze Proved Direct Infringement

At trial, Emblaze's expert, Dr. Vijay Madisetti provided a limitation-by-

limitation analysis showing how the implementation of the Accused Streams

directly infringes the Asserted Claims.  More specifically, Dr. Madisetti testified

how implementation of the MLB at Bat stream directly infringed all four Asserted

Claims, and how implementation of each of the other Accused Streams directly infringed Asserted Claims 28, 37 and 40. *See, e.g.*, A00810-A00839; *see also* Section V(J) above.

> **a.** **Apple's Argument That Emblaze Failed to Prove Direct Infringement Was Based on Three Claim Limitations**

As explained above, at trial Apple argued that Emblaze failed to prove direct infringement because implementation of the Accused Streams lacked three limitations found in all Asserted Claims, namely, (1) "real-time broadcasting"; (2) "each slice having a predetermined data size associated therewith"; and (3) "upload[] the sequence [of files] to a server."  Because Apple did not argue that implementation of the Accused Streams lacked any other claim limitation, the jury could only have relied upon one or more of the above three limitations in reaching its general verdict that there was no direct infringement.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 846 (Fed. Cir. 2010) ("In conducting this review, we must presume the jury resolved underlying factual disputes in i4i's favor because the jury made no explicit factual findings"); *see also Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1108 (Fed. Cir. 2003) ("When a party has preserved its right to appeal the jury verdict by filing a valid JMOL motion on obviousness, we first review the underlying factual findings, whether explicitly

47

made by special verdict or presumed as necessary to support the jury verdict, to ascertain whether they are supported by substantial evidence").

As also noted above, of the three limitations that Apple argued were not met by implementation of the Accused Streams, the District Court's Order denying Emblaze's motion for JMOL relied on only one of them, *i.e.*, "real-time broadcasting."  A00007.

### i.     "real-time broadcasting"

Apple made two arguments for why implementation of the Accused Streams did not meet the "real-time broadcasting" limitation, *i.e.*, (1) the Accused Streams were not simultaneously received by all client devices, and (2) that the delay, or latency, between the live event and reception of the Accused Streams at the client devices exceeds the latency contemplated by "real-time broadcasting."

As explained above in Section V(J)(1), Apple's argument that "real-time broadcasting" requires simultaneous reception of the stream by the end users (*see, e.g.*, A00480-A00482; A01597-A01606; A02160-A02163) is contrary to the District Court's claim construction.  The District Court's claim construction requires "simultaneous transmission" of the stream, not simultaneous reception. A00023.  In its October 9, 2014 Claim Construction Order, the District Court

48

explained that "[t]he '473 patent thus discloses that the invention is principally directed toward providers of the data stream and not clients" (A00055), and that:

> Apple's quoted excerpt from the specification refers to simultaneous transmission, not simultaneous receipt. The adverb "simultaneously" in the passage modifies the verb "transmitted" rather than receipt by clients. Second, the background section of the '473 patent describes the prior art, not the invention. Without some indication in the background section that this statement also describes the patented invention, the court will not assume statements about the prior art apply to the claimed invention. Moreover, the fact that Apple fails to identify any other portions of the specification that imply that the invention as claimed requires simultaneous receipt of the data stream by clients strongly counsels against importing this limitation into the "real-time broadcasting" term. Accordingly, the court's construction requires simultaneous transmission of the data stream, but not simultaneous receipt.

A00034-A00035.

Simultaneous "transmission" concerns the upload of data, *i.e.*, the transmission of data from the transmitting computer to the server, not the downloading of information by client devices. Indeed, excepting for claim 28, the Asserted Claims do not include a limitation requiring that the data is actually downloaded by any client device. *See, e.g.*, A00200-A00201, claim 23 ("such that the one or more client computers **can download** the sequence") (emphasis added). *See also* A00055; A01700.

Accordingly, Apple's arguments at trial that "real-time broadcasting" requires simultaneous reception by end users (*see, e.g.*, A00480-A00482; A01597-A01606; A02160-A02163) find no support in the District Court's claim

49

construction, only served to mislead the jury, and could not have been the basis for a reasonable jury to find no infringement.

Regarding Apple's second argument, Apple's evidence showed that in the case of the Accused Streams, the delay from the live event to receipt of the live stream at the client devices was between 15 and 30 seconds.  A01538; A01595-A01596.  During the claim construction proceedings, both Emblaze and Apple proposed constructions for "real-time broadcasting" that addressed the duration of the delay from the occurrence of the live event to reception of the live stream by the client devices.  *See, e.g.*, A00011.  However, the District Court rejected both parties' proffered constructions and instead adopted a construction ("simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process") that does not address the delay between occurrence of a live event and receipt of the live stream by the client devices.  A00007; A00011.  For that reason alone no reasonable jury could have found that a delay of 15 to 30 seconds avoided the "real-time broadcasting" limitation.

Moreover, even if the District Court's construction of "real-time broadcasting" does somehow implicate the concept of latency, on the evidence presented no reasonable jury could have found that a delay of 15 to 30 seconds

50

avoids infringement.  In its decision on Emblaze's JMOL, the District Court found that:

> The jury's verdict of noninfringement is substantially supported by Apple's evidence - left undisputed by Emblaze - that the accused streams all embody by design a latency of at least 15 seconds.  A "reasonable jury could have found, relying on ample testimony from Apple's witnesses, that this amount of delay falls outside the scope of 'real-time broadcasting,' as construed by the court."

A00012.

First, the District Court's reasoning ignores that "real-time broadcasting" as recited in Asserted Claims 23, 37, and 40 ends at the server, not the client device.  And broadcasting from the transmitting computer to the server happens with practically no delay whatsoever.  *See* A00663-A00875; A00908-A00978; A00920.  For that reason alone, no reasonable jury could have found that that implementation of the Accused Streams does not meet the "real-time broadcasting" limitation of Asserted Claims 23, 37, and 40.

Second, although the District Court found that "[m]ultiple Apple witnesses explained HLS was purposely designed to *not* be a real time system so that the client's stream would not freeze any time the HLS system encountered a slowdown in the network or a different data rate"  (A00008),  no reasonable jury could have relied on that testimony to find that the "real-time broadcasting" limitation was not met because that observation is an exact description of the preferred

51

implementation of the invention of the '473 patent, which also introduces a "lag" or "delay" between a live event and receipt of the live stream at the client devices. A00197, 7:4-17; 8:1-9, 8:32-41; A00663-A00875; A00908-A00978; A00920. Any other conclusion would exclude from the scope of the Asserted Claims embodiments disclosed in the '473 patent as preferred, which this Court has repeatedly rejected. *See, e.g.*, *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification"); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007).

Indeed, despite Apple's decision to include latency in its HLS technology, Apple told the world that HLS allowed content providers to "[s]end [l]ive [s]treams." *See, e.g.*, A02434.

The evidence presented at trial could lead to only one reasonable conclusion, *i.e.*, that implementation of all of the Accused Streams met the "real-time broadcasting" limitation of the claims. Because no reasonable jury could have found otherwise, the jury's verdict finding no direct infringement cannot be sustained on that basis.

### ii.    "each slice having a predetermined data size associated therewith"

The District Court construed this limitation to mean "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided." *See, e.g.*, A00062-A00063.

Apple argued at trial that implementation of the Accused Streams did not meet this limitation because the slices in the Accused Streams did not all have the same data size and because the data size of the slices was not known in advance. *See, e.g.*, A00484-A00487; A02163-A02164; A01607-A01628.

However, nothing in the District Court's claim construction requires the data sizes of the slices to be uniform or known in advance, as the District Court acknowledged in its summary judgment order. A00072-A00074. Therefore, Apple's arguments to the jury as to why this limitation was not met by the implementation of the Accused Streams were contrary to the District Court's claim construction and, therefore, immaterial to the issue of infringement the jury was charged to decide. *See* Section V(J)(2) above.

Consistent with the District Court's claim construction, Emblaze demonstrated at trial that all of the Accused Streams are implemented by assigning in advance a time duration for the slices and, therefore, that the Accused Streams meet the "each slice having a predetermined data size associated therewith"

53

limitation. *See, e.g.*, A00607-A00608; A00616; A00652; A00663-A00839; A00963-A00978; A01681; A02106-A02107; A02295-A02296; A02299; A02303-A02305; A02332; A02336; A02368-A02376

Accordingly, based on the District Court's claim construction, the evidence at trial permitted only one reasonable conclusion, *i.e.*, that implementation of the Accused Streams meets the "each slice having a predetermined data size associated therewith" limitation. Because no reasonable jury could have found otherwise, the jury's verdict finding no direct infringement cannot be sustained on that basis.

### iii.    "upload[] the sequence [of files] to a server"

Under the District Court's construction, "uploading the sequence [of files] to a server" means "transmitting the files from the transmitting computer to the server," and the District Court's claim construction expressly recognized that the sequence can be downloaded from the server "over the network." A00023-A00025.

As explained above in Section V(J)(3), at trial Apple argued to the jury that for implementation of the Accused Streams to meet this limitation, client devices must download the sequence of files from the same server to which the sequence was uploaded from the transmitting computer. Here too, however, Apple's argument was contrary to the District Court's claim construction. The claims

themselves and the District Court's construction recognize that download of the sequence of files to the client devices will be performed "over the network," *e.g.*, a CDN. The claims simply do not require the files to be downloaded directly from the same server to which the files are initially uploaded from the transmitting computer. *See* A00200-A00201, claims 1 and 25 (from which the Asserted Claims depend); A00023-A00025; *see also* A02088; *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1353 (Fed. Cir. 2005) ("Basic patent law holds that a party may not avoid infringement of a patent claim using an open transitional phrase, such as comprising [which is used in the '473 patent claims], by adding additional elements"); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("[i]n the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements").

Moreover, at trial, Emblaze provided evidence that implementation of the Accused Streams *does* include "uploading" a sequence of files to a server and downloading those files to client devices from the same server. *See* A00616; A00652; A00663-A00875; A00908-A00978; A01663-A01664; A02272-A02273; A02301-A02302; A02377-A02385; A02386-A02422.

55

For either or both of these reasons, no reasonable juror could have found no direct infringement on the basis of Apple's "same server" argument, and the jury's verdict finding no direct infringement cannot be sustained on that basis.

Regarding this claim limitation, Apple made a second argument to the jury, namely, that for two Accused Streams implemented using Akamai's RTMP architecture, this limitation was not met because the RTMP core transforms the sequence of files to an intermediate file format, with the files then being converted to a different format before being downloaded to the client devices. *See, e.g.*, A02175-A021766. Once again, however, nothing in the District Court's claim construction precludes a change in file format when the streamed files are readied for downloading to client devices. Therefore, no reasonable jury could have found that implementation of the Accused Streams did not directly infringe based on Apple's "intermediate file format" argument, and the jury's non-infringement verdict cannot be sustained on that basis either.

### D.  Jury Instruction Concerning Infringement of Apparatus Claims 28, 37 and 40

Regarding apparatus claims 28, 37 and 40, the District Court instructed the jury that infringement required "a single third party [to have] put an infringing apparatus into service, that is, controlled the apparatus," but the District Court did

56

not explain the meaning of "controlled."  Emblaze objected to the District Court's

instruction:

> if you just use the word 'controls' in front of a jury, they're going to say, well, the guy who turns on the phone, he's not controlling the encoder over there, and I think it's confusing and misleading and I don't see how they possibly get to the right place under the law as it's been articulated here.
>
> . . .
>
> I agree it does talk about control, but 'control' has a lot of meanings, and control doesn't mean that the person who turns on the phone is somehow operating that equipment by himself.
>
> That's not what it means, and that's not what the case law says, and if you just use the word 'control' to a layman, that's what they're going to think.
>
> The court: All right. Your objection is noted.

A02014.

The District Court's instruction suggests that the end users (in the case of

claim 28) or the content providers (in the case of claims 37 and 40) must somehow

"control" the entire accused apparatus, when the law has no such requirement.

As this Court has explained:

> We hold that the on-demand operation is a "use" of the system as a matter of law.  The customer puts the system as a whole into service, *i.e.*, controls the system and obtains benefit from it.  The customer controls the system by creating a query and transmitting it to Qwest's back-end.  The customer controls the system on a one request/one response basis.  This query causes the back-end processing to act for its intended purpose to run a query and return a result.  The user may then download the result and perform additional processing as required by the claim.  If the user did not make the request, then the back-end processing would not be put into service.  By causing the system as a whole to perform this processing and obtaining the benefit of the result, the

57

> customer has "used" the system under § 271(a).  It makes no difference that the back-end processing is physically possessed by Qwest.  The customer is a single "user" of the system and because there is a single user, there is no need for the vicarious liability analysis from *BMC* or *Cross Medical.*

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1285 (Fed. Cir. 2011) (emphasis added); *see also Akamai Technologies, Inc. v. Limelight Networks, Inc.*, Appeal Nos. 2009-1372, -1380, -1416 and -1417, 2015 U.S. App. LEXIS 7856, *21 (Fed. Cir. May 13, 2015) ("whoever combines the last element of an apparatus necessarily, individually, "makes" the invention.  **Thus, in the case of an apparatus claim, there is always a single entity directly infringing the patent"** (emphasis added)).

At trial, Emblaze showed that implementation of the Accused Streams met all of the limitations of apparatus claims 28, 37 and 40 and, under this Court's precedent, that was sufficient to establish direct infringement of these claims.

Because this jury instruction was improper, if this Court remands for a new trial on the issue of direct infringement, this Court should correct that District Court's jury instruction to more accurately reflect the law.

58

### E.    This Court Should Enter Judgment That Implementation of the Accused Streams Directly Infringes Claims 23, 28, 37 and 40

Because when the evidence adduced at trial is viewed in a light most favorable to Apple, the only reasonable conclusion is that all of the Asserted Claims are directly infringed by the implementation of the Accused Streams, this Court should reverse the District Court's denial of Emblaze's motion for JMOL on the issue of direct infringement, vacate the judgment entered by the District Court (A00022), and enter a judgment finding that implementation of the Accused Streams directly infringes Asserted Claims 23, 28, 37 and 40.

### F.    Emblaze Established That Apple Induced Infringement

Although the jury did not reach the issue of whether Apple was liable for induced infringement, because there was no "legally sufficient evidentiary basis to find for [Apple] on that issue," Emblaze respectfully requests that this Court enter judgment that Apple induced infringement of the '473 patent.  Fed. R. Civ. P. 50(a).

In *Shum v. Intel Corp.*, this Court explained:

> Judgment as a matter of law is proper "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a).  The court may "grant a motion for judgment as a matter of law against the

59

> party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." *Id.* A jury's inability to reach a verdict does not necessarily preclude a judgment as a matter of law. *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000). The question is "'whether the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion.'" *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).

*Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010).

The Supreme Court recently explained that "liability for inducing infringement attaches only if the defendant knew of the patent and that the induced acts constitute patent infringement." *Commil USA,* 2015 U.S. LEXIS 3406, *17-*18. (internal quotations omitted).

### a. Apple Was Aware of the '473 Patent and That the Acts it Induced Constituted Patent Infringement

On October 29, 2009, Emblaze sent Apple a cease and desist letter advising Apple that it was infringing the '473 patent. As of that date, Apple was aware of the '473 patent and had been informed that the conduct it was inducing constituted infringement. *See* A00523-A00524; A01268; A02423-A02425.

"Evidence of 'active steps . . . taken to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *DSU Med. Corp.*

*v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (quoting *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005).

Here, Emblaze established at trial that Apple took affirmative steps to encourage direct infringement of the '473 patent. Dr. Madisetti showed at trial how "Apple has encouraged third parties to practice all [of] the limitations of the [A]sserted [C]laims by distributing literature, such as the Apple Overview and the [IETF] specification," that "described how to implement an HLS compliant system," how Apple sold "devices that can play these multimedia live sequences using the HLS standard," and how Apple "worked with content providers, such as MLB, and discussed technology with them and how to implement the system to work out the problems." A00848. *See also* A00607-A00608; A00663-A00839; A00848; A02334-A02335; A02377-A2422; A02426-A02463. Apple rebutted none of this evidence.

For example, the evidence at trial showed that Apple's Overview was distributed to app developers, content providers, and others to educate them regarding how to implement HLS streams compatible with Apple's devices. *See, e.g.*, A00607-A00608; A00611-A00612; A01504; A02360-A02361; A02426-A02463; A02464. The Overview expressly directs readers to follow steps that, if

implemented, result in direct infringement of the '473 patent. *See, e.g.*, A00611-A00612; A01510-A01511, A01517-A01520; A02426-A02463; A02470-A02483.

And the evidence at trial showed that implementation of all of the Accused Streams followed Apple's guidance. *See, e.g.*, A00712-A00751, A00754-A00839.

Also, Apple's witnesses acknowledged that they met directly with content providers to discuss implementation of their streams to comply with Apple's HLS protocol such that the streams could be played on Apple's devices (*see, e.g.*, A00607-A00608; A02334-A02335),  and documents produced by Apple and introduced at trial confirmed those meetings. *See, e.g.*, A02485-A02486; A02487-A02489; A02490-A02492.

The evidence adduced at trial, even when viewed in a light most favorable to Apple, allowed the jury only one reasonable conclusion, *i.e.,* that on and after October 29, 2009, Apple was aware of the '473 patent and knew that the conduct it was inducing constituted infringement of the '473 patent.

> **b.    Circumstantial Evidence Established that Apple Knew that it was Inducing Direct Infringement of Emblaze's Patent**

This Court has explained that inducement of infringement can be established by circumstantial evidence, and that a defendant's failure to produce an opinion of counsel is a relevant consideration:

> While inducement "requires more than just intent to cause the acts that produce direct infringement," and also requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement," *DSU*, 471 F.3d at 1306, this intent may be established through circumstantial evidence, *see Id.* Moreover, "[t]he requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988). . . . Because opinion-of-counsel evidence, along with other factors, may reflect whether the accused infringer "knew or should have known" that its actions would cause another to directly infringe, we hold that such evidence remains relevant to the second prong of the intent analysis. Moreover, we disagree with Qualcomm's argument and further hold that the failure to procure such an opinion may be probative of intent in this context.

*Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008). *See also Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1366 (Fed. Cir. 2013), *rev'd on other grounds*, *Commil USA,* 2015 U.S. LEXIS 3406 ("Circumstantial evidence can, of course, support a finding of actual knowledge or willful blindness just as it did in *Global-Tech*").

In an effort to establish that it lacked knowledge that the acts it was inducing infringed Emblaze's patent, at trial Apple proffered two Apple employees (neither of whom is an attorney) who testified that they did not believe Apple was infringing the '473 patent, and that they had no intent to infringe the '473 Patent. *See* A01359; A01499. However, on cross examination, both Apple witnesses admitted that they had never even read the '473 patent. *See* A01360; A01500.

Moreover, Apple did not introduce at trial an opinion of counsel that Apple did not induce infringement of the '473 Patent.

Here too, the evidence introduced at trial, even when viewed in a light most favorable to Apple, admits of only one reasonable conclusion, *i.e.*, that Apple induced infringement of Emblaze's patent. Therefore, this Court should grant Emblaze's motion for JMOL on this issue.

### G.    In The Alternative, Emblaze Is Entitled To A New Trial

Grounds for a new trial under Fed. R. Civ. P. 59 include, but are not limited to, instances where "the verdict is against the weight of the evidence . . . or [] for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation omitted). *See also Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004), citing *Murphy v. Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("A trial court should grant a motion for a new trial if (1) the jury instructions were erroneous or inadequate, (2) the court made incorrect and prejudicial admissibility rulings, or (3) the verdict is contrary to the great weight of the evidence"); *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) (finding that the cumulative prejudice from multiple errors may warrant a new trial).

64

For the reasons explained above, Emblaze, in the alternative, is entitled to a new trial because the jury's verdict was against the great weight of the evidence and/or because the jury reached a seriously erroneous result. *See Apple Inc. v. Samsung Electronics,* 2015 U.S. App. LEXIS 9096, *7.

In addition, Emblaze is entitled to a new trial because the District Court erroneously allowed Apple to introduce its own patents in evidence at trial. *See* A01143.

Regional circuit law governs this Court's review of a denial of a motion for a new trial based on evidentiary rulings. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1372 (Fed. Cir. 2008). In the Ninth Circuit, when "the erroneous admission of evidence actually prejudiced the defendant, such that the error was not harmless, the appropriate remedy is a new trial." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014).

The introduction of the Apple Patents at trial unfairly prejudiced Emblaze, as it permitted the inference that Apple had the right to practice HLS technology that infringes Emblaze's '473 patent. Although the District Court was wrong to admit this evidence, it said that:

> Apple was allowed to use its patents to demonstrate the differences between Emblaze's asserted claims and the accused HLS streams. By requiring a named inventor on the Apple patents to testify about the Apple patents, **the court ensured that discussion of Apple's patents focused on the subjects to which Apple's patents were**

> **relevant: the differences between the asserted claims and Apple's accused technology.**

A00015 (emphasis added).

At trial, however, Apple did not introduce any testimony or other evidence tying the Apple Patents to differences between the Asserted Claims and Apple's accused technology.

As this Court has long held, "it is well-established that the existence of one's own patent does not constitute a defense to infringement of someone else's patent." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 879 n.4 (Fed. Cir. 1991).

For this additional reason, alone or together with the other bases asserted by Emblaze, this Court should, in the alternative to the other relief requested herein, grant Emblaze a new trial on the issue of infringement.

## H.    The District Court's Costs Award Should be Vacated

If this Court reverses or vacates the District Court's judgment finding no infringement of the Asserted Claims, then Apple will no longer be a prevailing party and the District Court's costs award (A00087-A00101) should be vacated.

## VIII.  CONCLUSION

For the reasons stated herein, Emblaze requests that this Court reverse the District Court's denial of Emblaze's motion for JMOL on the issues of direct infringement and induced infringement and enter judgment in favor of Emblaze finding that implementation of the Accused Streams directly infringed the Asserted Claim and that Apple induced that infringement, or, in the alternative, grant Emblaze's motion for a new trial on the issue of infringement.  Should this Court reverse the District Court's denial of Emblaze's motion for JMOL on the issue of infringement, Emblaze further requests that this Court vacate the District Court's costs award and remand the case for further proceedings.

## IX.    STATEMENT OF ORAL ARGUMENT

Oral argument is respectfully requested.


                                        Respectfully submitted,

Dated: May 28, 2015                     */s/ Martin B. Pavane*
                                        Martin B. Pavane
                                        Lisa A. Ferrari
                                        COZEN O'CONNOR
                                        277 Park Avenue
                                        New York, NY 10172
                                        (212) 883-4900

                                        *Attorneys for Plaintiff-Appellant Emblaze Ltd.*

# ADDENDUM

# ADDENDUM
# TO BRIEF FOR PLAINTIFF-APPELLANT EMBLAZE LTD.

## APPEAL NOS. 2014-1734, 2015-1400, 2015-1557

| Appendix Number | Docket No. | Document |
|---|---|---|
| A00001 – A00016 | 667 | Order Denying Motions for Judgment as a Matter of Law and for New Trial |
| A00017 – A00021 | 609 | Verdict |
| A00022 | 610 | Judgment in a Civil Case |
| A00023 – A00025 | 169 | Claim Construction Order |
| A00026 – A00056 | 653 | Claim Construction Order (Re: Docket No. 169) |
| A00057 | 214 | Civil Minute Order July 2, 2013 |
| A00058 – A00086 | 424 | Order Re: Apple's Motion for Summary Judgment and Emblaze's Motion for Leave to Amend its Infringement Contentions (Re: Docket Nos. 343,346,348,350 and 401) |
| A00087 – A00101 | 677 | Order Granting-In-Part Motions Seeking Review of Clerk's Taxation of Costs (Re: Docket Nos. 657, 658) |
| A00182 – A00202 |  | U.S. Patent No. 6,389,473 |

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., | ) Case No. 5:11-cv-01079-PSG |
| | ) |
| Plaintiff, | ) **ORDER DENYING MOTIONS FOR** |
| v. | ) **JUDGMENT AS A MATTER OF LAW** |
| | ) **AND FOR NEW TRIAL** |
| APPLE INC., | ) |
| | ) **(Re: Docket Nos. 630, 631)** |
| Defendant. | ) |
| | ) |
| | ) |

Mention HTTP Live Streaming to most people, even in Cupertino, and you are likely to get a blank stare. Mention watching live sports or other events on an iPhone or iPad, and you might at least see their eyes begin to blink. By breaking down a content stream into a series of chunks comprising HTTP-based files, HLS permits the stream to adjust to varying bandwidths and data rates. Convinced that HLS infringed its patent, Plaintiff Emblaze Ltd. filed suit against Defendant Apple Inc. A jury of nine rejected Emblaze's infringement claim, even as it rejected Apple's counterclaim that the patent is invalid.

Before the court is Emblaze's motion for judgment as a matter of law, or, in the alternative, for a new trial.[1] Apple also conditionally moves for judgment as a matter of law.[2] Apple states that "[i]f the Court does not disturb the jury's verdict and the Court's judgment . . . , then Apple

---

[1] *See* Docket No. 631.

[2] *See* Docket No. 630.

1

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

A00001

does not request judgment as a matter of law and/or a new trial on invalidity."[3]  After considering

the parties' arguments, the court DENIES Emblaze's motion.  Because the court denies Emblaze's

motion, Apple's motion is DENIED as moot.

## I.

Emblaze is an Israeli corporation dedicated to the "development and marketing of

innovative high-tech technologies and products."[4]  Apple is a California-based corporation that,

among other things, markets phones, tablets and computers that incorporate "HTTP Live Streaming

technology" capable of "real-time" broadcasting.[5]  In this patent infringement suit, Emblaze alleges

that Apple infringes U.S. Patent No. 6,389,473.

The '473 patent claims methods and apparatuses that allow "transmission of live audio and

video to multiple devices" without requiring "devoted streaming servers" and permitting

adjustment to "different bandwidths" where necessary.[6]  As the abstract of the '473 patent puts it,

the invention disclosed is:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, including providing at the transmitting computer a data stream having a given data rate, and dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith.  The slices are encoded in a corresponding sequence of files, each file having a respective index, and the sequence is uploaded to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Independent Claim 1 of the '473 patent is representative:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:
>     providing at the transmitting computer a data stream having a given data rate;
>     dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;
>     encoding the slices in a corresponding sequence of files, each file having a respective index; and
>     uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence

---

[3] *Id.* at 1.

[4] Docket No. 143 at ¶ 1.

[5] *Id.* at ¶ 11.

[6] *See* Docket No. 143 at ¶ 9.

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
TRIAL

**A00002**

1    over the network from the server at a download rate generally equal to the data
     rate.[7]

2          Emblaze claims that Apple's HTTP Live Streaming, which Apple introduced into its

3    products around 2009,[8] infringes asserted '473 patent claims 23, 28, 37 and 40.

4          Not long after, Emblaze filed a complaint in the Southern District of New York.[9]  Several

5    months later, the case was transferred to this district.[10]  After the parties initially declined to

6    consent to magistrate judge jurisdiction, the case was assigned to Judge Armstrong.[11]  Emblaze

7    thereafter sought leave to amend its complaint to:

8    (1) amend the list of claims of the '473 Patent that are asserted by Emblaze so as to conform
         the allegations to what Emblaze has asserted in its Infringement Contentions;

9    (2) amend the products that Emblaze is accusing of infringement so as to conform the
         allegations of the Complaint to what Emblaze has learned in its ongoing investigation and
10       from discovery thus far;

11   (3) remove certain allegations concerning Apple's presence in the Southern District of
         New York (no longer relevant now that the action has been transferred to the Northern
12       District of California);

13   (4) update the firm affiliation of counsel for Emblaze and the change of venue from the
         Southern District of New York to the Northern District of California; and

14   (5) make minor editing changes to the text.[12]

15   After Apple filed a statement of non-opposition, Judge Armstrong granted Emblaze's motion for

16   leave to amend the complaint.  Apple then moved to dismiss the amended complaint pursuant to

17   Fed. R. Civ. P. 12(b)(6).  Judge Armstrong dismissed Emblaze's indirect infringement claims with

18   leave to amend, but denied Apple's related request to dismiss Emblaze's direct infringement or

19

20

21

22   ───────────────
     [7] *See* Docket No. 143-1 at 14:18-32.

23   [8] Docket No. 143 at ¶ 12.

24   [9] *See* Docket No. 1.

25   [10] *See* Docket No. 24.

26   [11] *See* Docket No. 31.

27   [12] Docket No. 75 at 2-3 (verb tenses modified).

28
                                        3
     Case No. 5:11-cv-01079-PSG
     ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
     TRIAL

United States District Court
For the Northern District of California

1    willfulness claims.[13]  Emblaze responded with a second amended complaint claiming direct,

2    induced, contributory and willful infringement.[14]

3        Pursuant to the parties' stipulation, the case was reassigned to the undersigned.[15]  Following

4    this latest reassignment and a tutorial and hearing, the court construed the disputed claim terms.[16]

5    A few months later, Apple moved the court to reconsider or clarify its prior construction that the

6    term "each slice having a predetermined data size associated therewith" means "each slice having a

7    data size, which may be a time duration, assigned in advance of the stream being divided."[17]  The

8    court agreed that reconsideration was warranted and construed the term as meaning "each slice

9    having a data size, which may be established by setting a time duration of the slice, assigned in

10   advance of the stream being divided."[18]

11       Apple next moved for leave to amend its invalidity contentions,[19] which the court granted.[20]

12   Pursuant to another stipulation between the parties, the court held that it would consider Emblaze's

13   revised patent disclosures to be its operative patent disclosures.[21]  Needless to say, the court also

14   resolved a variety of discovery disputes.[22]

15       As the case turned toward dispositive motion practice, the court denied Apple's motion to

16   stay in light of the Supreme Court's decision to grant certiorari in *Akamai v. Limelight Networks*.[23]

17   [13] *See* Docket No. 137.

18   [14] *See* Docket No. 143.

19   [15] *See* Docket No. 150.

20   [16] *See* Docket No. 169.  The court later explained the details of its reasoning. *See* Docket No. 653.

21   [17] *See* Docket No. 207.

22   [18] Docket No. 214 at 1.

23   [19] Docket No. 216.

24   [20] *See* Docket No. 248.

25   [21] *See* Docket No. 300.

26   [22] *See, e.g.,* Docket No. 294.

27   [23] *See* Docket No. 361; *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301
     (Fed. Cir. 2012) *cert. granted*, 134 S. Ct. 895 (2014).
28
                                          4
     Case No. 5:11-cv-01079-PSG
     ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
     TRIAL

The court also held that although portions of Emblaze expert Vijay Madisetti's report would not be struck, Emblaze was precluded from introducing later-model accused products in its report that were not disclosed in Emblaze's original or revised infringement contentions.[24]

Apple next filed four summary judgment motions. After a hearing, the court granted Apple's motion for summary judgment of no willful infringement, granted-in-part Apple's motion for summary judgment of non-infringement as to all accused streams, denied Apple's motion for summary judgment of non-infringement of specific content providers and denied Apple's motion for summary judgment of invalidity.[25] In granting-in-part Apple's motion for summary judgment of non-infringement as to all accused streams, the court was obligated to construe the term "upload rate."[26] The court found that "'upload rate' in the context of the '473 patent should be read to include wait time between the transmission of files within a sequence."[27]

Following the Supreme Court's decision in *Akamai*, the court permitted Apple to file a motion for summary judgment of non-infringement as to Emblaze's asserted method claims.[28] The court granted it in-part.[29]

The parties then filed their pre-trial motions, including three *Daubert* motions. After a pre-trial conference, the court granted-in-part Apple's two *Daubert* motions and denied Emblaze's.[30] The case proceeded to trial; a nine-person jury returned a verdict finding that none of Apple's accused products infringed the '473 patent.[31] The parties now bring their post-trial motions.

---

[24] *See* Docket No. 394.

[25] *See* Docket No. 424.

[26] *See id.* at 11-14.

[27] *Id.* at 14.

[28] *See* Docket No. 468.

[29] *See* Docket No. 520.

[30] *See* Docket Nos. 519, 544.

[31] *See* Docket No. 609.

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

United States District Court
For the Northern District of California

**II.**

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.  The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

**III.**

Fed. R. Civ. P. 50(b) provides that, upon a renewed motion for judgment as a matter of law, the court may: (1) "allow judgment on the verdict, if the jury returned a verdict," (2) "order a new trial" or (3) "direct the entry of judgment as a matter of law."  To grant a Rule 50(b) motion, the court must determine that "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's."[32]  In other words, to set aside the verdict, there must be an absence of "substantial evidence"—meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion"—to support the jury's verdict.[33]  "Substantial evidence is more than a mere" scintilla;[34] it constitutes "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."[35]  In reviewing a motion for judgment as a matter of law, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."[36]  "In ruling on such a

---

[32] *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)) ("The Ninth Circuit upholds any jury verdict supported by substantial evidence.").

[33] *Id.*

[34] *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[35] *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

[36] *Transbay Auto Serv., Inc. v. Chevron U.S.A., Inc.*, Case No. 09-cv-04932, 2013 WL 496098, at *2 (N.D. Cal. Feb. 7, 2013) (quoting *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006) ("We must view the evidence in the light most favorable to the nonmoving party—here, Josephs,— and draw all reasonable inferences in that party's favor.")).

1  motion, the trial court may not weigh the evidence or assess the credibility of witnesses in

2  determining whether substantial evidence exists to support the verdict."[37]

3       Emblaze moves for judgment as a matter of law that the accused streams infringe the '473

4  patent.  Apple's noninfringement position at trial focused on three claim terms: (1) "each slice

5  having a predetermined data size associated therewith," (2) "real-time broadcasting" and

6  (3) "uploading the sequence to the server . . . such that one or more client computers can download

7  the sequence over the network from the server."  Because Apple's noninfringement evidence on

8  the "real-time broadcasting" limitation is sufficient to support the jury verdict, the court need only

9  address that limitation.

10      The court construed "real-time broadcasting" to mean "simultaneous transmission of data to

11  one or more clients matching the human perception of time or proceeding at the same rate as a

12  physical or external process."  At trial, Apple argued that the accused streams do not meet this

13  limitation because Apple's HLS technology includes a built-in delay from the time of the live event

14  to the time a client views the event.  In the art, this delay is referred to as "latency."  According to

15  Apple, the court's construction allows for some latency, but not the amount of latency used in

16  HLS.

17      Apple presented substantial evidence at trial to establish that HLS is designed to include

18  significant latency.  For example, Apple's HLS overview document reveals that HLS is not "a real-

19  time delivery system," as "[i]t has inherent latency corresponding to the size and duration of the

20  media files containing stream segments. . . . Typical latency with recommended settings is in the

21  neighborhood of 30 seconds."[38]  Dr. Polish, Apple's technical expert, observed that Apple's HLS

22  system exhibited between 15 and 30 seconds of latency so that it could deal with network

23  problems: "HLS collects I believe it's two or three buffersworth [sic], or segments worth of data in

24  the client before it plays.  So that adds, depending upon how large those segments are, between 15

---

[37] *Id.* (citing *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984)
("Neither the district court nor this court may weigh the evidence or order a result it finds more
reasonable if substantial evidence supports the jury verdict.")).

[38] Docket No. 628-11 at PTX 23.35.

7

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
TRIAL

United States District Court
For the Northern District of California

and 30 seconds worth of latency, and that gives them the ability to handle certain glitches in the network, and it gives them the ability to switch streams between different rates without getting a noticeable delay."[39] Dr. Polish also performed testing which demonstrated delays of 28 and 42 seconds between the video feed and the client's viewing of the video.[40]

Multiple Apple witnesses explained HLS was purposely designed to *not* be a real time system so that the client's stream would not freeze any time the HLS system encountered a slowdown in the network or a different data rate. William May, a software engineer at Apple, stated that "[t]here's a whole bunch of latency that gets introduced in HLS."[41] Specifically, "[t]here's latency that's built into the HLS system to allow the . . . data to flow through the Internet. So usually around three segments, which is usually between 15 and 30 seconds."[42] Mr. May further disclosed that the introduction of latency was an intentional design decision made by Apple.[43]

Returning to Apple's HLS overview document and Dr. Polish, Dr. Polish testified that the HLS overview document demonstrates that "Apple has deliberately added latency for the purpose of making it possible to switch data rates smoothly. So [the HLS overview document] is talking about how they've added latency to ensure seamless transition between segments, particularly

United States District Court
For the Northern District of California

---

[39] Docket No. 636-3 at 1383:25-1384:6.

[40] *Id*. at 1389:2-1395:3; *see also id.* at 1383:20-23 (Q. "And in your analysis of HLS, and in particular the seven accused streams, did you see latency in its design that prevents it from being real time? A. Yes, I did.").

[41] *Id*. at 1326:1-2.

[42] *Id*. at 1326:6-9; *see also id.* at 1382:24-1383:10 (explaining that latency built into HLS is desirable because it allows for seamless switching between data rates).

[43] *See id*. at 1326:10-12; *see also id.* at 1143:23-1145:6.

8

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

1    when you're changing data rates."[44]  In fact, according to David Biderman, an engineering

2    manager at Apple, Apple developers "called it near-real-time streaming."[45]

3         Several Apple witnesses also compared HLS to the streaming technology used in Apple's

4    FaceTime product, which is used for video calling.  Roger Pantos, a software engineer at Apple,

5    described the difference between HLS and FaceTime well:

6         [I]n real time—what we view as a real time delivery system, you heard the
          fellow from Akamai talking about the hand wave test, which is that you wave
7         a hand on camera and you start your stopwatch and you wait until you see—
          somebody sees it on the iPad.
8
          We at Apple feel that the hand wave test on a real time system is measured in
9         hundreds of milliseconds, or tens of milliseconds, much less than a second.

10        We feel that FaceTime, that audio-visual conference, video conference thing
          that Mr. Fowler talked about before, is an example of a real time system.  It's
11        something where you can sort of converse back and forth and you don't feel a
          perceptible lag.
12
          We wanted to make very clear, with HLS, that we had made deliberate
13        decisions, we had made deliberate tradeoffs such that HLS could not be used
          in that way.  It would have been nice if you, you know, could be all things to
14        all people.

15        But in our view, the requirements for scaling HLS to a hundred thousand, a
          million simultaneous viewers made those kinds of subsecond latencies
16        prohibitively difficult for sort of all the parties involved.

17        So we backed off from that and we said, we're not going to represent this as
          being real time.  Understand that there are going to be lags . . . of up to 30
18        seconds, and that was a deliberate choice that we made.[46]

19    Through questioning by Apple's attorney, Mr. Biderman expounded on why Apple never

20    considered using HLS technology to implement FaceTime:

21        Q. Does Apple use HLS for FaceTime?

22        A. No. We—it would not work for FaceTime.

23    ─────────────────────
      [44] *Id.* at 1382:12-16; *see also id.* at 1384:16-24 ("And I've had a lot of experience with real time
24    systems, and real time is not about a set amount of latency. It's really about the design.  You can
      design systems that are real time that can meet certain specific deadlines, and that's part of the
25    design.  HLS is not designed in any way to meet particular deadlines.  It simply has latency in there
      to enable scaling and to enable smooth switching.  It's not designed as a real time system.").
26
      [45] *Id.* at 1132:11-1133:2.
27
      [46] *Id.* at 1257:8-1258:7.
28
                                                9
      Case No. 5:11-cv-01079-PSG
      ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
      TRIAL

United States District Court
For the Northern District of California

Q. Why not?

A. I mentioned earlier that HLS has this inherent delay built into it, and that's so that it can scale to many, many users. But because of that delay, you couldn't have a real time interaction with someone. So, like, FaceTime where there's someone on the other end of the connection and you're talking and conversing with them, you couldn't ever do that with HLS. It wouldn't work.

. . .

Q. Was there some discussion about using HLS for FaceTime?

A. No, that wasn't a consideration.

Q. Why?

A. Because of this inherent delay that would make it very hard to have a back and forth real time conversation with someone.[47]

Therefore, Apple presented substantial testimony that Apple intentionally designed HLS to have significant built-in latency, such that the accused streams do not practice the "real-time broadcasting" limitation, as construed by the court.

In response, Emblaze cites to testimony from Joseph Inzerillo, the Senior Vice President of Multimedia and Distribution at MLB Advanced Media. In a portion of Mr. Inzerillo's video deposition, which was played at trial, Mr. Inzerillo was asked, "[w]ould you consider HLS to be a realtime system?" Mr. Inzerillo answered: "I would. I would consider it to be realtime in the sense of, if you don't have a completely external frame of reference, then it's live to you, is sort of the way it is. I think over time, the reason I would still consider it realtime is that the people, the customer, the public has a whole different concept of time than they used to."[48] However, Mr. Inzerillo also testified that HLS "is definitely not a low latency system."[49] In addition, when Mr. Inzerillo was asked to compare HLS to a real time videoconferencing system, Mr. Inzerillo testified: "Using video conferencing as the barometer as to the concept of realtime, there's no way HLS is realtime in that construct."[50] Thus, Mr. Inzerillo's testimony provides some support for

---

[47] *Id*. at 1142:18-1143:22.

[48] Docket No. 631-3 at 409:19-20; 443:6-7 (during which Docket No. 631-5 at 263:17-264:1 was played).

[49] *Id*. (during which Docket No. 636-4 at 263:13-16 was played).

[50] *Id*. (during which Docket No. 636-4 at 270:25-271:6 was played).

10

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

1    both Emblaze and Apple.  As such, it hardly begins to refute the voluminous evidence Apple

2    presented indicating that Apple's HLS technology is not "real time."

3         Emblaze's only other argument on the "real-time broadcasting" limitation is that "[t]he

4    Court's construction of 'real-time broadcasting' to mean 'simultaneous transmission of data to one

5    or more clients matching the human perception of time or proceeding at the same rate as a physical

6    or external process' allows for a lag time between the live occurrence of the streamed event and

7    receipt of the stream by the end user."[51]  On this point, Emblaze is right—the court's construction

8    does allow "for a lag time between the live occurrence of the streamed event and receipt of the

9    stream by the end user."[52]  However, just because the '473 patent claims encompass streams with

10   some latency does not mean that streams with an endless amount of lag are within the scope of the

11   claims.  Rather, whether an accused stream practices the "real-time broadcasting" limitation is a

12   question of degree—is latency sufficiently minimal such that the "simultaneous transmission of

13   data to one or more clients match[es] the human perception of time or proceed[s] at the same rate

14   as a physical or external process?"

15        Significantly, Emblaze agreed with Apple at claim construction that the claims cover some,

16   but not much, delay.  The parties merely disagreed over how to express that concept.  Emblaze

17   proposed that the court construe "real-time broadcasting" as requiring that the stream is received by

18   clients "without substantial delay after the broadcast."[53]  Apple suggested that "real-time

19   broadcasting" means that the stream is received by clients "simultaneously with minimal delay."[54]

20   While the court ultimately found both parties' proposals unsupported by the intrinsic and extrinsic

21   evidence, the court's construction did not omit any limit on the amount of permissible delay.

22   Indeed, the court construed the "real-time broadcasting" transmission as "matching the human

23   perception of time or proceeding at the same rate as a physical or external process."

---

[51] Docket No. 642 at 6 (citation omitted).

[52] Id.

[53] See Docket No. 563 at 9.

[54] Id.

11

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
TRIAL

United States District Court
For the Northern District of California

1    Taking another look at the '473 patent's specification confirms that "real-time

2  broadcasting" includes—at most—a small amount of lag.  For example, the '473 patent discloses

3  that the clients "start receiving the data stream substantially in real time, preferably with only a

4  minimal lag, as it is transmitted from computer 34."[55]  The specification also explains that "[t]ime

5  stamps in the data stream are used to synchronize the data, so that the multimedia sequence is

6  played back just as it was input at computer 34, preferably with only a minimal necessary

7  transmission and decoding delay."[56]  Thus, the specification—just like the parties—contemplates

8  that some delay is allowed, but that too much delay, however defined, takes an accused stream

9  outside the scope of the invention.

10    In sum, both parties' proposed constructions presented the latency issue as a factual

11  question of degree to be resolved by a jury.  Now that a jury has found in favor of Apple, Emblaze

12  argues for the first time that the court's construction allows for some unstated, large amount of

13  delay.  But that was neither party's position at claim construction, nor the court's understanding

14  throughout this case.  The court therefore reaffirms that "real-time broadcasting" means

15  "simultaneous transmission of data to one or more clients matching the human perception of time

16  or proceeding at the same rate as a physical or external process," which allows for some, but not

17  limitless, delay.  The jury's verdict of noninfringement is substantially supported by Apple's

18  evidence—left undisputed by Emblaze—that the accused streams all embody by design a latency

19  of at least 15 seconds.  A reasonable jury could have found, relying on ample testimony from

20  Apple's witnesses, that this amount of delay falls outside the scope of "real-time broadcasting," as

21  construed by the court.

**IV.**

23    Fed. R. Civ. P. 59 states that the court "may, on motion, grant a new trial on all or some of

24  the issues."  The "trial court may grant a new trial, even though the verdict is supported by

25  substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon

---

[55] Docket No. 1-1 at 8:4-7.

[56] *Id.* at 10:49-54.

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
TRIAL

United States District Court
For the Northern District of California

1    evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of

2    justice.'"[57]

3         Emblaze argues for a new trial on two grounds.  Neither is persuasive.

4         *First*, Emblaze asserts that juror number 8, who was the jury foreperson, was biased against

5    Emblaze.  Emblaze's theory goes like this: Juror number 8 is a finance manager at Aruba

6    Networks, Inc.  At Aruba, juror number 8's duties include collecting financial data for patent cases

7    in which Aruba is a defendant.  Aruba is a co-defendant with Apple in *Linex Technologies, Inc. v.*

8    *Hewlett-Packard Co., et al.*, No. 13-cv-159 CW, a case unrelated to the instant case.  Because juror

9    number 8 collects patent-related financial data in his job at Aruba, "juror number 8 was

10   undoubtedly involved in the *Linex* case in which Apple was a co-defendant with his employer."[58]

11   Juror number 8 thus should have answered affirmatively when asked by the court during *voir dire*

12   whether he was familiar with "the lawyers, the parties, or [the judge]."[59]  Because juror number 8

13   did not answer affirmatively to this question, he improperly withheld information during *voir dire*.

14   *Ergo*, juror number 8 was biased in favor of Apple.  Also, Apple's in-house counsel present at trial

15   should have known about this and notified the court of the situation.[60]

16        The legal standard for demonstrating implied juror bias in the Ninth Circuit—which is

17   absent from Emblaze's opening brief—requires that "the relationship between a prospective juror

18   and some aspect of the litigation is such that it is highly unlikely that the average person could

19   remain impartial in his deliberations under the circumstances."[61]  Examples of implied juror bias

20   include being personally involved in a situation involving a similar fact pattern, or being employed

21

22   _____

     [57] *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010)

23   (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

24   [58] Docket No. 631 at 23.

25   [59] Docket No. 631-3 at 21:22-23.

26   [60] *See* Docket No. 631 at 23.

27   [61] *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (quoting *Tinsley v. Borg*, 895 F.2d

     520, 527 (9th Cir. 1990)).

28
                                        13
     Case No. 5:11-cv-01079-PSG
     ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
     TRIAL

**A00013**

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    by one of the parties.[62]   The facts here—where a juror is employed by a co-defendant of one of the

2    parties in an unrelated case and where the juror's job duties include collecting patent-related

3    financial data—provide no indication that juror number 8 may have been biased.  Critically,

4    Emblaze, knowing juror number 8's occupation, asked no questions directed to juror number 8.

5           Emblaze also selectively quotes the court's question regarding jurors' familiarity with "the

6    lawyers, the parties, or [the judge]."  After introducing the individual lawyers and representatives

7    of the parties, the court asked: "Having been introduced to the lawyers and to the parties, having

8    been introduced to me, does anybody know any of those individuals?  Either personally,

9    professionally, or otherwise?  Does anybody know the lawyers, the parties, or me?  If so, please

10   hold your card up.  Anyone?  Okay.  Good."[63]   Rather than inquire as to whether any of the jurors

11   knew of Apple—a question that would likely have been answered affirmatively by nearly

12   everyone—the court asked whether any of the jurors knew any of the individuals who had just been

13   introduced in the courtroom.  All prospective jurors answered no.  There was nothing untoward in

14   any of this.

15          ***Second***, Emblaze contends that it is entitled to a new trial because the court erred in

16   admitting evidence of Apple's patents covering the accused HLS technology.  When this issue

17   arose, the court requested that the parties brief whether Apple's patents covering HLS technology

18   should be admitted as evidence.  After the court considered the parties' briefs[64] and heard oral

19   argument,[65] the court ruled that "the right way to balance [Federal Rule of Evidence] 401 and Rule

20   403" was to admit an Apple patent only if a named inventor testified about the patent and only if

21   the patent issued over the asserted Emblaze patent.[66]   In addition, the court instructed the jury on

22   the issue: "You may have heard evidence that Apple has its own patents.  However, ownership of

23   _____

[62] *See Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997).

[63] Docket No. 631-3 at 21:19-24.

[64] *See* Docket Nos. 581, 583.

[65] *See* Docket No. 631-3 at 921:25-934:3.

[66] *See id.* at 933:3-13.

14

1   patents is not a defense to patent infringement and a party can still infringe even if it has its own

2   patents in the same area."[67]

3          As recognized by the court's instruction to the jury and strict limitations on the

4   admissibility of Apple's patents, "it is well-established that the existence of one's own patent does

5   not constitute a defense to infringement of someone else's patent.  It is elementary that a patent

6   grants only the right to exclude others and confers no right on its holder to make, use, or sell."[68]

7   However, the Federal Circuit has also found that the "fact of separate patentability is relevant, and

8   is entitled to due weight."[69]

9          This case presented the rare situation in which the defendant's patents covering the accused

10  technology issued over the plaintiff's asserted patent.  Apple's admitted patents cited the asserted

11  '473 patent in prosecution but were deemed novel and nonobvious despite the '473 patent being

12  prior art.  At trial, Apple's admitted patents were relevant to Apple's noninfringement position.

13  Specifically, Apple was allowed to use its patents to demonstrate the differences between

14  Emblaze's asserted claims and the accused HLS streams.  By requiring a named inventor on the

15  Apple patents to testify about the Apple patents, the court ensured that discussion of Apple's

16  patents focused on the subjects to which Apple's patents were relevant: the differences between the

17  asserted claims and Apple's accused technology.

18         The court further protected Emblaze from unfair prejudice by including an additional

19  instruction to the jury.  A jury instruction can help mitigate the risk of unfair prejudice.[70]  Here, the

20  court based its jury instruction on Instruction A.3 from the Northern District of California Model

21  Patent Jury Instructions.[71]  The court took care to note that "ownership of patents is not a defense

22  [67] Docket No. 636-3 at 2003:19-22.

23  [68] *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 879 n.4 (Fed. Cir.
24  1991) (emphasis omitted); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1559
    (Fed. Cir. 1996) (same).

25  [69] *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996).

26  [70] *See United States v. Carrasco*, 257 F.3d 1045, 1049 (9th Cir. 2001).

27  [71] *See* Northern District of California Model Patent Jury Instructions, Instruction A.3 (June 17,
28  2014).

15

Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
TRIAL

United States District Court
For the Northern District of California

1  to patent infringement and a party can still infringe even if it has its own patents in the same

2  area."[72]

3      In sum, the court took substantial precautions to admit the Apple patents only for their

4  relevance and to mitigate the danger of unfair prejudice to Emblaze. First, the court strictly limited

5  the Apple patents that Apple could present to the jury. The court also limited the way in which

6  Apple could present those patents. Finally, the court instructed the jury that ownership of patents is

7  not a defense to patent infringement. Based on these limitations, the probative value of Apple

8  patents was not substantially outweighed by the danger of unfair prejudice.

9

10  **SO ORDERED.**

11

12  Dated: January 29, 2015

13                           PAUL S. GREWAL

14                           United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

   [72] Docket No. 636-3 at 2003:19-22.

28

<div align="center">16</div>

Case No. 5:11-cv-01079-PSG

ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW
TRIAL

**United States District Court**
For the Northern District of California



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMBLAZE LTD.,

        Plaintiff(s),

  v.

APPLE, INC.,

        Defendant(s).

No.  CV11-01079 PSG

VERDICT

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the Jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

## A.    FINDINGS ON INFRINGEMENT

### INDUCED INFRINGEMENT

1. Do you find by a preponderance of the evidence that any of the accused HLS streams satisfy the limitations of any of the following claims of the '473 patent?

   **Answer "YES" or "NO" for each listed claim.** (An answer of YES is a finding for Emblaze. An answer of NO is a finding for Apple).

| Accused HLS Streams | ABC News | PGA | MLB at Bat | NFL Preseason | ESPN | Apple Keynotes | iTunes Festival |
|---|---|---|---|---|---|---|---|
| Claim 23 | | | Yes:___<br>No: X | | | | |
| Claim 28 | Yes:___<br>No: ✓ | Yes:___<br>No: X | Yes:___<br>No: ✓ | Yes:___<br>No: X | Yes:___<br>No: X | Yes:___<br>No: X | Yes:___<br>No: X |
| Claim 37 | Yes:___<br>No: ✓ | Yes:___<br>No: X | Yes:___<br>No: X | Yes:___<br>No: X | Yes:___<br>No: ✓ | Yes:___<br>No: X | Yes:___<br>No: X |
| Claim 40 | Yes:___<br>No: X | Yes:___<br>No: X | Yes:___<br>No: ✗ | Yes:___<br>No: X | Yes:___<br>No: ✓ | Yes:___<br>No: X | Yes:___<br>No: X |

2

Case No. 5:11-cv-01079-PSG
VERDICT FORM

**Only answer Question 2 if you answered YES for any claim in Question 1. Otherwise skip to Question 3.**

2. Do you find by a preponderance of the evidence that Apple has induced others to infringe any of the following claims of the '473 patent?

**Answer "YES" or "NO" for each listed claim.** (An answer of YES is a finding for Emblaze. An answer of NO is a finding for Apple).

| Accused HLS Streams | ABC News | PGA | MLB at Bat | NFL Preseason | ESPN | Apple Keynotes | iTunes Festival |
|---|---|---|---|---|---|---|---|
| Claim 23 | | | Yes:____ No: ✗ | | | | |
| Claim 28 | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ✗ | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ____ |
| Claim 37 | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ✗ | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ____ |
| Claim 40 | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ✗ | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ____ | Yes:____ No: ____ |

I Gnore

3

Case No. 5:11-cv-01079-PSG
VERDICT FORM

**B.    FINDINGS ON INVALIDITY**

### ANTICIPATION

3.    Did you find by clear and convincing evidence that any of the following claims are invalid as anticipated by the prior art?

**Answer "YES" or "NO" for each listed claim.**  (An answer of YES is a finding for Apple.  An answer of NO is a finding for Emblaze).

Claim 23    No

Claim 28    No

Claim 37    No

### OBVIOUSNESS

4.    Did you find by clear and convincing evidence that any of the following claims are invalid as obvious in view of the prior art?

**Answer "YES" or "NO" for each listed claim.**  (An answer of YES is a finding for Apple.  An answer of NO is a finding for Emblaze).

Claim 23    No

Claim 28    No

Claim 37    No

Claim 40    No

Case No. 5:11-cv-01079-PSG
VERDICT FORM

4

**C.    FINDINGS ON DAMAGES**

### REASONABLE ROYALTY

If you have found any claim infringed and not invalid, answer Questions 5-7. Otherwise, do not answer Questions 5-7.

5.    In the hypothetical negotiation, do you find that the parties would have agreed to a license agreement for **a running royalty** or for a **fully paid-up lump sum?  Choose only one.**

**Running royalty:** _____    OR    **Fully paid-up lump sum:** _____

Only answer the following Question 6 if you chose "running royalty" in Question 5.  If you chose "fully paid-up lump sum" in Question 5 skip to Question 7.

6.    What "royalty base" and what "royalty rate" do you find from a preponderance of the evidence would fairly and reasonably compensate Emblaze for Apple's infringement through June 30, 2013 (fill in the numbers in the empty columns):

| ROYALTY BASE | | ROYALTY RATE | |
|---|---|---|---|
| Number of Devices | | amount per unit ($) | |
| Number of Software Upgrades | | amount per unit ($) | |
| Total Amount of Application Revenues | | percentage (%) | |

Only answer the following Question 7 if you chose "fully paid-up lump sum" in Question 5.

7.    What paid-up lump sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Emblaze for Apple's infringement?

**Answer with the amount: $**_____

**Certification of Jury Verdict**

_____
JURY FOREPERSON

7 - 11 - 14
_____
DATE

Case No. 5:11-cv-01079-PSG
VERDICT FORM

5

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A00021**

1

2          IN THE UNITED STATES DISTRICT COURT

3

4          FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6    EMBLAZE LTD.,                          No. CV 11-01079 PSG

7              Plaintiff,
                                            **JUDGMENT IN A CIVIL CASE**
8       v.

9    APPLE INC.,

10             Defendant.

_____/

11

12      (X)  **Jury Verdict.** This action came before the court for a trial by jury. The issues

13   have been tried and the jury has rendered its verdict.

14      ()  **Decision by Court.** This action came to trial or hearing before the court. The

15   issues have been tried or  heard and a decision has been rendered.

16      **IT IS SO ORDERED AND ADJUDGED** that pursuant to the jury verdict filed

17   July 11, 2014, judgment is entered in favor of defendant.

18

19   Dated: July 11, 2014                   Richard W. Wieking, Clerk

20                                          By: Oscar Rivera
                                            <u>Deputy Clerk</u>
21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                           NORTHERN DISTRICT OF CALIFORNIA

10                                  SAN JOSE DIVISION

11    EMBLAZE LTD.,                        )      Case No.: 11-1079 PSG
                                           )
12                        Plaintiff,       )      **CLAIM CONSTRUCTION ORDER**
                                           )
13          v.                             )
                                           )
14    APPLE INC.,                          )
                                           )
15                        Defendant.       )
      _____)

16

17          In this patent infringement suit, Plaintiff Emblaze Ltd. ("Emblaze") claims Defendant

18    Apple Inc. ("Apple") infringes its patent.  Consistent with Pat. L.R. 4-3(c), the parties seek

19    construction of terms and phrases in claims in the patents-in-suit.[1]  To avoid unnecessary delay, the

20    court at this time will simply issue its constructions without its full reasoning and analysis:

21

| **CLAIM TERM** | **CONSTRUCTION** |
|---|---|
| "real-time broadcasting" | simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process |
| "providing at the transmitting computer a data stream having a given data rate" | the transmitting computer provides a data stream having a given amount of data per unit of time |

27

28    _____

      [1] *See* Docket No. 111.

                                                    1
      Case No.: 11-1079
      ORDER

| | |
|---|---|
| "data stream having a given data rate" | a data stream having a given amount of data per unit of time |
| "slice" | a discrete segment of the data stream |
| "each slice having a predetermined data size associated therewith" | each slice having a data size, which may be a time duration, assigned in advance of the stream being divided |
| "encoding the slices in a corresponding sequence of files" | forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices |
| "sequence of files, each file having a respective index" | sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence |
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" | transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream |
| "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" | such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate |
| "decode the sequence" | decompressing any compressed data in the sequence |
| "play back the data stream responsive to the indices of the files" | playing back the data stream based on the indices of the files to be played back |
| "at a replay rate generally equal to the data rate" | the rate at which the client plays back the data stream is generally equal to the data rate of the stream |
| "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" | uploading to a server an index file, and updating the index file with the index of the most recently uploaded file |
| "encoding slices at a different plurality of different quality levels" | forming slices at more than one quality level |
| "determining a data bandwidth of the network between the server and the client computer" | the client determines a data rate at which a client can download a file from the server |
| "wherein dividing the stream into the sequence | the stream is divided into a sequence of slices, |

Case No.: 11-1079
ORDER

United States District Court
For the Northern District of California

| of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" | where the predetermined data size of the slices is established by setting the time duration of the slices |
|---|---|

The parties should rest assured that the court arrived at these constructions with a full appreciation of not only the relevant intrinsic and extrinsic evidence, but also the Federal Circuit's teaching in *Phillips v. AWH Corp.*,[2] and its progeny. So that the parties may pursue whatever recourse they believe is necessary, a complete opinion will issue before entry of any judgment.

**IT IS SO ORDERED.**

Dated:   April 19, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

---

[2] 415 F.3d 1303, 1312-15 (Fed. Cir. 2005).

3

Case No.: 11-1079
ORDER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| EMBLAZE LTD., | ) | Case No. 5:11-cv-01079-PSG |
| | ) | |
| Plaintiff, | ) | **CLAIM CONSTRUCTION ORDER** |
| v. | ) | |
| | ) | **(Re: Docket No. 169)** |
| APPLE INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this patent infringement suit, Plaintiff Emblaze Ltd. ("Emblaze") alleges that Defendant Apple, Inc. ("Apple") infringes U.S. Patent No. 6,389,473. The parties submitted 16 claim construction disputes for resolution by the court. Two days after the hearing, the court issued a summary construction order and explained that a more complete order would follow providing the court's reasoning.[1] The court now provides that reasoning.

## I. BACKGROUND

**A.    The Parties and Disputed Technology**

Emblaze is an Israeli corporation dedicated to the "development and marketing of innovative high-tech technologies and products."[2] Apple is a California-based corporation that,

---

[1] *See* Docket No. 169.

[2] Docket No. 143 at ¶ 1.

1

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

among other things, markets phones, tablets and computers that incorporate "HTTP Live Streaming technology" capable of "real-time" broadcasting.[3]  Emblaze owns the sole patent at issue in this case: U.S. Patent No. 6,389,473 ("the '473 patent").[4]

The '473 patent claims methods and apparatuses that allow "transmission of live audio and video to multiple devices" without requiring "devoted streaming servers" and permitting adjustment to "different bandwidths" where necessary.[5]  As the abstract of the '473 patent puts it, the invention disclosed is:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, including providing at the transmitting computer a data stream having a given data rate, and dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith.  The slices are encoded in a corresponding sequence of files, each file having a respective index, and the sequence is uploaded to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Independent Claim 1 of the '473 patent is representative:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:
>
>> providing at the transmitting computer a data stream having a given data rate;
>>
>> dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;
>>
>> encoding the slices in a corresponding sequence of files, each file having a respective index; and
>>
>> uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.[6]

Emblaze claims that Apple's HTTP Live Streaming, which Apple introduced into its products around 2009,[7] infringes asserted '473 patent claims 23, 28, 37, and 40.

---

[3] *Id.* at ¶ 11.

[4] *See id.* at ¶ 6; Docket No. 143-1, Ex. A.

[5] *See* Docket No. 143 at ¶ 9.

[6] *See* Docket No. 143-1, Ex. A at 14:18-32.

[7] *See* Docket No. 143 at ¶ 12.

2

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

**B.    Procedural History**

Emblaze kicked off this case by filing a complaint for patent infringement in the Southern District of New York.[8]  Several months later, the case was transferred to this district.[9]  After the parties initially declined to consent to magistrate judge jurisdiction, the case was assigned to United States District Judge Saundra Brown Armstrong.[10]  Emblaze thereafter sought leave to amend its complaint to:

(1) amend the list of claims of the '473 Patent that are asserted by Emblaze so as to conform the allegations to what Emblaze has asserted in its Infringement Contentions;

(2) amend the products that Emblaze is accusing of infringement so as to conform the allegations of the complaint to what Emblaze has learned in its ongoing investigation and from discovery thus far;

(3) remove certain allegations concerning Apple's presence in the Southern District of New York (no longer relevant now that the action has been transferred to the Northern District of California);

(4) update the firm affiliation of counsel for Emblaze and the change of venue from the Southern District of New York to the Northern District of California; and

(5) make minor editing changes to the text.[11]

After Apple filed a statement of non-opposition, Judge Armstrong granted Emblaze's motion for leave to amend the complaint.  Apple then moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Judge Armstrong dismissed Emblaze's indirect infringement claims with leave to amend, but denied Apple's related request to dismiss Emblaze's direct infringement or willfulness claims.[12]  Emblaze's responded with a second amended complaint claiming direct, induced, contributory and willful infringement.[13]

---

[8] *See* Docket No. 1.

[9] *See* Docket No. 24.

[10] *See* Docket No. 31.

[11] *See* Docket No. 75 at 2-3 (verb tenses modified).

[12] *See* Docket No. 137.

[13] *See* Docket No. 143.

3

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

Pursuant to the parties' stipulation, the case was reassigned to the undersigned.[14]  Following this latest reassignment and a tutorial and hearing, the court construed the disputed claim terms as follows:[15]

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[14] *See* Docket No. 150.

[15] *See* Docket No. 169 at 1-3.

4

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "real-time broadcasting" | simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process |
| "providing at the transmitting computer a data stream having a given data rate" | the transmitting computer provides a data stream having a given amount of data per unit of time |
| "data stream having a given data rate" | a data stream having a given amount of data per unit of time |
| "slice" | a discrete segment of the data stream |
| "each slice having a predetermined data size associated therewith" | each slice having a data size, which may be a time duration, assigned in advance of the stream being divided |
| "encoding the slices in a corresponding sequence of files" | forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices |
| "sequence of files, each file having a respective index" | sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence |
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" | transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream |
| "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" | such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate |
| "decode the sequence" | decompressing any compressed data in the sequence |
| "play back the data stream responsive to the indices of the files" | playing back the data stream based on the indices of the files to be played back |
| "at a replay rate generally equal to the data rate" | the rate at which the client plays back the data stream is generally equal to the data rate of the stream |
| "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" | uploading to a server an index file, and updating the index file with the index of the most recently uploaded file |
| "encoding slices at a different plurality of different quality levels" | forming slices at more than one quality level |
| "determining a data bandwidth of the network between the server and the client computer" | the client determines a data rate at which a client can download a file from the server |
| "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" | the stream is divided into a sequence of slices, where the predetermined data size of the slices is established by setting the time duration of the slices |

A few months later, Apple moved the court to reconsider or clarify its prior construction

that the term "each slice having a predetermined data size associated therewith" means "each slice

having a data size, which may be a time duration, assigned in advance of the stream being

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

A00030

divided."[16]  The court agreed that reconsideration was warranted but further construed the term as

meaning "each slice having a data size, which may be established by setting a time duration of the

slice, assigned in advance of the stream being divided."[17]

Apple next moved for leave to amend its invalidity contentions,[18] which the court granted.[19]

Pursuant to a stipulation between the parties, the court also held that it would consider Emblaze's

revised patent disclosures to be its operative patent disclosures.[20]

As the case turned toward dispositive motion practice, the court denied Apple's motion to

stay in light of the Supreme Court's decision to grant certiorari in *Akami v. Limelight Networks*.[21]

The court also held that although portions of Emblaze expert Vijay Madisetti's report would not be

struck, Emblaze was precluded from introducing later-model accused products in its report that

were not disclosed in Emblaze's original or revised infringement contentions.[22]

Apple next filed four summary judgment motions.  After a hearing, the court granted

Apple's motion for summary judgment of no willful infringement, granted-in-part Apple's motion

for summary judgment of non-infringement as to all accused streams, denied Apple's motion for

summary judgment of non-infringement of specific content providers, and denied Apple's motion

for summary judgment of invalidity.[23]  In granting-in-part Apple's motion for summary judgment

of non-infringement as to all accused streams, the court additionally construed the term "upload

---

[16] *See* Docket No. 207.

[17] Docket No. 214 at 1.

[18] *See* Docket No. 216.

[19] *See* Docket No. 248.

[20] *See* Docket No. 300.

[21] *See* Docket No. 361; *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) *cert. granted*, 134 S. Ct. 895 (2014).

[22] *See* Docket No. 394.

[23] *See* Docket No. 424.

6

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

rate."[24]  The court found that "'upload rate' in the context of the '473 patent should be understood to include wait time between the transmission of files within a sequence."[25]

Following the Supreme Court's decision in *Akamai*, the court permitted Apple to file a motion for summary judgment of non-infringement as to Emblaze's asserted method claims.[26] After considering Apple's motion, the court granted it in-part.[27]

The parties then filed their pre-trial motions, including three *Daubert* motions.  Subsequent to the pre-trial conference, the court ruled on the pre-trial motions, including granting-in-part Apple's two *Daubert* motions and denying Emblaze's *Daubert* motion.[28]  The case proceeded to trial, and after eight days of testimony, statements, arguments and deliberations, the jury returned a verdict finding that none of Apple's accused products infringed the '473 patent.[29]  Now that trial is complete, the court provides the parties with the reasoning underlying the court's claim construction rulings.

## II. LEGAL STANDARDS

Nine years after the Federal Circuit's seminal *Phillips* decision,[30] the canons of claim construction are now well-known—if not perfectly understood—by parties and courts alike.  "To construe a claim term, the trial court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing."[31]  This requires a

---

[24] *See id.* at 11-14.

[25] *Id.* at 14.

[26] *See* Docket No. 468.

[27] *See* Docket No. 520.

[28] *See* Docket Nos. 519, 544.

[29] *See* Docket No. 609.

[30] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

[31] *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008).

7

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

careful review of the intrinsic record, comprised of the claim terms, written description, and prosecution history of the patent.[32] While claim terms "are generally given their ordinary and customary meaning," the claims themselves and the context in which the terms appear "provide substantial guidance as to the meaning of particular claim terms." Indeed, a patent's specification "is always highly relevant to the claim construction analysis."[33] Claims "must be read in view of the specification, of which they are part."[34] Although the patent's prosecution history "lacks the clarity of the specification and thus is less useful for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[35] The court also has the discretion to consider extrinsic evidence, including dictionaries, learned treatises, and testimony from experts and inventors.[36] Such evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language."[37]

---

[32] *See id.* ("To construe a claim term, the trial court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing. Intrinsic evidence, that is the claims, written description, and the prosecution history of the patent, is a more reliable guide to the meaning of a claim term than are extrinsic sources like technical dictionaries, treatises, and expert testimony.") (citing *Phillips*, 415 F.3d at 1312).

[33] *Phillips,* 415 F.3d at 1312-15.

[34] *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995); *see also Ultimax Cement Mfg. Corp v. CTS Cement Mfg. Corp.*, 587 F. 3d 1339, 1347 (Fed. Cir. 2009).

[35] *Phillips*, 415 F.3d at 1317 (internal quotations omitted).

[36] *See id.* ("Although we have emphasized the importance of intrinsic evidence in claim construction, we have also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'") (quoting *Markman*, 52 F.3d at 980).

[37] *Id.* (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)) (internal quotations and additional citations omitted).

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

**III. DISCUSSION**

**A.      Dispute #1:  "Real-Time Broadcasting"**

| CLAIM TERM 1 | |
| --- | --- |
| "real-time broadcasting" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "a broadcast data stream that is received at one or more clients without substantial delay after the broadcast" | "communicating a data stream that is received at one or more clients simultaneously with minimal delay" |
| **CONSTRUCTION** | |
| "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process" | |

The parties' dispute over the construction of "real-time broadcasting" has two components. First, Apple and Emblaze contest whether "real-time broadcasting" requires simultaneous receipt of the data stream by clients (Apple's position), or only simultaneous transmission of the data stream (Emblaze's position).  In support of its narrower construction, Apple cites to the first sentence of the background section of the '473 patent, which states: "In network broadcasting, data are transmitted over a network in real time from a single transmitting computer to a plurality of clients simultaneously."[38]  Apple argues that "[i]t is illogical to read the above passage as emphasizing simultaneous transmission only, while the clients can receive the data in a staggered or otherwise unsystematic fashion as Emblaze contends."[39]

The court finds Apple's position unpersuasive for two reasons.

First, Apple's quoted excerpt from the specification refers to simultaneous transmission, not simultaneous receipt.  The adverb "simultaneously" in the passage modifies the verb "transmitted" rather than receipt by clients.  Second, the background section of the '473 patent describes the prior art, not the invention.  Without some indication in the background section that this statement also describes the patented invention, the court will not assume statements about the prior art apply to

---

[38] '473 patent, at 1:16-18.

[39] Docket No. 118, at 7.

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

**A00034**

the claimed invention.  Moreover, the fact that Apple fails to identify any other portions of the

specification that imply that the invention as claimed requires simultaneous receipt of the data

stream by clients strongly counsels against importing this limitation into the "real-time

broadcasting" term.  Accordingly, the court's construction requires simultaneous transmission of

the data stream, but not simultaneous receipt.

Second, Apple and Emblaze essentially dispute the immediacy with which the invention

must deliver the event stream to the user.  This disagreement centers on the degree of delay

allowable in "real-time" transmission.  Apple requests that the court construe "real-time" to require

"minimal delay," whereas Emblaze contends that "real-time" means "without substantial delay."

There is not much difference between these two constructions, but the court must nevertheless

resolve the conflict.  The parties cite four passages of the specification as informing the

construction of "real-time."  The '473 patent explains that "[t]he division of the data stream into

slices . . . allows the broadcast to go on substantially in real time without the use of special-purpose

hardware."[40]  The specification repeats this "substantially in real time" language later: "Clients 30

connect to server 36 and receive the multimedia sequence, substantially in real time."[41]  The third

and fourth passages are similar, but they add that any delay is preferably minimal: "When one of

computers 30 connects to server 36 and begins to download the data stream, it first reads the index

file in order to identify at what point in stream 40 to begin and to start receiving the data stream

substantially in real time, preferably with only a minimal lag, as it is transmitted from computer

34."[42]

Unfortunately, these specification excerpts do not especially inform the court as to the

meaning of "real-time."  Instead, they describe two characteristics of the invention: (1) the

invention transmits the data stream to the client "substantially in real time,"[43] and (2) a preferred

---

[40] '473 patent, at 2:17-21.

[41] *Id*. at 7:4-5.

[42] *Id*. at 8:1-7; *see also id.* at 10:49-54 ("Time stamps in the data stream are used to synchronize the data, so that the multimedia sequence is played back just as it was input at computer 34, preferably with only a minimal necessary transmission and decoding delay.").

[43] *See id*. at 2:17-21, 7:4-5, 8:1-7.

10

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1   embodiment of the invention transmits the data stream to the client "with minimal lag."[44]  The first

2   characteristic is unhelpful in defining "real-time" because it uses the term itself.  The second

3   characteristic is also unhelpful because Federal Circuit law is clear that courts typically should not

4   import limitations from a preferred embodiment into a claim.[45]

5           Without further citations to the intrinsic evidence from the parties, the court turns to the

6   specification for other clues as to the meaning of "real-time."  One passage overlooked by the

7   parties is especially helpful.  The '473 patent states that "[f]urther preferably, the client compares

8   the times stamped in the data stream to a local real-time clock and, if it determines that there is a

9   significant lag in the time codes relative to the real-time clock, opens additional links with server

10  36 in order to increase the overall data rate."[46]  While the steps of recording and comparing time

11  stamps are part of a preferred embodiment and should not be imported into a basic claim term like

12  "real-time," inherent in this excerpt is the idea that the delivery of the data stream to the client

13  should generally match the procession of the event being broadcast.  The specification also

14  mentions that applications of the invention include "an interview program or an entertainment or

15  sports event"[47] and "video teleconferencing."[48]  Applications such as these require a transmission

16  system rapid enough to proceed in "real-time" with the live event.  The Microsoft Computer

17  Dictionary's definition of "real-time" expresses this requirement well: "Real-time operations are

18  those in which the machine's activities match the human perception of time or those in which

19  computer operations proceed at the same rate as a physical or external process."[49]

20

21  [44] *See id.* at 8:1-7, 10:49-54.

22  [45] *See, e.g.*, *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific
    embodiments of the invention, we have repeatedly warned against confining the claims to those
23  embodiments."); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The
    patentee is entitled to the full scope of his claims, and we will not limit him to his preferred
24  embodiment or import a limitation from the specification into the claims.").

25  [46] '473 patent, at 10:59-63.

26  [47] *Id.* at 6:58-59.

27  [48] *Id.* at 13:49.

28  [49] Docket No. 119-6, Handy Decl. Ex. F, *Microsoft Computer Dictionary* 441 (5th ed. 2002).

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

1    This language best captures the meaning of "real-time" as it is used by the '473 patent. The

2    Federal Circuit "ha[s] especially noted the help that technical dictionaries may provide to a court

3    'to better understand the underlying technology' and the way in which one of skill in the art might

4    use the claim terms."[50]  As such, the court construes "real-time broadcasting" to mean

5    "simultaneous transmission of data to one or more clients matching the human perception of time

6    or proceeding at the same rate as a physical or external process."

7    **B.    Dispute #2: "Providing at the Transmitting Computer a Data Stream Having a Given Data Rate"**

| CLAIM TERM #2 | |
|---|---|
| "providing at the transmitting computer a data stream having a given data rate" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "providing from the transmitting computer a data stream [having an assigned data rate, where a data rate is an amount of data per unit of time]" | "inputting a data stream to the transmitting computer from a source of broadcast data" |
| CONSTRUCTION | |
| "the transmitting computer provides a data stream [having a given amount of data per unit of time]" | |

17    The limitation, "providing at the transmitting computer a data stream having a given data

18    rate," appears in claim 1, upon which asserted claim 23 depends.  Apple and Emblaze contest

19    whether "providing at the transmitting computer a data stream" requires a data stream to be input to

20    the transmitting computer from a source of broadcast data (Apple's position), or whether the data

21    stream can be generated by the transmitting computer itself (Emblaze's position).

22    The specification is clear that some embodiments of the invention broadcast data that is

23    generated by the transmitting computer.  For example, the summary of the invention section states

24    that "[i]n some preferred embodiments of the present invention, the data stream comprises

25    multimedia data captured *or generated* by the transmitting computer."[51]  Later, the specification

---

[50] *Phillips*, 415 F.3d at 1318 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)).

[51] '473 patent, at 2:29-31 (emphasis added).

12

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   takes care to say that although the transmitting computer "preferably receives audiovisual input

2   from input devices," "data inputs of other types may be generated at or by computer 34 using any

3   suitable means known in the art."[52]  The specification thus considers a data stream generated by the

4   transmitting computer to be within the scope of the invention.  The disputed term also appears in

5   claim 1, rather than a dependent claim more likely to claim a narrower embodiment of the

6   invention.  Nothing in the plain claim language—"providing at the transmitting computer a data

7   stream" —indicates that the data stream must come from an external source.  Accordingly, as

8   Emblaze argues, the claim should not be so limited.

9        Rather than argue that the claim excludes the more minor embodiments of the invention

10  that allow for the transmitting computer to generate the data stream, Apple simply points to other

11  embodiments in which a data stream is input to the transmitting computer from an external source.

12  For example, describing Figure 5, the specification states that "[t]o begin the broadcast, computer

13  34 connects to server 36, optionally opening the plurality of links shown in Fig. 4.  Broadcast data

14  are then input to the computer, for example, from input devices 22, or from a video, audio or

15  animation sequence stored on disk or tape."[53]  Apple's two other citations to the specification are

16  similarly unpersuasive.[54]  Considering the specification as a whole, the court finds that the

17  invention is principally directed toward improving streaming of external events.[55]  However, the

18  specification is unequivocal that the claims are not limited to only data streams input to the

19  transmitting computer.  The court therefore construes "providing at the transmitting computer a

20

21  ───────────────

    [52] *Id.* at 6:32-35.

22  [53] *Id.* at 9:62-66.

23  [54] *See id.* at 1:23-28 ("Fig. 1 is a schematic illustration showing a real-time broadcasting system 20,
    as is known in the art.  One or more input devices 22 (for example, a video camera and/or
24  microphone) are used to generate a multimedia data stream representing an entertainment or
    informational program to be transmitted to a plurality of clients 30 via a network 28."), 7:36-42
25  ("Computer 34 monitors the time codes as file 40 is transmitted, and clients 30 similarly monitor
    the time codes as the file is received, in order to ensure that the transmission or reception is
26  'keeping up' with the input of the data to the computer.").

27  [55] *See id.* at 6:58-59 (mentioning "an interview program or an entertainment or sports event"),
    13:49 (mentioning video teleconferencing).
28

                                        13

    Case No. 5:11-cv-01079-PSG
    CLAIM CONSTRUCTION ORDER

1    data stream [having a given data rate]" to mean "the transmitting computer provides a data stream

2    [having a given amount of data per unit of time]."

3

4    **C.**      **Dispute #3: "Data Stream Having a Given Data Rate"**

| CLAIM TERM #3 | |
|---|---|
| "data stream having a given data rate" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "[providing from the transmitting computer a data stream] having an assigned data rate, where a data rate is an amount of data per unit of time" | "the speed, as measured in bits per second, at which the data stream is input to the transmitting computer" |
| CONSTRUCTION | |
| "a data stream having a given amount of data per unit of time" | |

12        Apple and Emblaze appear to agree that a "data rate" is an "amount of data per unit of

13    time." Apple argues that this definition should be more specific, and contends that a data rate is a

14    "speed, as measured in bits per second." Emblaze responds that Apple's proposed requirement that

15    "data rate" be measured in bits per second is unsupported by the intrinsic and extrinsic evidence.

16    The court agrees with Emblaze. Apple points to only one sentence in the specification that

17    purportedly supports its construction. In the detailed description of preferred embodiments section

18    of the specification, the '473 patent states that "[a]ssuming that computer 34 communicates over

19    network 28 through a 28.8 Kbaud modem and maintains a typical FTP upload rate of 2 *Kbytes/sec*

20    (allowing for moderate Internet bottlenecks), data stream 40 will be uploaded to server 36 over link

21    60 (Fig. 4) substantially at the rate that the audio data are input to computer 34."[56] Apple asserts

22    that because the above passage refers to an upload rate in kilobytes per second, the patent claims

23    should be limited to data rates measured in bits per second. But as discussed earlier in this order,

24    "[t]he patentee is entitled to the full scope of his claims, and [the Federal Circuit] will not limit him

25    to his preferred embodiment or import a limitation from the specification into the claims."[57]

26

27    [56] '473 patent, at 11:59-64 (emphasis added).

28    [57] *Kara*, 582 F.3d at 1348.

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Consistent with Federal Circuit case law, this court will not turn one passing mention of a bits per

2  second data rate in the context of a preferred embodiment into a limitation on all of the '473

3  patent's method claims.

4      Apple also cites the Microsoft Computer Dictionary's definition of "data rate" as support

5  for its "bits per second" limitation.  The Microsoft Computer Dictionary defines "data rate" as

6  "[t]he speed at which a circuit or communications line can transfer information, usually measured

7  in bits per second (bps)."[58]  This definition only confirms that the '473 patent's method claims

8  should not be limited to measuring data rate in bits per second—data rate is "usually" measured in

9  bits per second, but not always.  Apple finally asserts that Emblaze's construction "is too general,

10  and leaves open the very real possibility that Emblaze will use this general definition (divorced

11  from any actual units of measure) to expand the meaning of 'data rate' beyond the bounds of what

12  is actually contemplated by the '473 patent."[59]  However, Apple fails to provide a single example

13  of how Emblaze might expand the meaning of "data rate" beyond the intended scope of the '473

14  patent.  Instead, the court finds that Apple's proposed construction is too narrow.  As both parties

15  agree with the general premise that a "data rate" is an "amount of data per unit of time," the court

16  construes "data stream having a given data rate" as "a data stream having a given amount of data

17  per unit of time."

18  **D.    Dispute #4: "Slice"**

| CLAIM TERM #4 | |
| --- | --- |
| "slice" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "a segment of the data stream" | "a discrete segment of the data stream that results from the data stream being divided" |
| CONSTRUCTION | |
| "a discrete segment of the data stream" | |

---

[58] Docket No. 119-6, Handy Decl. Ex. F, *Microsoft Computer Dictionary* 144 (5th ed. 2002).

[59] Docket No. 118, at 10.

15

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

1    Both independent claims of the '473 patent recite "dividing the stream into a sequence of

2    slices."[60] Apple argues that a "slice" is "a discrete segment of the data stream that results from the

3    data stream being divided," but Emblaze contends that a "slice" is simply "a segment of the data

4    stream."  The parties' dispute revolves around whether a "segment" of the data stream is a single

5    (or, in Apple's words, "discrete") slice of the data stream, or whether a "segment" of the data

6    stream could contain a group of slices.[61]

7    The court agrees with Apple.  The '473 patent does not contemplate that a "slice" could

8    contain a group of adjacent slices.  Instead, the '473 patent's specification explains that "[d]ata

9    stream 40 comprises a series of data slices 42, 44, 46, 48, etc.  Each slice contains a segment of

10    video and/or audio data . . . ."[62]  This passage indicates that a data stream is made up of several

11    data slices, but that each slice includes only a single segment of data.  Apple cites an excerpt of the

12    specification also supporting this interpretation.[63]  Notably, Emblaze cannot point the court to any

13    part of the specification that suggests that a slice can comprise multiple segments of data.

14    Moreover, allowing "slice" to mean both a single segment of the data stream and multiple

15    segments of the data stream would inappropriately introduce ambiguity into the term where there is

16    none.  Under Emblaze's construction, a slice could itself contain several slices.  Apple contends

17    that its construction clarifies that a "slice" is a single segment.  Emblaze provides no response to

18    this argument other than to assert without warrant that "that 'clarification' is not helpful."[64]  The

19    court disagrees.  Clarifying that a slice is a discrete segment is necessary to avoid the ambiguity

20
21    [60] '473 patent, claim 1; *see* '473 patent, claim 25 (reciting "divides the stream into a sequence of slices").

22    [61] Apple also briefly argues that the construction of "slice" should specify that a "slice" "results
23    from the data stream being divided."  However, claims 1 and 25 state that the data stream is
      divided into a sequence of slices.  The court finds the claim language sufficiently clear such that
24    construing "slice" as "a discrete segment of the data stream" captures the '473 patent's usage of the
      word "slice."

25    [62] '473 patent, at 7:22-24.

26    [63] *See id.* at 2:22-26 ("Preferably, each segment or slice is contained in a separate, respective file.
      Alternatively, the segments or slices may all be contained in a single indexed file, which is
27    streamed to the client in a series of packets, each covering a range of one or more indices.").

28    [64] Docket No. 127, at 6.

16

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

that a slice could itself contain several slices.  Therefore, the court construes "slice" to mean "a discrete segment of the data stream."

**E.    Dispute #5: Predetermined Data Size of the Slice and Associated Time Duration**

| CLAIM TERM #5 | |
|---|---|
| "each slice having a predetermined data size associated therewith" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "each slice having an assigned data size which may be an assigned time duration" | "each slice has an amount of data, measured in bits, that is assigned in advance of the stream being divided" |
| CONSTRUCTION | |
| "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided" | |

| CLAIM TERM #16 | |
|---|---|
| "wherein divided the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "the stream is divided into a sequence of slices, where the predetermined data size of the slices is established by setting the time duration of the slices" | "the stream is divided into a sequence of slices, each slice having an assigned data size and an assigned time duration, with both the data size and the time duration of each slice being assigned in advance of the stream being divided" |
| CONSTRUCTION | |
| "the stream is divided into a sequence of slices, where the predetermined data size of the slices is established by setting the time duration of the slices" | |

On claim terms 5 and 16, Apple and Emblaze have the same two disputes: (1) whether "predetermined" means that the data size is determined in advanced of the data stream being divided, and (2) whether the data size can be established by setting a time duration of the slice. The court considers each issue in turn.

First, the court finds that the term "predetermined" requires that the data size of each slice must be assigned in advance of the stream being divided.  Under *Phillips*, the court begins by

17

examining the claim language itself.[65]  In independent claims 1 and 25, the word "predetermined" modifies "data size," indicating that the data size must be determined before some other event.  The rest of the claim element provides further context: "dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith; . . . ."[66]  If the stream is divided into a sequence of slices, and slices have an associated, predetermined data size, the slice size must be determined before the stream is divided.  The plain claim language thus strongly supports Apple's suggestion that the court specify that the data size is "assigned in advance of the stream being divided."

The specification and associated figures bolster this construction.  Emblaze cites to a specification passage stating that "[t]he data are compressed at step 80, and are then 'sliced' at step 82 into files 42, 44, 46, 48, etc., as shown in Fig. 3A."[67]  According to Emblaze, this excerpt indicates that "slicing" is a single step that includes assigning a data size.  However, Figure 7 of the '473 patent, which is a flowchart of the claimed algorithm, depicts step 82 as two separate steps:[68] an initial "set slice duration" step, and a following "prepare slice I" step.  Figure 7 and the above specification passage therefore are consistent with the claim language, which makes clear that the slice data size is assigned in advance of the stream being divided.

Second, the parties contest whether the predetermined data size can be established by setting a time duration of the slice.  Emblaze argues that setting a time duration of the slice can result in setting a predetermined data size because the data size can be calculated given a time duration and a data transfer rate.  Specifically, at the *Markman* hearing Emblaze explained:

> [I]f we know the given data rate and we're going to have a predetermined data size in that slice, there's a couple of ways to do it, right?  One way is if you know the rate, you can set the amount of data and that's going to fix the amount of time of each slice; or you can simply set the duration of the slices.  Once you know the data rate, that's going to fix how much data will

---

[65] *See Phillips*, 415 F.3d at 1312-13.

[66] '473 patent, claim 1.

[67] *Id*. at 9:66-10:1.

[68] Not including the "I = I + 1" increment step.

18

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1   be in each slice because, again, there's [sic] only three variables in that equation."[69]

2   Emblaze later provided an example: "You can say 'I'm going to slice it for two seconds,' so if it's

3   100 kilobytes per second and it's a two second slice, I know it's going to be 200 kilobytes."[70]

4   Apple disagrees with Emblaze's interpretation, and instead argues that the data size must be

5   measured in bits.

6   Again the court begins with the claim language. Claim 1 recites the element of "dividing

7   the stream into a sequence of slices, each slice having a predetermined data size associated

8   therewith." Claim 23, which depends from claim 1, adds the limitation that "dividing the stream

9   into the sequence of slices comprises dividing the stream into a sequence of time slices, each

10   having a predetermined duration associated therewith." Claim 23 therefore introduces a further

11   limitation on the "dividing the stream into a sequence of slices" element: that the slices are time

12   slices having a predetermined duration. Based on this claim language and the rule that dependent

13   claims are narrower than independent claims,[71] the "predetermined data size" should encompass

14   the possibility that a time duration could be considered a "data size" within the scope of claim 1.

15   The court recognizes that there is an alternate explanation for the language of claims 1 and 23—it

16   could also be interpreted as requiring that each slice have both a predetermined bit size and a

17   predetermined time duration—but the court finds this alternate interpretation inferior. The

18   invented algorithm requires a decision rule instructing it where to divide the data stream. The '473

19   patent's specification does not disclose an embodiment of the invention in which the algorithm

20   divides the data stream into slices based on both a bit size and a time duration. As will be detailed

21   below, the specification consistently describes the dividing step as being based on either a bit size

22   or a time duration, but not both. This observation is consistent with the '473 patent's teaching that

23   data rate may vary over the course of the broadcast.[72] If the data rate varies over the course of the

24   [69] Docket No. 181, at 77:18-25.

25   [70] *Id*. at 85:14-17.

26   [71] *See AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) ("Under the
27   doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the
independent claims from which they depend.").

28   [72] *See* '473 patent, at 9:31-47.

19

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1  broadcast, dividing the data stream based on both a predetermined bit size and a predetermined

2  time duration would force these decision rules to conflict.  Therefore, claim 1 encompasses two

3  ways of predetermining data size—setting a bit size and setting a time duration—and claim 23

4  excludes the bit size embodiment of the invention.

5      The specification further confirms that the ability to predetermine a data size based on a set

6  time duration is a prominent feature of the invention that should be encompassed by claim 1.  For

7  example, the summary of the invention section teaches that "[t]he data stream is divided into a

8  sequence of segments or slices of the data, preferably time slices, wherein the data are preferably

9  compressed."[73]  In the briefing, "Apple agrees that a predetermined data size might ultimately

10  'correspond' to a time duration"[74]—a notion strongly supported by the specification[75]—but Apple

11  argues that this correspondence "does not mean that 'data size' and 'time duration' are the same

12  parameter."[76]  However, as described above, Emblaze does not assert that "data size" and "time

13  duration" are the same.  Rather, Emblaze explained at the *Markman* hearing that the data size can

14  be calculated by setting a time duration.  It is in this sense that data size "corresponds" to a time

15  duration.  Therefore, based on the claim language and the specification, the court finds that the data

16  size may be established by setting a time duration of the slice.  Consequently, the court construes

17  "each slice having a predetermined data size associated therewith" to mean "each slice having a

18  data size, which may be established by setting a time duration of the slice, assigned in advance of

19  the stream being divided."

20      Disputed claim term #16 is the claim language from claim 23 discussed throughout this

21  section.  The parties' disagreement as to claim term #16 is resolved by the above analysis.

22  Accordingly, the court construes "wherein divided the stream into the sequence of slices comprises

23  dividing the stream into a sequence of time slices, each having a predetermined duration associated

24  
_____

25  [73] *Id*. at 2:4-6.

26  [74] Docket No. 118, at 13.

27  [75] '473 patent, at 5:34-35, 7:23-25, 9:33-35.

28  [76] Docket No. 118, at 12.

20

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

therewith" to mean "the stream is divided into a sequence of slices, where the predetermined data

size of the slices is established by setting the time duration of the slices."

**F.    Dispute #6: Encoding**

| CLAIM TERM #6 | |
|---|---|
| "encoding the slices in a corresponding sequence of files" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "forming each slice as a file, wherein a file includes data from a corresponding slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices" | "compressing each slice and saving each compressed slice as a file after the dividing step" |
| CONSTRUCTION | |
| "forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices" | |

| CLAIM TERM #10 | |
|---|---|
| "decode the sequence" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "retrieving at least a portion of the data stream from the downloaded file" | "decompress the files in the sequence" |
| CONSTRUCTION | |
| "decompressing any compressed data in the sequence" | |

| CLAIM TERM #14 | |
|---|---|
| "encoding slices at a different plurality of different quality levels" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "forming slices at more than one quality level" | "compressing each slice at two or more different compression levels" |
| CONSTRUCTION | |
| "forming slices at more than one quality level" | |

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

**A00046**

United States District Court
For the Northern District of California

1    The parties dispute whether the encoding step includes compressing the data.  The court

2    finds that compression is a necessary aspect of the invention, and that data in the encoded files is

3    compressed data.

4    The background of the invention section of the '473 patent's specification explains that

5    compression is required "[b]ecause of bandwidth limitations of the network."[77]  The invention does

6    not lift the bandwidth limitations of the network, but is instead directed principally at eliminating

7    the need for high-cost, special purpose broadcast computer equipment.[78]  The specification

8    confirms that the slice data must be compressed.  For example, the specification repeatedly refers

9    to the "set compression ratio" and "compress data" steps in Figure 7 as "encoding."[79]  In addition,

10    nearly every time the specification describes "encoding," compression or a "quality level" (which

11    necessarily involves compression) is also discussed.[80]

12    Emblaze cites to one sentence of the specification, which reads, "[p]referably, the data in

13    the sequence are compressed, although compression is not essential to implementation of the

14    present invention."[81]  However, the claims govern the scope of the intellectual property right.[82]

15

16    ─────────────────
     [77] '473 patent, at 1:29-33 ("Because of bandwidth limitations of the network, the data stream from

17    host 22 must first be compressed by a real-time encoder 24 and then routed to appropriate clients
     30 by a broadcast server 26 (since not all clients on the network are necessarily intended to receive

18    the broadcast).").

19    [78] See id. at 1:34-2:21.

20    [79] Id. at 11:23-24 ("Fig. 7 is a flow chart that schematically illustrates details of encoding step 80
     . . . ."), 10:19-22 ("Alternatively or additionally, the encoding/quality level (step 80) or slicing

21    (step 82) of the data may be adjusted, as described hereinbelow with reference to Fig. 7."), 13:23-
     26 ("The process shown in FIG. 5, including the interdependent steps of encoding 80, slicing 82,

22    FTP upload 84, updating 86 and checking link function 88 thus continues until the entire data
     stream 40 is uploaded . . . .").

23    [80] See, e.g., id. at 3:45-48 ("Further preferably, encoding the stream includes compressing data in

24    the stream at a desired compression ratio, and adjusting the upload rate includes changing the
     compression ratio."), 4:39-43 ("In still another preferred embodiment, encoding the slices includes

25    encoding slices at a plurality of different quality levels, such that the files corresponding to a given
     one of the slices have a different, respective data size for each of the quality levels."), 11:26-31

26    ("In encoding data stream 40, computer 34 preferably compresses the data using any suitable
     compression method known in the art.  For example, if data stream 40 comprises audio data, GSM

27    6.10 standard encoding may be used, as is known in the art, to compress the data by about 10:1.").

28    [81] Id. at 6:54-56.

22

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

1  While this excerpt states that compression is not essential to the invention, "encoding" is a

2  limitation in every claim of the '437 patent.  As outlined above, the specification consistently refers

3  to compression as "encoding," and in at least seven different places the '473 patent explains that

4  encoding includes compressing data.[83]  Consequently, compression may not be essential to the

5  implementation of the invention, but it is required by every claim.

6      Emblaze also makes a claim differentiation argument, contending that a compression

7  element is added only in claim 16.  Claim 1 recites the step of "encoding the slices in a

8  corresponding sequence of files, each file having a respective index."  Claim 15 depends from

9  claim 1 and adds a limitation irrelevant to the present dispute.  Claim 16 in turn depends from

10  claim 15.  Claim 16 recites "[a] method according to claim 15, wherein encoding the stream

11  comprises compressing data in the stream at a desired compression ratio, and wherein adjusting the

12  upload rate comprises changing the compression ratio."  Emblaze argues that "'encoding' is used

13  in two different contexts in the claims of the '473 patent": "encoding the slice" (claim 1), and

14  "encoding the stream" (claim 16).[84]  Apple responds that "encoding the slice" and "encoding the

15  stream" are used interchangeably throughout the '473 patent, and that "[c]laim 16 may fairly be

16  read as only adding the requirement of a particular 'desired compression ratio' (as opposed to, for

17  example, variable rate compression) and not the step of compression itself."[85]

18      Apple has the better argument.  The '473 patent throughout the specification uses the terms

19  "encoding the slice" and "encoding the stream" interchangeably.[86]  Claim 16 only adds an

20

21  [82] *Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that the claims of a patent

22  define the invention to which the patentee is entitled the right to exclude.") (internal quotation omitted).

23  [83] *See supra* notes 77, 79, 80.

24  [84] Docket No. 111, at 14.

25  [85] Docket No. 118, at 15.

26  [86] *See, e.g.*, 3:45-48 ("Further preferably, encoding the stream includes compressing data in the

27  stream at a desired compression ratio, and adjusting the upload rate includes changing the compression ratio."), 4:39-43 ("In still another preferred embodiment, encoding the slices includes encoding slices at a plurality of different quality levels, such that the files corresponding to a given

28  one of the slices have a different, respective data size for each of the quality levels.").

23

1  additional limitation onto the same encoding recited by claim 1.  At best for Emblaze, it is

2  ambiguous whether that limitation is an entirely new compressing step, or whether that limitation

3  merely specifies the use of "a desired compression ratio."  As a result, Emblaze's claim

4  differentiation argument cannot overcome the clear specification teaching that compressing is an

5  element of claim 1.

6      Other than the omission of a compressing step, the court finds Emblaze's proposed

7  construction more descriptive and consistent with the specification than Apple's proposed

8  construction.  Therefore, the court modifies Emblaze's proposed instruction to specify that the data

9  formed into a file is compressed.  "Encoding the slices in a corresponding sequence of files" is

10  construed as "forming each slice as a file, wherein a file includes compressed data from the slice

11  and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices."

12      Having resolved the dispute between the parties in the construction of "encoding the slices

13  in a corresponding sequence of files," constructions for related claim terms #10 and #14 follow

14  naturally.  The court thus construes "decode the sequence" to mean "decompressing any

15  compressed data in the sequence," and "encoding slices at a different plurality of different quality

16  levels" to mean "forming slices at more than one quality level."

17  **G.      Dispute #7: Indexing**

| CLAIM TERM #7 | |
|---|---|
| "sequence of files, each file having a respective index" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "a sequence of files, wherein each file has an indicator that distinguishes the file from other files" | "a sequence of files, wherein each file contains an alphanumeric indicator stored therein that represents a respective slice's location in the sequence" |
| CONSTRUCTION | |
| "sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence" | |

**United States District Court**
For the Northern District of California

24

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

| CLAIM TERM #11 | |
| --- | --- |
| "play back the data stream responsive to the indices of the files" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "playing back the data stream based on the indices of the files to be played back" | "play back the data stream in the order of the indices by reading the index contained in each file" |
| **CONSTRUCTION** | |
| "playing back the data stream based on the indices of the files to be played back" | |

| CLAIM TERM #13 | |
| --- | --- |
| "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "uploading to a server an index file, and updating the index file with the index of the most recently uploaded file" | "uploading to the server a file that contains a single alphanumeric index variable and changing the variable to equal the index of the most recently uploaded file" |
| **CONSTRUCTION** | |
| "uploading to a server an index file, and updating the index file with the index of the most recently uploaded file" | |

Two disagreements are at the heart of disputed claim terms 7, 11, and 13: (1) whether the index merely distinguishes the file from other files, or whether it represents a respective slice's location in the sequence, and (2) whether the "index" must be "alphanumeric." Apple and Emblaze cite the same specification passages and agree that the specification resolves these claim term disputes.

First, the '473 patent teaches that the purpose of the index is to represent a respective slice's location in the sequence. Claim 1 itself refers to a "sequence of files," with "each file having a respective index." This sequence is not independent from the index—rather, the index is used to identify a slice's order in the sequence: "The symbols $J, J + 1, J + 2, \ldots N$ in the figure are the indices of the slices of stream 40 that are stored on server 36, wherein N is the index of the most

25

**A00050**

recent slice, and J is the index of the earliest stored slice."[87]  Furthermore, "[w]hen one of

computers 30 connects to server 36 and begins to download the data stream, it first reads the index

file in order to identify at what point in stream 40 to begin and to start receiving the data stream

substantially in real time . . . ."[88]  The index must indicate where in the stream the slice is located,

so that during playback the client device can download the data in the correct order.  As such,

Emblaze's proposed construction—which requires that the index only distinguish each file from

the other files—is not sufficiently descriptive.  The index represents a respective slice's location in

the sequence.

    Second, the specification only provides examples of indices with alphanumeric characters.

For instance, the '473 patent teaches that "[c]omputer 34 stores each slice as a corresponding file,

having a running slice index 1, 2, 3 . . . N."[89]  "Preferably, ID 52 holds the file name of the new

file, wherein the name typically comprises a string followed by the index of the file."[90]  Other

excerpts explain the operation of an "index" similarly.[91]  However, Apple can point to no evidence

indicating that the claim term "index" should be limited to the preferred embodiments disclosed in

the specification.  The plain meaning of "index" is versatile, so other types of data could perform

the index's function of representing a respective slice's location in the sequence.  Even though the

specification only discloses alphanumeric examples of an index, and even though such an index is

likely the most efficient implementation of the invention, the court will not limit the construction of

"index" to just the disclosed embodiments.[92]  Accordingly, the court adopts a portion of each

---

[87] '473 patent, at 8:23-26.

[88] *Id.* at 8:1-5.

[89] *Id.* at 7:27-28.

[90] *Id.* at 7:66-8:1.  Note that in computer science, a string is typically a data type comprised of a sequence of characters.

[91] *See, e.g., id.* at 7:59-64, 8:1-5, 8:23-26.

[92] *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.").

26

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

United States District Court
For the Northern District of California

party's proposed construction and construes "sequence of files, each file having a respective index" as "sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence."

The above analysis also resolves the parties' disputes as to claim terms 11 and 13. The court specifies that the index reflects the slice's location in the sequence. Consequently, Emblaze's proposed construction that "play back the data stream responsive to the indices of the files" means "playing back the data stream based on the indices of the files to be played back" sufficiently communicates that the files are played back in the order given by the indices. As to claim 13, given that the court rejected Apple's argument that "index" should be limited to alphanumeric indicators, the court can adopt Emblaze's proposed construction. Therefore, the court construes "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" to mean "uploading to a server an index file, and updating the index file with the index of the most recently uploaded file."

**H.    Dispute #8: Generally equal to the data rate of the stream (terms 8, 9, 12)**

| CLAIM TERM #8 | |
|---|---|
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "uploading files in the sequence from the transmitting computer to a server at an upload rate generally equal to the data rate of the stream" | "transmitting the files from the transmitting computer to the server at a speed, as measured in bits per second, that closely matches 'the data rate' [as defined in Apple's Term #3 above]" |
| **CONSTRUCTION** | |
| "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream" | |

27

United States District Court
For the Northern District of California

| CLAIM TERM #9 | |
|---|---|
| "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "one or more client computers are capable of selecting individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate" | "each client receiving the broadcast requests and receives each file of the sequence from the server at a transmission speed, as measured in bits per second, that closely matches 'the data rate' [as defined in Apple's Term #3 above]" |
| **CONSTRUCTION** | |
| "such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate" | |

| CLAIM TERM #12 | |
|---|---|
| "at a replay rate generally equal to the data rate" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "the rate at which the client plays back the data stream is generally equal to the data rate of the stream" | "the speed the client computer plays back the downloaded slices, as measured in bits per second, closely matches 'the data rate' [as defined in Apple's Term #3 above]" |
| **CONSTRUCTION** | |
| "the rate at which the client plays back the data stream is generally equal to the data rate of the stream" | |

The court next turns to Apple and Emblaze's disagreement as to the meaning of "generally equal to the data rate of the stream." This term appears in disputed claim terms 8, 9, and 12, and it presents the same issues in each term. In particular, the parties especially contest the meaning of "data rate of the stream" and "generally equal." The court considers these issues in turn.

The term "a given data rate" is the antecedent basis for "data rate of the stream." Apple argues that the construction of "a given data rate" in claim term #3 controls the court's construction of "data rate of the stream." However, the court rejected Apple's construction of "a given data rate" in the section on claim term #3, finding that nothing in the specification requires that the data

28

1   rate be expressed in bits per second.[93]  Accordingly, the court need not provide further construction

2   of the term "data rate."

3      Apple next contends that the court should construe "generally equal" to mean "closely

4   matches."  Apple does not explain how substituting "closely matches" for "generally equal"

5   provides any further clarification of the claim term.  Instead, Apple asserts that its interpretation is

6   supported by the specification and the dictionary definition of "real-time."  The court finds Apple's

7   position unpersuasive.  Notably, Apple cites to no source that uses Apple's proposed "closely

8   matches" language.  Apple directs the court to specification excerpts that refer to "upload[ing] the

9   sequence of slices to the server substantially in real time . . . ."[94] and "monitor[ing] the time codes

10  as the file is received, in order to ensure that the transmission or reception is 'keeping up' with the

11  input of data to the computer."[95]  These passages, along with all others cited by Apple, express

12  only the concept of real-time broadcasting, which the court construed above.[96]  Apple's reference

13  to the dictionary definition of real-time similarly is most relevant to the court's construction of

14  "real-time broadcasting."  As described by Emblaze, "[t]he ordinary meaning of 'generally equal'

15  is clear—it means approximately, but not necessarily exactly, equal."[97]  "Generally equal" is a

16  common phrase easily understood by persons of ordinary skill in the art and the reasonable juror.

17  Further, neither the intrinsic evidence nor extrinsic evidence suggest that the '473 patent's use of

18  "generally equal" deviates in any way from the term's ordinary meaning.  Therefore, the court

19  provides no further construction of "generally equal."

20     Finally, although the parties do not argue over the significance of the language, the court

21  finds Apple's proposed "transmitting the files from the transmitting computer" language to be

22  helpful in clarifying the "uploading" step.  The court thus construes "uploading the sequence to a

23  _____

24  [93] *See supra* Section III.C.

25  [94] '473 patent, at 2:8-9.

26  [95] *Id*. at 7:37-39.

27  [96] *See supra* Section III.A.

28  [97] Docket No. 111, at 17.

29

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1  server at an upload rate generally equal to the data rate of the stream" to mean "transmitting the

2  files from the transmitting computer to the server at an upload rate generally equal to the data rate

3  of the stream." The above discussion also resolves the parties' disputes with respect to claim term

4  #12. As such, the court construes "at a replay rate generally equal to the data rate" to mean "the

5  rate at which the client plays back the data stream is generally equal to the data rate of the stream."

6       As to claim term #9, Apple makes the additional argument that the "such that" clause

7  requires that the client computers actually download the sequence, and not that clients just have the

8  ability to download the sequence, as proposed by Emblaze. Beginning with the claim language, the

9  court observes that the claim recites "uploading the sequence . . . such that one or more client

10  computers *can* download the sequence . . . ."[98] The word "can" in the claim explicitly requires

11  only the ability to download the sequence, not actual downloading. Apple does not point to

12  anything in the specification indicating that a third party client must download the data for the

13  method to be completed. In fact, the first sentence of the summary of the invention section of the

14  '473 patent states that "[i]t is an object of some aspects of the present invention to *provide*

15  substantially continuous, high-bandwidth data streaming over a network using common, existing

16  server and network infrastructure."[99] The '473 patent thus discloses that the invention is

17  principally directed toward providers of the data stream and not clients. Apple contends that

18  *Hoffer v. Microsoft Corp.* holds that a "whereas" or "such that" clause requires more than

19  capability.[100] However, the issue in *Hoffer* was whether a "whereas" clause limited the claim at

20  all—not whether actual performance of the "whereas" clause by a third party was required.[101] In

21  *Hoffer*, both parties and the court agreed that if the "whereas" clause was limiting, only capability

22  was required.[102] As such, in this case the express claim language governs, and the court construes

23  "such that one or more client computers can download the sequence over the network from the

---

[98] '473 patent, claim 1 (emphasis added).

[99] *Id.* at 1:50-53 (emphasis added).

[100] *See* 405 F.3d 1326 (Fed. Cir. 2005).

[101] *See Hoffer*, 405 F.3d at 1329-30.

[102] *See id.* at 1330.

30

Case No. 5:11-cv-01079-PSG
CLAIM CONSTRUCTION ORDER

server at a download rate generally equal to the data rate" to mean "such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate."

**I.    Dispute #9: Bandwidth (term 15)**

| CLAIM TERM #15 | |
|---|---|
| "determining a data bandwidth of the network between the server and the client computer" | |
| **Emblaze's Preferred Construction** | **Apple's Preferred Construction** |
| "the client determines a data rate at which a client can download a file from the server" | "the client measures the data transfer capacity, in bits per second, of the network connection between the server to which the sequence of files is uploaded and the client computer operated by the user requesting the download" |
| CONSTRUCTION | |
| "the client determines a data rate at which a client can download a file from the server" | |

Apple uses the word "bandwidth" in claim term #15 as another vehicle to insert a "bits per second" limitation into the claim. Apple's argument—the entirety of which encompasses only one short paragraph of briefing—points to a sole dictionary definition of "bandwidth" as support. Specifically, the Microsoft Computer Dictionary defines bandwidth as "[t]he data transfer capacity, or speed of transmission, of a digital communications system as measured in bits per second (bps)."[103] As detailed above,[104] nothing in the '473 patent's specification indicates that any data rate must be measured in bits per second. The court thus construes "determining a data bandwidth of the network between the server and the client computer" to mean "the client determines a data rate at which a client can download a file from the server."

**IT IS SO ORDERED.**

Dated: October 9, 2014

PAUL S. GREWAL
United States Magistrate Judge

---

[103] Docket No. 119-6, Handy Decl. Ex. F, *Microsoft Computer Dictionary* 50 (5th ed. 2002).

[104] *See supra* Section III.C.

31

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION
### Magistrate Judge Paul S. Grewal
Courtroom 5 - 4th Floor

## Civil Minute Order

Date: July 2, 2013                                            Time in Court: 10 minutes

Courtroom Deputy Clerk: Oscar Rivera
Court Reporter: Lee-Anne Shortridge

---

**TITLE: Emblaze Ltd. v. Apple, Inc.**
**CASE NUMBER**: **CV11-01079 PSG**
Plaintiff Attorney(s) present: Martin Pavane
Defendant Attorney(s) present: James DeCarlo and Ryan Moran

---

### PROCEEDINGS:
**Defendants Motion for Reconsideration of Claim Construction Order, Dkt. 169 (Doc. 207)**

Counsel present oral arguments.
The court amends earlier construction of the term "each slice having a predetermined data size associated therewith" to "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided"

///

1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                                  NORTHERN DISTRICT OF CALIFORNIA

10                                           SAN JOSE DIVISION

11   EMBLAZE LTD.,                                )   Case No. 5:11-cv-01079-PSG
                                                  )
12                          Plaintiff,            )   **ORDER RE: APPLE'S MOTIONS**
                                                  )   **FOR SUMMARY JUDGMENT AND**
13           v.                                   )   **EMBLAZE'S MOTION FOR LEAVE**
                                                  )   **TO AMEND ITS INFRINGEMENT**
14   APPLE INC.,                                  )   **CONTENTIONS**
                                                  )
15                          Defendant.            )   **(Re: Docket Nos. 343, 346, 348,**
                                                  )   **350 and 401)**
16   _____ )

17           The invention claimed in this patent case bears a certain resemblance to the Veg-O-Matic

18   once hawked on late-night TV: "It slices, it dices and so much more!"  But rather than carrots or

19   celery, this contraption chops up streams of data for upload and download.  The point is to permit

20   live casting of audio, video and the like without any dedicated server.

21           Before the court are Plaintiff Emblaze Ltd.'s motion for leave to amend its infringement

22   contentions to add recently-released Apple products[1] and Defendant Apple Inc.'s separate motions

23   for summary judgment of: (1) non-infringement across all[2] and (2) specific[3] content streams,

24

25   _____
     [1] *See* Docket No. 401.

26   [2] *See* Docket No. 346.

27   [3] *See* Docket No. 348.

28
                                                       1
     Case No. 5:11-cv-01079-PSG
     ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
     MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

(3) invalidity[4] and (4) no willfulness.[5]  To address these motions, the parties appeared at a specially-set hearing.  Although Apple's dispositive motions remain opposed, at the hearing Apple agreed not to oppose Emblaze's motion for leave to amend its infringement contentions.[6]  On that basis, Emblaze's motion is GRANTED.  After considering the arguments, the court GRANTS Apple's motions, but only IN-PART, as follows:

| DOCKET NUMBER | MOTION | RESULT |
|---|---|---|
| 343 | Summary Judgment of No Willful Infringement | GRANTED |
| 346 | Summary Judgment of Non-Infringement as to All Accused Streams | GRANTED-IN-PART |
| 348 | Summary Judgment of Non-Infringement of Specific Content Providers | DENIED |
| 350 | Summary Judgment of Invalidity | DENIED |

## I. BACKGROUND

**A.    The Parties and Disputed Technology**

Emblaze is an Israeli corporation dedicated to the "development and marketing of innovative high-tech technologies and products."[7]  Apple is a California-based corporation that, among other things, markets phones, tablets and computers that incorporate "HTTP Live Streaming technology" capable of "real-time" broadcasting.[8]  Emblaze owns the sole patent at issue in this case: U.S. Patent No. 6,389,473 ("the '473 patent").[9]

The '473 patent describes methods that allow "transmission of live audio and video to multiple devices" without requiring "devoted streaming servers" and permitting adjustment to

---

[4] *See* Docket No. 350.

[5] *See* Docket No. 343.

[6] *See* Docket No. 417.

[7] Docket No. 143 at ¶ 1.

[8] *Id.* at ¶ 11.

[9] *See id.* at ¶ 6; Docket No. 143-1, Ex. A.

2

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

"different bandwidths" where necessary.[10]  As the patent abstract of the '473 patent puts it, the

invention disclosed is:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, including providing at the transmitting computer a data stream having a given data rate, and dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith.  The slices are encoded in a corresponding sequence of files, each file having a respective index, and the sequence is uploaded to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Independent Claim 1 of the '473 patent is representative:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:
>
>> providing at the transmitting computer a data stream having a given data rate;
>>
>> dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;
>>
>> encoding the slices in a corresponding sequence of files, each file having a respective index; and
>>
>> uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.[11]

Emblaze claims that through its HTTP Live Streaming, introduced into Apple's products around

2009,[12] Apple infringes each of the asserted '473 patent claims.

**B.    Procedural History**

Emblaze kicked off this case by filing a complaint for patent infringement in the Southern

District of New York.[13]  Several months later, the case was transferred to this district.[14]  After the

parties initially declined to consent to magistrate judge jurisdiction, the case was assigned to

---

[10] *See* Docket No. 143 at ¶ 9.

[11] *See* Docket No. 143-1, Ex. A at 14:18-32.

[12] *Id.* at ¶ 12.

[13] *See* Docket No. 1.

[14] *See* Docket No. 24.

United States District Court
For the Northern District of California

3

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Judge Saundra Brown Armstrong.[15]  Emblaze thereafter sought leave to amend its complaint to:

(1) amend the list of claims of the '473 Patent that are asserted by Emblaze so as to conform the allegations to what Emblaze has asserted in its Infringement Contentions;

(2) amend the products that Emblaze is accusing of infringement so as to conform the allegations of the Complaint to what Emblaze has learned in its ongoing investigation and from discovery thus far;

(3) remove certain allegations concerning Apple's presence in the Southern District of New York (no longer relevant now that the action has been transferred to the Northern District of California);

(4) update the firm affiliation of counsel for Emblaze and the change of venue from the Southern District of New York to the Northern District of California; and

(5) make minor editing changes to the text.[16]

After Apple filed a statement of non-opposition, Judge Armstrong granted Emblaze's motion for leave to amend the complaint.  Apple then moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Judge Armstrong dismissed Emblaze's indirect infringement claims with leave to amend, but denied Apple's related request to dismiss Emblaze's direct infringement or willfulness claims.[17]  Emblaze's responded with a second amended complaint claiming direct, induced, contributory and willful infringement.[18]

Pursuant to the parties' stipulation, the case was reassigned to the undersigned.[19]  Following this latest reassignment and a tutorial and hearing, the court construed disputed claim terms as follows:[20]

---

[15] *See* Docket No. 31.

[16] Docket No. 75 at 2-3 (verb tenses modified).

[17] *See* Docket No. 137.

[18] *See* Docket No. 143.

[19] *See* Docket No. 150.

[20] *See* Docket No. 169 at 1-3.  As the court indicated at the hearing and in its order, a complete opinion setting forth the court's full reasoning and analysis will issue before entry of judgment.

4

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "real-time broadcasting" | simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process |
| "providing at the transmitting computer a data stream having a given data rate" | the transmitting computer provides a data stream having a given amount of data per unit of time |
| "data stream having a given data rate" | a data stream having a given amount of data per unit of time |
| "slice" | a discrete segment of the data stream |
| "each slice having a predetermined data size associated therewith" | each slice having a data size, which may be a time duration, assigned in advance of the stream being divided[21] |
| "encoding the slices in a corresponding sequence of files" | forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices |
| "sequence of files, each file having a respective index" | sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence |
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" | transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream |
| "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" | such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate |
| "decode the sequence" | decompressing any compressed data in the sequence |
| "play back the data stream responsive to the indices of the files" | playing back the data stream based on the indices of the files to be played back |
| "at a replay rate generally equal to the data rate" | the rate at which the client plays back the data stream is generally equal to the data rate of the stream |
| "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" | uploading to a server an index file, and updating the index file with the index of the most recently uploaded file |
| "encoding slices at a different plurality of different quality levels" | forming slices at more than one quality level |
| "determining a data bandwidth of the network between the server and the client computer" | the client determines a data rate at which a client can download a file from the server |
| "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" | the stream is divided into a sequence of slices, where the predetermined data size of the slices is established by setting the time duration of the slices |

A few months later, Apple moved the court to reconsider or clarify its prior construction

that the term "each slice having a predetermined data size associated therewith" means "each slice

---

[21] As explained below, this term was later re-construed by the court following Apple's request for reconsideration.

5

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

having a data size, which may be time duration, assigned in advance of the stream being divided."[22]   The court agreed that reconsideration was warranted and construed the term as meaning "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided."[23]

Apple next moved for leave to amend its invalidity contentions,[24] which the court granted.[25] The court later held that it would consider Emblaze's revised patent disclosures to be its operative patent disclosures pursuant to a stipulation between the parties.[26]

As the case turned towards dispositive motion practice, the court denied Apple's motion to stay in light of the Supreme Court's decision to grant certiorari in *Akami v. Limelight Networks*.[27] The court also held that although portions of the report of Emblaze expert Vijay Madisetti report would not be struck, Emblaze was precluded from introducing later-model accused products in its report that were not disclosed in Emblaze's original or revised infringement contentions.[28]

With that, the dispositive motions now before the court finally appeared.

## II. LEGAL STANDARDS

### A.    Summary Judgment

Pursuant to Fed. R. Civ. P. 56(a), the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[22] *See* Docket No. 207.

[23] Docket No. 214 at 1.

[24] Docket No. 216.

[25] *See* Docket No. 248.

[26] *See* Docket No. 300.

[27] *See* Docket No. 361; *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) *cert. granted,* 134 S. Ct. 895 (2014).

[28] *See* Docket No. 394.

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

judgment as a matter of law."[29]  Material facts are those that may affect the outcome of the case.[30]

A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

return a verdict for the nonmoving party.[31]  When the parties file cross-motions for summary

judgment, the district court must consider all of the evidence submitted in support of both motions

to evaluate whether a genuine issue of material fact exists precluding summary judgment for either

party.[32]  The "sufficiency of an expert's opinion at summary judgment" in a patent case is

evaluated "according to the standards of regional circuit law."[33]  In the Ninth Circuit, expert

"opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat"

summary judgment,[34] but when "expert opinion is not supported by sufficient facts to validate it in

the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion

unreasonable, it cannot support a jury's verdict."[35]

**B.    Anticipation**

Section 102(a) provides that an issued patent is invalid, absent an exception, if "the claimed

invention was patented, described in a printed publication, or in public use, on sale, or otherwise

---

[29] Fed. R. Civ. P. 56(a).

[30] *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

[31] *See id.*

[32] *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (the "court must review the evidence submitted in support" of each cross-motion).

[33] *Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1183-84 (Fed. Cir. 2009) (citing *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1048 (Fed. Cir. 2000)).

[34] *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994).

[35] *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)) (citing *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point.")).

7

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

available to the public before the effective filing date of the claimed invention."[36]  Once issued,

however, patents are entitled to a presumption of validity.  Apple's attempt to invalidate the

'473 patent therefore "must overcome the presumption of validity in 35 U.S.C. § 282 by clear and

convincing evidence."[37]

Section 102 embodies the concept of novelty—if a device or process has been previously

invented (and disclosed to the public), then it is not new, and therefore the claimed invention is

'anticipated' by the prior invention."[38]  "Anticipation requires a showing that each element of the

claim at issue, properly construed, is found in a single prior art reference."[39]  Apple must show

"that the four corners of a single, prior art document describe every element" of the disputed claims

within the '473 patent.[40]  To invalidate the '473 patent, any prior art Apple points to "must be

'enabling'—i.e., it must be sufficient to permit a person having ordinary skill in the art to practice

the invention."[41]  "Anticipation is a question of fact, and the determination of whether a prior art

reference is enabling 'is a question of law based upon underlying factual findings.'"[42]  "However,

without genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment

as a matter of law."[43]  To prevail on its anticipation argument Apple must prove by "clear and

---

[36] 35 U.S.C. 102(a)(1).

[37] *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005) (quoting *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003)).

[38] *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).

[39] *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

[40] *Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1322 (Fed. Cir. 2006) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)).

[41] *Medtronic Vascular Inc. v. Abbott Cardiovascular Sys., Inc.*, 614 F. Supp. 2d 1006, 1014 (N.D. Cal. 2009) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342 (Fed. Cir. 2005)).

[42] *Id.* (citing *SmithKline*, 403 F.3d at 1342; *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002)).

8

**A00065**

convincing" evidence that "each and every limitation is found either expressly or inherently in a single prior art reference."[44]

## C. Obviousness

A patent is invalid as obvious under Section 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[45] "Whether a patent claim is obvious is a question of law based on four underlying facts: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the prior art and the claims at issue; and (4) such secondary considerations as commercial success, long felt but unsolved need, and the failure of others."[46] "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so."[47]

"The Supreme Court has warned, however, that, while an analysis of any teaching, suggestion, or motivation to combine known elements is useful to an obviousness analysis, the overall obviousness inquiry must be expansive and flexible."[48] The obviousness inquiry must be

---

[43] *SmithKline*, 403 F.3d at 1343.

[44] *Celeritas Technologies, Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).

[45] 35 U.S.C. § 103(a).

[46] *Endo Pharm. Inc. v. Mylan Pharm. Inc.*, Case No. 11-cv-00717-RMB-KW, 2014 WL 334178, at *13 (D. Del. Jan. 28, 2014) (citing *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

[47] *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012) (citing *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quotation omitted)).

[48] *Id.* (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415, 419 (2007)).

9

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

**United States District Court**
For the Northern District of California

account for the fact that a person having ordinary skill in the art is also "a person of ordinary creativity, not an automaton."[49]  There need not be "precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."[50]  "Almost any invention, no matter how nonobvious at the time, will appear obvious when looking backward from the solution.  It is for that reason that '[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'"[51]

**D.     Willfulness**

"Establishing that a defendant has willfully infringed a valid patent is a two-step inquiry."[52]  First, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."[53]  After the "threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk" was "either known or so obvious that it should have been known to the accused infringer."[54]  The threshold objective prong "is a question of law based on underlying questions" of law and fact.[55]

---

[49] *KSR*, 550 U.S. at 415, 421.

[50] *Id.* at 418.

[51] *Janssen Pharmaceutica N.V. v. Mylan Pharm., Inc.*, 456 F. Supp. 2d 644, 662 (D.N.J. 2006) (quoting *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 840 F.2d 902, 907 (Fed. Cir. 1988) (citation and quotations omitted, alteration for clarity).

[52] *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, Case No. 2012-1575, 2014 WL 1387144, at *9 (Fed. Cir. Apr. 10, 2014).

[53] *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

[54] *Id.*

[55] *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012).

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

**III. DISCUSSION**

**A.    Summary Judgment of Non-Infringement as to All Accused Streams is Warranted, But Only In Part**

Although Apple marshals five non-infringement arguments as to all accused streams, at oral argument it focused on two in particular: (1) that the accused streams do not have an "upload rate generally equal to the data rate" and (2) that the accused streams do not have slices of "predetermined data size."  Apple's additional arguments address (3) streams not analyzed by Emblaze's expert Vijay Madisetti, (4) the absence of a single infringer of the apparatus claims at issue and (5) whether Apple is a direct infringer of the '473 patent.  The court will consider each argument in turn.

**1.    A Reasonable Jury Could Find That the Accused Streams Upload the Claimed Sequence at an Upload Rate Generally Equal to the Data Rate of the Stream**

Apple argues that because the "undisputed upload rate evidence shows that the Accused Streams are not uploaded at an upload rate generally equal to the data rate of the stream," summary judgment is warranted.[56]  To get there, Apple urges a further construction of the "upload rate" term as "the rate at which the files are uploaded from the transmitting computer to the server, and it must be generally equal to the data rate of the stream."[57]  As explained in greater detail below, while Apple is right that further construction is appropriate, Apple's construction inappropriately excludes the wait time between files during a sequence upload from the calculation.

Pursuant to *O2 Micro*, the court is obligated to construe "upload rate" specifically – despite the court's prior constructions offered in this case.[58]  As noted earlier, the court previously issued

---

[56] Docket No. 346 at 7.

[57] *Id.*

[58] *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (holding that although "district courts are not (and should not be) required to construe every limitation present in a patent's asserted" claims, when "the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve" it).  A fundamental dispute addresses the meaning and scope of a claim term, not the application of the

11

A00068

United States District Court
For the Northern District of California

the following construction of a broader limitation that includes "upload rate":[59]

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" | transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream |

Because determining the meaning and scope of patent claims is a responsibility of the court,[60] the court accepts its *O2 Micro* duty and will construe the specific "upload rate" term with the guidance of *Phillips*[61] and its progeny in mind, just as it has done with its earlier constructions.[62]

According to Apple, "upload rate" must constitute the ratio of data uploaded to upload time, exclusive of the wait time between file uploads. But this construction overlooks the claims' specific reference to the upload rate of the sequence, not the upload rate of a single file within the sequence.[63] The court has already explained that "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" means "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the

---

claim to an accused instrumentality. *See id.* (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)

The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.

[59] Docket No. 169.

[60] *See O2 Micro*, 521 F.3d at 1360 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.") (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (holding that claim construction is a matter of law)).

[61] *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

[62] *See* Docket Nos. 169 and 214.

[63] *See* Docket No. 143-1, Ex. A at 14:28-29 ("uploading the sequence to a server at an upload rate generally equal to the data rate of the stream").

12

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

stream."[64]  The upload rate thus must be based on the transmission of the files – plural – to the

server and not transmission of a single file.  Even though the data in a single file may take only a

fraction of the slice allotted to upload, the encoder must wait the balance of the wait time before

uploading a second file.[65]  Because the sequence as a whole is not uploaded until the upload of the

last of its files, the wait time in between the files must be included.[66]

　　　Apple's additional argument that "use of the segment duration for the time to upload

renders the claim's 'generally equal' requirement meaningless" – because the upload rate and data

rate must necessarily be the same if wait time is included – is incomplete.[67]  "A claim construction

that gives meaning to all the terms of the claim is preferred over one that does not do so."[68]  But

here, regardless of whether wait time is included, if the upload rate is too slow, a "live" stream will

_____

[64] Docket No. 169 at 2.

[65] *See* Docket No. 388-12, Madisetti Decl. at ¶ 5 ("The data in a 10-second single file may take
only .1 seconds ('Actual Time') to upload, but the encoder must wait the remaining 9.9 seconds
('Wait Time') before it can begin uploading the second file, and so on.  Therefore, to calculate the
upload rate for the sequence of files, one must include the Actual Time plus Wait Time since the
second file (and third and fourth, etc.) will not be available for uploading until the Wait Time of the
previous file has expired.  Since the claims explicitly require a determination of the upload rate of
the "sequence" (and not a single file within the sequence), Apple's calculation (and argument) is
flawed.").

[66] This understanding is in agreement with the objective of the patent: keeping the live upload, data
and download rates of the stream all generally equal to maintain uninterrupted live-streaming.  If
the file upload times are delayed beyond the allotted slice, then the upload rate would need to be
adjusted.  This required modification gives meaning to dependent claims 15 through 17 – which
claim comparison and corrective action related to the upload rate, the compression ratio and the
size of the slices.  On this point, reference to the written description is instructive:

　　　In some preferred embodiments of the present invention, the transmitting computer and
　　　the clients monitor the uploading and downloading of data to and from the server,
　　　respectively, in order to determine the amount of time required to convey each slice and to
　　　verify that the slices are conveyed at a sufficient rate.  When the data stream comprises
　　　multimedia data, the data rate should be generally equal to or faster than the rate at which
　　　the data are generated at the transmitting computer.

*See* Docket No. 143-1, Ex. 1 at 2:51-59.

[67] Docket No. 346 at 9.

[68] *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *see also Pause
Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("In construing claims, however,
we must give each claim term the respect that it is due.").

13

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

lag and the client's display will eventually stall while subsequent segments are uploaded and

transmitted.  The upload and data rates therefore must be "generally equal" to maintain live

streaming.

Apple also urges that the "upload time" referred to in the patent as pertaining to a single file

is interchangeable with "upload rate."   It cannot be overlooked, however, that the patentee relied

on two different words to describe those two concepts.[69]

In sum, the term "upload rate" in the context of the '473 patent should be read to include

wait time between the transmission of files within a sequence.  A reasonable jury could find that

the accused streams include such an upload rate.

> **2.    A Reasonable Jury Could Find Each Slice Has a Data Size Established By Setting a Time Duration Assigned in Advance of the Stream Being Divided**

Focusing on an ambiguity in the specific term "predetermined data size" Apple argues that

the record is undisputed that the accused products do not practice the broader limitation "each slice

having a predetermined data size associated therewith."   Once again, while the court agrees that

clarification of the disputed term is appropriate, that clarification could be applied by a reasonable

jury to find infringement of the accused content streams.

Consider first the history of the construction of the "predetermined data size" term thus far.

The asserted claims of the '473 patent all require each slice to have "a predetermined data size

---

[69] *See* Docket No. 143-1, Ex. A at 9:34-36; 12:13-15; *cf. Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119-20 (Fed. Cir. 2004) (When "an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.") (citing *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.,* 359 F.3d 1367, 1373 (Fed. Cir. 2004) (The "use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each."); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 1579 (Fed. Cir. 1996) ("If the terms 'pusher assembly' and 'pusher bar' described a single element, one would expect the claim to consistently refer to this element as either a 'pusher bar' or a 'pusher assembly,' but not both, especially not within the same clause.  Therefore, in our view, the plain meaning of the claim will not bear a reading that 'pusher assembly' and 'pusher bar' are synonyms.")).

14

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

associated therewith."[70]  During the initial *Markman* hearing in this case, Apple argued this term should be construed as "each slice has an amount of data, measured in bits, that is assigned in advance of the stream being divided."[71]  Emblaze countered that the predetermined data size could be an "assigned time duration."[72]  The court declined to adopt Apple's granular construction – in part, because the patent does not identify any requirement that the predetermined data size be measured in bits – and construed the term as "each slice having a data size, which may be a time duration, assigned in advance of the stream being divided."[73]  Apple subsequently sought leave to move the court to reconsider its initial construction[74] and the court granted Apple's request.[75] Apple's motion for reconsideration suggested that the court impermissibly equated "data size" with "time duration" and suggested that neither party advocated the court's construction.  In response, the court refined its construction to "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided."[76]

Now, at summary judgment, the parties dispute whether setting the time duration generates a slice with a data size that is assigned in advance of the slice being divided, in satisfaction of the claim limitation.  Apple urges that the data size of a slice may not be assigned in advance by a time duration if the accused streams employ variable data rates.  But the patent simply does not teach always assigning the exact number of bits prior to slice division.  In fact, it teaches the opposite, by describing one embodiment in which setting the time duration predetermines the data size of the

---

[70] Docket No. 143-1, Ex. 1 at 14:24-25.

[71] Docket No. 118 at 12.

[72] Docket No. 111 at 11.

[73] Docket No. 169 at 2.

[74] Docket No. 201.

[75] *See* Docket No. 206.

[76] *See* Docket No. 214.

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

slice.[77]  Under ordinary circumstances, claims should not be construed to ignore an embodiment.[78]

Apple's argument is colorable, but colorable arguments alone cannot overcome the intrinsic record.

Dependent claim 23 also supports the notion that setting the time duration predetermines the data size of the slice.  It reads: "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith."  Claim 23 thus makes it clear that the predetermined data size of the slices in claim 1 may comprise a "predetermined duration."  The same analysis applies to claim 37, which ultimately depends from claim 25.[79]  Critically, nothing in any of this language limits the use of time duration in predetermining data size to only constant bit rate streams.[80]

United States District Court
For the Northern District of California

---

[77] *See* Docket No. 143-1, Ex. 1 at 5:33-35 ("Further preferably, the data stream includes multimedia data, and the predetermined data size of each of the slices corresponds to a time duration of the slice.").

[78] *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (At least "where claims can reasonably to interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.").

[79] *See also* Docket No. 143-1, Ex. 1 at 2:4-6 ("The data stream is divided into a sequence of segments or slices of the data, preferably time slices, wherein the data are preferably compressed."); *id.* at 7:23-25 ("Each slice contains a segment of video and/or audio data, corresponding to a respective, successive time interval labeled $T_1$, $T_2$, $T_3$, etc."); id. at 9:33-35 ("The sizes of the files may be varied by adjusting slice durations $T_1$, $T_2$, $T_3$, etc., and a relatively greater volume of data may be transmitted through links exhibiting relatively greater data rates."); *id.* at 13:44-46 ("It will be understood in this case that the slices of the data stream corresponding to files 42, 44, 46, etc., will not necessarily be time slices as described hereinabove, but may rather have an appropriate, preferably variable, data size associated therewith.").

[80] *See id* at 11:53-64 ("Similarly, at a set duration step 92, slice durations $T_1$, $T_2$, $T_3$, etc., are optionally adjusted responsive to the link bandwidths.  Initially, duration $T_1$ of slice 1 for file 42 is set to a default value, typically between 1 and 5 sec.  For example, to transfer compressed audio data at 2 Kbytes/sec, file 42 may be assigned a file size of 10 Kbytes, with $T_1$ =5 sec.  Assuming that computer 34 communicates over network 28 through a 28.8 Kbaud modem and maintains a typical FTP upload rate of 2 Kbytes/sec (allowing for moderate Internet bottlenecks), data stream 40 will be uploaded to server 36 over link 60 (FIG. 4) substantially at the rate that the audio data are input to computer 34."); *id.* at 12:61-67 ("As noted above, for each file 42, 44, 46, etc., computer 34 measures a slice transmission time $T_{SL}$ corresponding to the time required to transmit the entire file to server 36.  If $T_{SL}$ is greater than a maximum permissible time $T_{MAX}$, it is then determined that the link over which the file was transmitted is not functioning adequately."); *id.* at ("the compression ratio may be adjusted by changing compression coefficients (e.g., MPEG coefficients) so as to match the data stream bandwidth to the available link bandwidth").

16

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE AMEND ITS INFRINGEMENT CONTENTIONS

A reasonable jury could find the accused streams, with their rates subject to a maximum rate, meet this requirement. For example, the MLB stream has a nominal 1200Kbps (the "given data rate"), combined with an audio stream having a "given data rate" of 64Kbps and a slice duration of 5 seconds, yields roughly 800,000 bytes per slice (or 800 Kbytes). By providing a data stream having a given data rate, whether constant or variable, and then establishing a time duration for each slice in advance of the stream being divided, so long as the rate is subject to a maximum value all of the resulting slices will have data sizes that are approximately equal. In Madisetti's experimental results, all the accused streams do just that – the streams are all within a few percentage points of target rates.[81] This is sufficient to require a jury to decide.[82]

### 3. Summary Judgment of Non-Infringement is Warranted As To Unanalyzed, Accused Streams

Apple argues that Emblaze has not satisfied its burden to establish infringement of streams from certain content providers that have not been analyzed. Because Emblaze did not compare each accused stream to the claims, Apple says Emblaze carried an obligation show that accused streams use HLS and that HLS necessarily practices the asserted claims.[83] Emblaze concedes it did not analyze certain streams – e.g. CNN, Fox News, NBC and Fox Sports – nor did it opine that HLS necessarily practices the asserted claims. Emblaze also conceded at oral argument that it is not accusing unanalyzed content streams. Based on these concessions the court grants partial summary judgment of non-infringement as to the unanalyzed content provider streams.

### 4. A Reasonable Jury Could Find Infringement of the Accused Apparatus Claims Based on Madisetti's Report

Apple argues that no reasonable jury could find that it induced infringement of any of the

---

[81] *See id.*

[82] *See* Docket No. 388-12 at ¶ 8.

[83] *See Fujitsu v. Netgear*, 620 F.3d 1321, 1327-28 (Fed. Cir. 2010).

17

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

apparatus claims from the '473 patent.[84]  For Apple to be so liable at least one party must have directly infringed the apparatus claims.[85]  Typically, this is not a problem,[86] and the record would support a finding that the same is true here.  Emblaze's infringement expert report concludes by reference that Apple induces MLB Advanced Media, which offers MLB AT BAT, to infringe the asserted apparatus claims of the '473 patent for "the same reasons discussed above" for the related asserted method claims.  While the court will not speculate whether this incorporation by reference strategy will succeed at trial, and the court will not permit Madisetti to stray from opinions disclosed in his report, a reasonable jury could rely on such testimony to find Apple induced MLB Advanced Media to directly infringe the asserted apparatus claims.  Summary judgment is not warranted as to the accused apparatus claims.

> **5.    Summary Judgment That Apple is Not a Direct Infringer is Warranted**

Because Madisetti only opined that Apple induced but did not directly infringe the '473 patent – and in light of Emblaze's concession to the same at the hearing – summary judgment that Apple did not directly infringe the '473 patent is warranted.

---

[84] *Compare* independent claim 1 ("A method for real-time broadcasting"), *with* independent claim 25 ("Apparatus for real-time broadcasting").

[85] *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed.Cir. 2012) (internal quotation marks omitted) ("To prove induced infringement, the patentee must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.").

[86] *See Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1305-06 (Fed. Cir. 2012) ("The problem of divided infringement in induced infringement cases typically arises only with respect to method patents.  When claims are directed to a product or apparatus, direct infringement is always present, because the entity that installs the final part and thereby completes the claimed invention is a direct infringer.").

18

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

**B.    Summary Judgment of Non-Infringement as to Specific Accused Content Providers Is Not Warranted**

### 1.    A Genuine Issue Remains as to Whether the PGA and ABC Streams Infringe

The parties agree that two of the accused streams – ABC and the PGA – use something called the Akamai RTMP architecture:[87]



As shown, the Akamai architecture consists five key components: (1) Entrypoint, (2) RtmpCore, (3) Archiver, (4) NetStorage and (5) Ghost (sitting on the "edge server").  After ABC or the PGA generates a live stream, the stream is passed through Entrypoint and onto RtmpCore.  RtmpCore converts the stream into an intermediate proprietary Akamai file format that supports not just Apple's HLS, but also HD Flash 1.0 and HDS.  The intermediate file format is not sent to the client but instead is subsequently stored in Archiver or NetStorage.  When an Apple client serves a

---

[87] *See* Docket No. 389-6 at ¶ 6 ("Specifically, as with the MLB, step 1 of Claim 1 is performed by the content provider (ABC News or PGA) which provides a stream having a given data rate to the Akamai entry point.  The Akamai RTMP Architecture then performs the function of the 'transmitting computer' (steps 2 and 3 of Claim 1) through its RTMPCore.").

19

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

1  stream request, Ghost fetches the intermediate file format from storage as "raw material" to build

2  an HLS stream, which is what the client receives.

3      Apple argues that no reasonable juror could find that this architecture practices any of the

4  asserted claims.  But none of Apple's three supporting arguments are persuasive.  First, there is

5  ample evidence in the record that the sequence of files sent to the client are uploaded to the edge

6  server on which Ghost sits.[88]  A reasonable jury could discount the fact that when those files are

7  uploaded, the files are in the proprietary Akamai format, and when they are downloaded, they are

8  in the format of Apple's HLS.  Nothing in the claim specifically excluded a translation of file

9  format, and claims "comprising" certain steps are generally understood to permit others.[89]  Second,

10  while Apple is right that the patent distinguishes its claimed invention from those relying on

11  "high-cost, dedicated computer systems" found in the prior art,[90] this distinction is identified as a

12  preferred embodiment and nothing in the claim language itself is so limited.  When "claim

13  language is broader than the preferred embodiment, it is well-settled that claims are not to be

---

17  [88] *See* Docket No. 347-6 ("Does the GHost actually reside on the Edge server?  A.  GHost refers to
18  server software which resides on different parts of the Akamai network, including the -- what we
    refer as to the Edge server, which is a server that we target to be as close as possible to the end user
19  or end device.  Q.  Okay. So is it -- is it – it's possible that client devices actually connect directly
    to the server with the GHost software?  A.  Yes, that is typical.  Q.  That's typical?  A.  Yes.  Q.  So
20  there's not going to be another server in between the GHost and the client in a typical case?
    A.  The -- the GHost server that's communicating with the end user is the one that's creating the
21  fragments for the purposes of http live streaming.  As it authors that fragment, it may need to
    communicate with other Akamai servers.  Q.  But the connection of the download of the -- of the
22  fragments to the client device is directly from that server with the GHost software on it, typically?
    A.  Yes, typically.").

23  [89] *See MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377, 1383
24  (Fed. Cir. 2012)

25      Open claim language, such as the word "comprising" as a transition from the preamble
        to the body of a claim, "signals that the entire claim is presumptively open-ended." *Gillette
        Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005). "The transition
26      'comprising' creates a presumption that the recited elements are only a part of the device,
        that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor
27      Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).

28  [90] Docket No. 143-1 at 1:34-37; 1:51-53.

20

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

confined to that embodiment."[91]  A reasonably jury could therefore find that Entrypoint and

RtmpCore make up the "transmitting computer" even if they are not common or general purpose

devices.  Finally, even if the "response bodies" Ghost sends to the client could not reasonably be

deemed the stored "files" that the patent requires,[92] files are stored in the intermediate format in

NetStorage and Archiver.[93]  And there is nothing inherently unreasonable about a finding that the

response bodies are in fact files that are stored when in temporary memory in Ghost.  Summary

judgment that the Akamai RTMP architecture does not infringe is not warranted.

United States District Court
For the Northern District of California

[91] *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1323 (Fed. Cir. 2005) (Although "the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) (noting the Circuit is "mindful" to avoid importing "limitations from the preferred embodiments into the claim").

[92] *See* Docket No. 347-6 at 98:7-99:21 ("Q.  And, again, the reason the GHost is creating those play lists and TS files is to put them in compliance with the HLS specification [] -- so they can be played back, right?  A.  It's creating these response bodies so that it can played back on the compatible devices.  We're not actually creating files and then returning files as part of the packaging step.  Q.  So when you say "a response body," what do you mean by that?  A.  The http protocol consists of a -- of a -- of a request.  In the case of http live streaming, that would be what's known as a get request.  It would ask the server for a specific object and, upon receipt of this request, we would return an http response.  And that response would contain either the play list information or the -- the actual TS or fragment data.  Q.  Okay. So there -- there's a get request that goes from the client device, such as the iPhone or the iPad, to the GHost, and then the GHost, depending on what the nature of the request is, would either return the play list, whether it's the variant play list or the child play list, or if it's being asked for a specific segment, it'll return that segment to the client device?  A.  Yes.  Q.  Okay.  And, again, those segments that are available are on the GHost as TS files?  A.  No.  Q.  What format are they on the GHost?  Or are they on the GHost, I guess?  A.  The -- the content may or may not be stored in memory or on disk on GHost.  And when present, it's in the Akamai intermediate format.  It is never stored outside of the temporary in-memory storage; just needed to send the data over the network while in the TS format."); *id.* at 71:3-24 ("Q.  Okay.  And what -- what transformation of the RTMP stream takes place in the RTMP core, if any?  A.  The transformation is from RTMP into -- into the Akamai intermediate file format.  Q.  So is segmenting occurring in here -- [] -- in this RPMT core software?  A.  The -- the content is prepared in a way that is not used directly for any end-user delivery of content.  So what we would refer to as packaging, for example, of HLS does not take place there.  Q.  Okay.  So it's just a proprietary Akamai intermediate file format?  A.  Yes.  Q.  And what is the purpose of -- of placing the RTMP stream into this intermediate file format?  A.  The -- the purpose is to have an optimized container for storage in the archiver and the long-term storage of content in the Akamai net storage platform.").

[93] *See id.* at 73: 2-5 ("Q.  Okay.  So if I understood that correctly, the net storage is a long-term storage if the content is going to be archived, essentially?  A.  Yes.").

21

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

2.    **A Genuine Issue Remains As To Whether the ESPN and NFL Preseason Streams Infringe**

Apple argues summary judgment of non-infringement is warranted as to the specific accused content streams provided by ESPN and NFL Preseason due to the bare evidentiary record. Because Emblaze did not depose ESPN, Apple says Emblaze has no record evidence as to what "backend" ESPN uses to stream its content. That Madisetti "didn't have time to put the full" analysis together in unavailing.[94] For the NFL Preseason stream, Apple highlights the fact that the NFL 30(b)(6) witness was unknowledgeable about how its content is streamed, presumably because the stream was handled externally by Neulion.com.[95] If Emblaze believed the NFL had not properly complied with its 30(b)(6) obligations, Emblaze should have sought relief at that time. The net of all this according to Apple is that Emblaze's expert now is unable to offer evidence about who owns and operates the transmitting computer responsible for streaming the NFL Preseason content.[96]

Emblaze counters that Madisetti's reliance on Wireshark, which permitted him to capture packets sent over a wireless network, store those packets as PCAP files and attach the results to his report and subsequent data analysis and comparison to the asserted claims – including determining the presence of indexes, file descriptors, target duration of slices and segments and data rates – provided him a sufficient basis to conclude that all of the streams complied with the HLS

---

[94] Docket No. 347-10, at 428:6-16 ("Q. Well, with respect to the ESPN stream, for example, you don't have any knowledge what the servers are that are utilized to deliver the ESPN stream, do you? [] THE WITNESS: As I said, it is in my data capture, and I can certainly -- I mean, I didn't have time to put the full analysis, but I certainly provided the data.").

[95] *See* Docket No. 347-14 at 128:4-10 ("Q. Do you know if New Line uses HLS? A. I do not know. Q. So you don't know if New Line uses HLS to stream Game Rewind, Pre-Season Live, Game Pass or Audio Pass? [objection] THE WITNESS: I don't know.").

[96] *See id.* at 395:9-18 ("Q. But you didn't identify any particular computers associated with the NFL Preseason Live that you were identifying as the transmitting computer? A. I identified -- based on my analysis, I'm certain that these computers performed these steps. I have not identified who owns these computers and where they are; but, in my opinion, I think these would either be controlled by NFL or its CDN providers.").

22

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

protocol.[97]  Madisetti's conclusion that both ESPN and NFL employ Apple's HLS streaming is based on "experimental" Wireshark results that "show" Apple follows the HLS protocol and uses "the same formats, the same syntax, and the same codes, the descriptors."[98]  Emblaze urges that Madisetti's conclusion that ESPN and the NFL Preseason both use HLS, together with Madisetti's detailed analysis of how HLS works relative to MLB AT BAT, provides him a sufficient basis to opine that the ESPN and NFL Preseasons streams infringe the asserted claims.[99]

The court agrees with Apple that Emblaze may not simply intuit what is going on in the back by what is coming out the front without additional analysis that the content provider practices HLS and HLS necessarily infringes.  Emblaze must show that a content stream complies with the HLS protocol and the HLS protocol necessarily infringes the asserted claims.[100]  But Madisetti does rely on outputs from Wireshark to suggest the similarity of the ESPN and NFL Preseason streams to MLB AT BAT – which relies on HLS.  Madisetti then bootstraps his infringement arguments regarding the ESPN and NFL Preseason streams onto his more fulsome infringement analysis of MLB AT BAT.  Although Madisetti's report is hardly a model of clarity, or disclosure, it appears to be just enough to squeak by under Ninth Circuit law.[101]  In particular, Apple has not pointed to "indisputable record facts" that contradict or otherwise indicate the unreasonableness of Madisetti's expert opinion.  Although the court cannot say whether Emblaze will ultimately succeed at trial relying on Madisetti's analysis, summary judgment is not warranted on these streams.

---

[97] *See* Docket No. 391-6 at ¶¶ 86-95.

[98] *See* Docket No. 390-5, Ex. C at 412-413.

[99] *See id.* at ¶¶ 97-200.

[100] *See Fujitsu*, 620 F.3d at 1327-28 (an accused product operating according to a standard is not a basis for infringement absent a comparison of the standard to the asserted claims to show that compliance with the standard necessarily infringes).

[101] *See supra* notes 33-35.

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

**C.    Summary Judgment of Invalidity is Not Warranted**

      **1.    A Reasonable Jury Could Find The '473 Patent Not Invalid as Anticipated By Cohen**

Asserted claims 1 and 25 are the only two independent claims in the '473 patent.[102]  Apple argues that a reasonable jury could only find those claims are anticipated by U.S. Patent No. 5,751,968 ("Cohen").[103]  The parties' primary disagreement centers on whether the Sound Blaster Audio Card referenced in Cohen provides a data stream with a given data rate as required by the independent claims of the '473 patent.[104]  Apple believes two references from Cohen, read together, satisfy this limitation:

> For example, if the multi-media presentation is an audio presentation, the computer forming the unit 12 will include an audio card capable of receiving audio signals, an audio card capable of receiving audio signals such as Sound Blaster, manufactured and sold by Creative Lab Technologies of the USA.[105]

> Another example is that the data fed by the feeding unit can be compressed and subsequently decompressed by the UOD.  Similarly, the data files including segments of the multi-media presentation or the single file may be compressed in the HTTP server and subsequently decompressed in the UOD.  These compression and decompression steps may be performed by any suitable compression and decompression algorithm known in the art.[106]

Emblaze disagrees.

A comparison of Cohen and the asserted, independent claims informed by expert declarations draws out key factual questions in dispute that require jury adjudication.  In particular, Madisetti and Michael Orchard, Apple's expert, filed conflicting declarations highlighting the

---

[102] *See* Docket No. 143-1, Ex. A.

[103] *See* Docket No. 350.  In light of the parties' agreement to treat claims 1 and 25 as equivalent for the purposes of this motion, the court, too, will merge its analysis of the related claims.

[104] The court previously construed the claim limitation "providing at the transmitting computer a data stream having a given data rate" to mean "the transmitting computer provides a data stream having a given amount of data per unit of time."

[105] *See* Docket No. 350-6, Ex. 4 at 4:32-36.

[106] *See id.* at 7:45-52.

24

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court<br>For the Northern District of California

United States District Court
For the Northern District of California

parties' dispute over (1) the breadth of Cohen's disclosure,[107] (2) what a PHOSITA would

understand about the various compression schemes from the mid-1990s and what the Sound

Blaster Cards – referenced in both Cohen and the '473 patent – disclose[108] and (3) whether Cohen

---

[107] *Compare* Docket No. 350-12, Orchard Decl. at ¶ 5

In Dr. Madisetti's rebuttal report, with respect to Cohen specifically, Dr. Madisetti states that "the lack of disclosure of . . . data sizes in relation to the time duration of the slices renders the combination with Cohen with any alleged prior art reference that discloses multiple rates unsuitable for rendering the asserted claims of the '473 patent obvious." (Ex. 5 at 34). It is my opinion that Cohen discloses dividing a stream by time durations as I have previously stated. (Orchard Report, Ex. 4).

*with* Docket No. 385-7 Madisetti Decl. at ¶ 9

Moreover, the passage in Cohen at 7:45-52 demonstrates that Cohen's reference to compression is not a recognition of the need to assign a given data rate to the data stream, much less a disclosure of that step. This is evident from the fact that Cohen teaches that compression can be applied to the already-formed files on the server ("Similarly, the data files . . . may be compressed in the HTTP server and subsequently decompressed in the [user operated device].") (Ex. 2, Cohen, 7:47-50). However, applying compression to the already-formed files on the server necessarily means that the stream had been sliced, formed as files, and uploaded to the server before compression was applied. That would be antithetical to the invention of the '473 patent, which requires providing a data stream having a given data rate at the transmitting computer, then dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith, then encoding the slices in a corresponding sequence of files, and only then uploading the sequence to a server. (Ex. 1, '473 patent, 14:18-33). That is, the method of claim 1 insures that the upload rate of the sequence of files to the server and the download rate of the sequence of files to the client device will both be generally equal to the data rate of the stream, whereas if Cohen's teaching is followed and compression is first applied to the already-formed files on the server, the upload and download rates will not be generally equal. Thus, it is clear that Cohen's reference to compression is not a teaching or suggestion to assign to the data stream a given data rate; indeed, this passage in Cohen demonstrates that Cohen did not even recognize the problems that would result from failing to do so.

[108] *Compare* Docket No. 350-12, Orchard Decl. at ¶ 5

However, [Madisetti] also fails to take into account that certain audio compression schemes such as GSM 6.10 operated at a fixed data rate per time duration. In the case of GSM 6.10, the scheme generates 260 bits for every 20 milliseconds of speech. (See, e.g., GSM 6.10 Specification, Ex. 9 at 6 & 10). As detailed in the GSM 6.10 Specification, GSM 6.10 only provides for a single bit rate but software modifications such as the one disclosed in Ferriere support modified GSM schemes that encode at multiple quality levels. The significance of operating at a fixed rate is that for GSM 6.10 or modified GSM encoding, dividing a stream into slices of the same data size will also result in dividing a stream into slices having the same time duration.

*with* Docket No. 385-7 Madisetti Decl. at ¶ 8

Apple's Motion cites to Cohen at 4:33-36 and 7:45-52 as teaching the limitation of "providing at the transmitting computer a data stream having a given data rate." (D.E. 350, Apple's Motion, p.16). My review of those passages shows that they do not teach the

25

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

1 considered the need to maintain the upload, download and data rates all generally equal in

2 satisfaction of the claim limitation requiring "transmitting the files from the transmitting computer

3 to the server at an upload rate generally equal to the data rate of the stream such that one or more

4 client computers are able to select individual files corresponding to the slices for download over

5 the network at a download rate generally equal to the data rate."[109]  Because a reasonable jury

6

7

8 limitation of "providing at the transmitting computer a data stream having a given data
   rate."  The first passage, at 4:33-36, only states that the feeding unit 12 in Cohen may
   include a Sound Blaster card for capturing an audio signal, but says nothing about assigning
   a "given data rate" to the audio stream.  (Ex. 2, Cohen, 4:33-36).  In fact, and as Apple
9 acknowledges, the Sound Blaster card only serves to capture an audio signal and convert it
   to a digital signal; it does not "provid[e] at the transmitting computer a data stream having a
   given data rate" as required by claim 1 of the '473 patent.  (D.E. 350, Apple's Motion,
10 p. 6).  The second passage in Cohen at 7:45-52 states only that the data files "may be
   compressed in the HTTP server and subsequently decompressed in the UOD," i.e., user
11 operated device.  (Ex. 2, Cohen, 7:45-52).  Here too there is no mention of assigning a
   "given data rate" to the data stream.  Nor is assigning a "given data rate" to the stream
12 inherent in "compression."  In this regard, in the mid-1990s, and even now, various
   compression schemes were in available and in use.  For example, one such scheme was
13 variable bit rate without restraint ("VBR"), and such a compression scheme will not result
   in a stream having a given data rate.  See Exhibit 1 attached to my Declaration showing the
14 difference in bit rate over time with VBR encoding without restraint ("VBR" in Exhibit 1),
   VBR encoding with a maximum value of 1000 Kbps ("VBR max 1000" in Exhibit 1), and
15 constant bit rate encoding at 1000 Kbps ("CBR 1000" in Exhibit 1); the bit rate of the
   former varies widely over time whereas the bit rate of the latter two are fairly constant.  Yet
16 there is no guidance in Cohen as to any particular compression scheme, which in my
   opinion demonstrates that Cohen did not appreciate the importance to real time live
17 streaming of providing a data stream having a given data rate.

18 [109] Compare Docket No. 350-12, Orchard Decl. at ¶ 4

19     In Dr. Madisetti's rebuttal report, he offered the opinion that "the given data rate should
   satisfy the upload and download rates as required by the '473 patent for live streaming, and
20 therefore Cohen is not able to live stream data as required by Claim 1."  (Dr. Madisetti
   Rebuttal Invalidity Report, Ex. 5 to the Weider Decl., at pg. 34).  I have already stated my
21 opinion that Cohen discloses a given data rate and that Cohen discloses the required upload
   and download rates under Emblaze's contention that the upload and download rates are
22 generally equal to the data rate in a live implementation.  (Orchard Report at Ex. 3).
   However, to the extent the claim can be read to contend that some affirmative act of
23 "picking" is required for purposes of the claim to maintain live streaming (which Cohen
   plainly discloses as I also state in my expert report), a person or ordinary skill in art would
24 readily understand that the data rate of the stream would need to be less than the available
   bandwidth to maintain live streaming and nothing further is necessary to meet the generally
25 equal requirement based upon Emblaze's definition of upload and download rates.

26 with Docket No. 385-7 Madisetti Decl. at ¶ 7

27     Unlike Cohen, the '473 patent recognizes, and claims, the necessity of "providing . . . a
   data stream having a given data rate," which is required if, as also required by claim 1, the
28 files are to be "upload[ed] to a server at an upload rate generally equal to the data rate of the

26

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

could draw different conclusions on these factual questions and find that Cohen does not anticipate the '473 patent, summary judgment of anticipation is not warranted.

### 2. A Reasonable Jury Could Find Dependent Claims 11, 12 and 40 Not Invalid as Obvious in Light of Cohen and Ferriere

As to the three "multiple quality level claims" (11, 12 and 40), Apple argues that the '473 patent is obvious in light of Cohen in combination with U.S. Patent No. 5,835,495 ("Ferriere"). Because of the genuine disputes regarding certain limitations allegedly disclosed by Cohen, Ferriere must therefore disclose these same limitations for the dependent multiple quality level claims to be obvious. Apple, however, makes no such claims, relying on Ferriere for only the additional limitations that the dependent claims require.[110] Because the central disputes over compression and maintenance of the upload, download and data rates thus remain even with the addition of Ferriere, summary judgment of obviousness as to dependent claims 11, 12 and 40 is not warranted.

### D. No Reasonable Fact-Finder Could Conclude That Apple Acted Willfully

Although Apple believes summary judgment precluding a finding of willfulness is warranted in this case based on the strength of its non-infringement and invalidity defenses, at oral argument it focused the court on its non-infringement positions. Because willfulness may be precluded based on the presentation of one objectively reasonable claim-construction-based defense, this court should find, as a matter of law, Apple did not willfully infringe.

Emblaze responds that viewing the evidence in the light most favorable to it, a reasonable fact finder could find facts sufficient to support a finding of willfulness. The record, viewed in this

---

stream" such that "one or more client computers can download the sequence over the network form the server at a download rate generally equal to the data rate."

[110] *See* Docket No. 409 at 9 ("The combination of Ferriere with Cohen renders claims 11, 12 and 40 obvious because Ferriere discloses the additional limitations of dependent claims 11, 12 and 40, and because one skilled in the art would have been motivated to combine the teachings of Ferriere with Cohen to create a system that practices each of these claims.") (citing Docket No. 350 at 23-25).

27

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

light, establishes that Apple knew about Emblaze and its technology at least as early as 2002.

Emblaze also points out that Apple knew about the '473 patent and Emblaze's claim of

infringement as of October 29, 2009 – only a few months after Apple introduced HTTP Live

Streaming in its products at a time when network effects from live-streaming were ripe for the

taking. Although Apple alleges it believed there were multiple, non-infringing alternatives to

HTTP Live Streaming, it has not submitted record evidence to that effect or pursued those

alternatives.

Apple has the better of the argument. When "a defense or noninfringement theory asserted

by an infringer is purely legal (e.g., claim construction), the objective recklessness of such a theory

is a purely legal question to be determined by the judge."[111] The court must "determine, 'based on

the record ultimately made in the infringement proceedings,' whether a 'reasonable litigant could

realistically expect' those defenses to succeed."[112] Where a disputed claim term is "susceptible to

a reasonable construction under which" the accused products do not infringe, there is "not an

objectively high likelihood" that the accused infringer's "actions constituted infringement."[113]

Here, every asserted claim contains the "uploading" and "predetermined data size"

limitations. Even though the court did not agree that complete summary judgment of

non-infringement was warranted, Apple's motions raise substantial questions. They may not be

enough to preclude any reasonable jury from finding infringement, but read together, Apple's

non-infringement defenses based on its claim construction positions are reasonable enough to

---

[111] *Bard*, 682 F.3d at 1007 (Fed. Cir. 2012) (citing *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) ("Under the objective prong, the answer to whether an accused infringer's reliance on a particular issue or defense is reasonable is a question for the court when the resolution of that particular issue or defense is a matter of law.").

[112] *Id.* at 1008 (quoting *iLOR*, 631 F.3d at 1377-78; *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)).

[113] *Cohesive Technologies, Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008) (citing *Seagate*, 497 F.3d at 1371).

28

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

preclude a finding as a matter of law that Apple has disregarded an "objectively high likelihood that its actions constituted infringement of a valid patent."[114]  Summary judgment on willfulness is warranted.

**IT IS SO ORDERED.**

Dated: April 24, 2014

_____
PAUL S. GREWAL
United States Magistrate Judge

United States District Court
For the Northern District of California

---

[114] *See, e.g., Multimedia Patent Tr. v. Apple Inc.*, Case No. 10-cv-2618-H-KSC, 2012 WL 6863471, at *17 (S.D. Cal. Nov. 9, 2012) (granting summary judgment of no willful infringement and observing that defendants "have presented objectively reasonable non-infringement arguments in their expert reports" and "although the Court has denied Apple and LG's motion for summary judgment on invalidity, their invalidity argument based on written description and enablement" were "objectively reasonable."); *Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012) (affirming district court's summary judgment of no willfulness where the facts showed that the defendant's "assertions of invalidity and noninfringement were, at minimum, objectively reasonable defenses" to the plaintiff's "charge of infringement").

29

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND EMBLAZE'S
MOTION FOR LEAVE TO AMEND ITS INFRINGEMENT CONTENTIONS

United States District Court
For the Northern District of California

1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT
8          NORTHERN DISTRICT OF CALIFORNIA
9          SAN JOSE DIVISION
10
11  EMBLAZE LTD.,                        )   Case No. 5:11-cv-01079-PSG
                                         )
12                    Plaintiff,         )   **ORDER GRANTING-IN-PART**
                                         )   **MOTIONS SEEKING REVIEW OF**
13          v.                           )   **CLERK'S TAXATION OF COSTS**
                                         )
14  APPLE INC.,                          )
                                         )   **(Re: Docket Nos. 657, 658)**
15                    Defendant.         )
    _____)

16          If trial is the feature film of any civil lawsuit, the taxation of costs and motions seeking

17  review are in many ways the closing credits.  Plaintiff Emblaze Ltd. and Defendant Apple Inc. both

18  seek review of costs taxed against Emblaze after a jury found that Emblaze's patent-in-suit was

19  neither invalid nor infringed.  Reflecting the mixed merit of both parties' arguments, the court

20  GRANTS both motions, but only IN-PART.

21                                       **I.**

22          While attorney's fees remain off limits in most civil cases, including patent cases, Fed. R.

23  Civ. P. 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides

24  otherwise, costs—other than attorney's fees—should be allowed to the prevailing party.  The clerk

25  may tax costs on 14 days' notice.  On motion served within the next 7 days, the court may review

26  the clerk's action."[1]

27  _____
[1] Fed. R. Civ. P. 54(d).

28
                                         1
Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
COSTS

United States District Court
For the Northern District of California

1    After an eight-day trial last summer, the jury returned its verdict that none of Apple's

2    accused products infringed Emblaze's U.S. Patent No. 6,389,473.[2]  The jury further found that

3    Apple had failed to prove the patent invalid.  Shortly thereafter, Apple submitted its bill of costs,

4    seeking a total of $577,014.40 in four categories of taxable costs: printed or electronically recorded

5    transcripts, fees for witnesses, exemplification and the costs of making copies and compensation of

6    interpreters.[3]  Emblaze objected to several of Apple's claimed costs,[4] prompting Apple to file an

7    amended bill of costs in which Apple waived all costs associated with obtaining multiple copies of

8    trial transcripts, all costs associated with the rental of copying equipment or other related trial

9    equipment and certain costs related to Apple's document production through its e-discovery

10   vendor.  The result was an amended total of $327,978.37.[5]

11   Good, said Emblaze, but not good enough.  More formally, Emblaze objected to the

12   amended bill of costs as well.  After the Clerk taxed costs in the amount of $73,108.83,[6] both

13   parties subsequently filed motions seeking review.  Emblaze asks the court to further reduce

14   Apple's recoverable costs for court and deposition transcripts.  Apple seeks an increase in

15   recoverable costs for exemplification and copies.

16                                              **II.**

17   This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.  The parties further

18   consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and

19   Fed. R. Civ. P. 72(a).

20

21

_____

22   [2] Docket No. 609.

23   [3] *See* Docket No. 623.

24   [4] *See* Docket No. 627.

25   [5] *See* Docket No. 635.

26   [6] *See* Docket No. 655 (disallowing $32,310.48 of the $93,187.81 in transcript costs as "outside the
     ambit of LR 54-3(b), (c);" $3,014.40 of the $6,945.90 in fees for witnesses as "outside the ambit of
27   LR 54-3(3);" $219,544.66 of the $220,644.66 in costs for exemplification and copies as "outside
     the ambit of LR 54-3(d)" and allowing $7,200.00 in costs for interpreters at depositions).

28
                                                2
     Case No. 5:11-cv-01079-PSG
     ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
     COSTS

United States District Court
For the Northern District of California

**III.**

Before it can do anything else, the court must first consider whether it should defer issuing a ruling on the bill of costs until after the Federal Circuit has ruled on Emblaze's appeal of the verdict. Rule 54(d) is clear that the court may review the clerk's taxation of costs and make any necessary adjustments.[7] What is less clear is whether this makes sense while an appeal on the underlying merits is pending. Although not explicitly contemplated by the plain language of the rule itself, the Advisory Committee Notes to Rule 54(d) only state that the decision is the trial court's to make: "If an appeal on the merits of the case is taken, the court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(B) a new period for filing after the appeal has been resolved."[8] While Emblaze represents that courts within the Ninth Circuit "have routinely applied this committee note to claims for costs as well as claims for fees,"[9] the undersigned's own review of published opinions suggests that such courts in fact have rarely chosen to do so.[10]

In assessing whether to stay an order pending appeal, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[11] In considering these factors, courts in this district have repeatedly denied requests to stay

---

[7] Fed. R. Civ. P. 54(d).

[8] Advisory Committee Notes to Rule 54(d).

[9] Docket No. 657 at 5.

[10] *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, Case No. 11-cv-01846, 2014 WL 4745933, *4 (N.D. Cal. Sept. 19, 2014) (acknowledging that the court has discretion to defer but declining to exercise such discretion); *Friends of Tahoe Forest Access v. U.S. Dep't of Agric.*, Case No. 12-cv-01876, 2014 WL 1575622, at *1 (E.D. Cal. Apr. 17, 2014) (finding no basis to defer a decision on the bill of costs pending plaintiffs' appeal).

[11] *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

3

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS

taxation of costs.[12]  Here, an assessment of these four factors confirms the absence of any basis to defer consideration of a case award to Apple.

**First**, Emblaze makes no showing that it is likely to succeed on the merits on appeal. Indeed, this court denied Emblaze's motions for judgment as a matter of law and for new trial on the issues on which it appealed, finding that a reasonable jury would have a legally sufficient evidentiary basis to find for Apple on those issues.[13]  There is no reason to expect that the Federal Circuit would find otherwise.

**Second**, Emblaze makes no showing that it will be irreparably injured absent a stay. Emblaze offers no evidence that it lacks assets sufficient to satisfy a cost award.  A party's "substantial assets mitigate any financial harm caused by the denial of a stay."[14]  Further, the mere fact that reversal on appeal would also entail reversal or reassessment of costs does not qualify as an irreparable injury and is not a sufficient basis to stay taxation of costs.[15]  Where, as here, a party has failed to "show[] that it will be irreparably harmed absent a stay," there is "no basis to defer a decision on the bill of costs pending [] appeal."[16]

---

[12] *See, e.g.*, *Mformation Techs., Inc. v. Research in Motion Ltd.*, Case No. 08-cv-04990, 2012 U.S. Dist. LEXIS 172071, at *14-17 (N.D. Cal. Dec. 4, 2012) (finding that none of four *Hilton* factors weighed in favor of staying taxation of costs); *ASIS Internet Servs. v. Optin Global, Inc.*, Case No. 05-cv-05124, 2008 U.S. Dist. LEXIS 103932, at *5 (N.D. Cal. Dec. 17, 2008) (considering factors and finding that stay of taxation of costs was not warranted), *aff'd sub nom.*, *ASIS Internet Servs. v. Azoogle.com, Inc.*, 357 F. App'x 112 (9th Cir. 2009); *Pizion Inc. v. PlaceWare Inc.*, Case No. 03-cv-02909, 2005 U.S. Dist. LEXIS 11351, at *4-5 (N.D. Cal. May 26, 2005) (denying request to stay taxation of costs pending appeal).

[13] *See* Docket No. 667.

[14] *In re Ricoh, Ltd. Patent Litig.*, Case No. 03-cv-02289, 2010 U.S. Dist. LEXIS 144033, at *11 (N.D. Cal. Sept. 29, 2010) *aff'd in part, rev'd in part*, 661 F.3d 1361 (Fed. Cir. 2011).

[15] *Kilopass Tech. Inc. v. Sidense Corp.*, Case No. 10-cv-02066, 2013 U.S. Dist. LEXIS, at *12 (N.D. Cal. Mar. 6, 2013) (finding that perceived burden in having to return or reassess costs if judgment were reversed on appeal was "a mere inconvenience, and not an irreparable injury"); *Jones v. City of Orange Cove*, Case No. 08-cv-00775, 2010 U.S. Dist. LEXIS 128578, at *4 (E.D. Cal. Nov. 23, 2010) (denying taxation of costs pending appeal because pending appeal "is not a sufficient [] basis to stay taxation of costs").

[16] *City of Alameda v. Nuveen Mun. High Income Opportunity Fund*, Case No. 08-cv-04575, 2012 U.S. Dist. LEXIS 7403, at *8 (N.D. Cal. Jan. 23, 2012).

4

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS

United States District Court
For the Northern District of California

1    ***Third***, Emblaze fails to address the presumptive injury to Apple from further delay of

2    taxation of costs.  The prevailing party has an interest in prompt payment of its taxable costs.[17]

3    Judgment was entered in this case on July 11, 2014.  Further delay is prejudicial to Apple as the

4    prevailing party under Rule 54(d).

5    ***Fourth***, Emblaze has not demonstrated that the public interest weighs in favor of staying

6    the consideration of costs.  To the contrary, public policy favors prompt recovery of costs.

7    Deferring judgment at this point also would increase the burden to the Federal Circuit by

8    presenting a possible second appeal.  This of course says nothing of the burden on this court in

9    reengaging with the facts of this case many months in the future, long after law clerks familiar with

10   this record have moved on and the undersigned's memory has begun to fade.  Better to dig into

11   these matters now while present faculties may be tapped.

12   The court must next determine whether there was a prevailing party so as to justify an

13   award of costs at all.[18]  To those less familiar with litigation, this must seem an odd question.

14   Trial, after all, is portrayed in popular culture as a game, with one winner and one loser.  But patent

15   cases, including this patent case, illustrate the reality that many trial outcomes are more nuanced.

16   A party "prevails when actual relief on the merits of [its] claim materially alters the legal

17   relationship between the parties,"[19] and there can only be one prevailing party within the meaning

18   of Rule 54(d).[20]  Only if the court determines that under this standard there is a distinct prevailing

19   party may the court exercise its discretion to award costs.[21]

---

[17] *See Kilopass*, 2013 U.S. Dist. LEXIS 31945, at *12 (finding that prevailing party had "an interest in the immediate payment of its taxable costs" and denying stay of taxation of costs).

[18] *See Farrar v. Hobby*, 506 U.S. 103, 113 (1992).

[19] *Manildra Mill Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1182 (Fed. Cir. 1996) (internal quotation marks omitted).

[20] *See Shum v. Intel Corp*, 629 F.3d 1360, 1367 (Fed. Cir. 2010).

[21] *See Manildra*, 76 F.3d at 1183 ("As the Supreme Court noted in *Farrar*, even if a party satisfies the definition of prevailing party, the district court judge retains broad discretion as to how much to award, if anything.").

5

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS

1    Emblaze argues that there is no clear prevailing party because while Apple was able to

2    prevail on its non-infringement theory, the jury made a finding of no invalidity.  The crux of its

3    argument is that because Emblaze's patent survived jury scrutiny, Apple cannot be said to have

4    ultimately prevailed.  But case law is clear that Apple is not required to prevail on every one of its

5    claims in order be the prevailing party for the purpose of Rule 54(d).[22]  Rather, the

6    "[d]etermination of the prevailing party is based on the relation of the litigation result to the overall

7    objective of the litigation, and not on the count of the number of claims and defenses" on which

8    each party succeeded.[23]

9    For example, in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, "Brooks raised several

10   defenses to the charge of patent infringement, any of which would have achieved Brooks' goal.

11   Thus when Brooks established its non-infringement of the Dutailier patent, it prevailed in the

12   litigation.  That other defenses, such as invalidity of the patent, were unsuccessful or withdrawn,

13   does not change the outcome in Brooks' favor."[24]  Similarly, in *Kinzenbaw v. Case LLC*, the

14   Federal Circuit held that even though the patent remained intact after the verdict the accused

15   infringer prevailed for purposes of Rule 54(d).[25]  Specifically, the court explained that "Kinze's

16   objective in bringing this litigation was to obtain a verdict of patent infringement.  It did not obtain

17   that verdict, even though its patent was ruled not invalid.  Case's objective, however, was to avoid

18   liability, and it achieved exactly that. . . . [W]e hold that Case was the 'prevailing party' within the

19   meaning of Rule 54(d)(1)."[26]

20

21

---

22   [22] *See Apple Inc.*, 2014 WL 4745933, at *5.

23   [23] *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)
24   (abrogated on other grounds by *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct.
     1749 (2014)).

25   [24] *Id.*

26   [25] *Kinzenbaw v. Case LLC*, Case No. 05-cv-01483, 2006 WL 1096683, at *3 (Fed. Cir. Apr. 26,
     2006).

27   [26] *Id.*

28
Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
COSTS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    This case is no different. Emblaze brought suit against Apple. When the jury found non-

2  infringement in Apple's favor, Emblaze lost. Emblaze therefore did not achieve its litigation

3  objective. That Apple did not succeed in its additional objective—invalidating Emblaze's patent—

4  does not change the fact that Apple did achieve its primary objective—avoiding liability. In short,

5  Apple is the prevailing party.

6    This leads the court to whether the clerk's taxation of costs[27] was appropriate—an inquiry

7  that must be analyzed according to the law of the regional circuit.[28] In the Ninth Circuit, there is a

8  "strong presumption" in favor of awarding costs to the prevailing party.[29] By contrast, the burden

9  is on the non-prevailing party to show why taxable costs should not be awarded.[30] To deny such an

10  award, the district court must provide specific reasons identifying why a particular case is not

11  ordinary and that special circumstances exist.[31] These circumstances are extremely limited.[32]

---

[27] *See* Docket No. 655.

[28] *See Manildra*, 76 F.3d at 1183("Even if a party satisfies the definition of prevailing party, the district court judge retains broad discretion as to how much to award, if anything.").

[29] *Apple Inc.*, 2014 WL 4745933, at*5 (citing *Miles v. California*, 320 F.3d 986, 988 (9th Cir. 2003)).

[30] *Id.*

[31] *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003); *Champion Produce, Inc. v. Rudy Robinson Co.*, 342 F.3d 1016, 1022 (9th Cir. 2003).

[32] The Ninth Circuit has held that proper grounds for denying costs under Rule 54 include:

(1) a losing party's limited financial resources; (2) misconduct by the prevailing party; and (3) the chilling effect of imposing . . . high costs on future . . . litigants, as well as (4) whether the issues in the case were close and difficult; (5) whether the prevailing party's recovery was nominal or partial; (6) whether the losing party litigated in good faith; and (7) whether the case presented a landmark issue of national importance. *Quan v. Computer Sciences Corp.*, 623 F.3d 870, 888-89 (9th Cir. 2010) (internal citation and quotation marks omitted).

While Emblaze may try to argue that—as a small company—it falls into the first category, this category typically covers indigent plaintiffs or low-income individuals or groups in civil rights cases who appropriately receive an exception under the Ninth Circuit standard. *See, e.g., Assoc. of Mex.-Am. Educators v. State of Cal.*, 231 F.3d 572 (9th Cir. 2000); *Bowoto v. Chevron Corp.*, Case No. 99-cv-02506, 2009 WL 1081096 (N.D. Cal. Apr. 22, 2009); *Schaulis v. CTB/McGraw-Hill, Inc.*, 496 F. Supp. 666 (N.D. Cal. 1980). Under this precedent, Emblaze's "limited financial resources" in the context of a patent case simply do not appear to count.

7

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS

United States District Court
For the Northern District of California

1    Emblaze takes issue with the Clerk's taxation of costs associated with trial transcripts and

2    deposition transcripts and is seeking a further reduction in costs taxed from $60,877.33 to

3    $26,770.19—thereby reducing the overall cost award from $73,108.83 to $39,001.69.  Emblaze

4    specifically challenges those costs associated with expedited delivery of trial transcripts or the use

5    of realtime transcription in the courtroom.

6    Pursuant to 28 U.S.C. § 1920, a prevailing party may recover "[f]ees for printed or

7    electronically recorded transcripts necessarily obtained for use in the case."  While this court does

8    not award these types of costs as a matter of course,[33] the undersigned's experience with patent

9    trials like the one in this case has been that expedited trial transcripts and real-time transcription are

10    in fact "necessarily obtained."  When trial judges push hard on parties at trial to raise objections

11    and motions promptly—so as to minimize the burden on both judge and jury from delay—it is

12    difficult to conclude otherwise.[34]

13    Recognizing that Section 1920 and our local rules generally provide for the costs of

14    deposition transcripts,[35] Emblaze nevertheless seeks to reduce the award of costs for deposition

15    transcripts under two alternative theories: that Apple has made no showing that each of the subject

16    depositions were necessary for trial and that Apple has sought to recover deposition-related costs

17    that are impermissible, such as costs for expedited transcripts and shipping and handling charges,

18    among others.

19    Emblaze first takes issue with the deposition costs for 14 witnesses that did not testify at

20    trial, arguing that Apple failed to establish that the depositions were necessary for trial rather than

21

22    ───────────────
[33] *See, e.g.*, *TransPerfect Global, Inc. v. MotionPoint Corp.*, Case No. 10-cv-02590, 2014 WL

23    1364792, at *4 (N.D. Cal. Apr. 4, 2014) (denying costs for trial transcripts delivered hourly and
       costs for RealTime); *Apple Inc.*, 2014 WL 4745933, at *7 (N.D. Cal. Sept. 19, 2014) (awarding

24    only standard daily transcripts, but noting that Apple had withdrawn its costs request for expedited
       transcripts).

25    [34] *See Kinzenbaw*, 2006 WL 1096683, at *6.  Because *Kinzenbaw* originated in the District of

26    Iowa, the district court applied Eighth Circuit rather than Ninth Circuit law.  But Emblaze offers no
       clear Ninth Circuit authority suggesting a different standard.

27    [35] *See* 28 U.S.C. § 1920; Civ. L.R. 54-3(c)(1).

28
                                              8

**A00094**

United States District Court
For the Northern District of California

1    "merely useful for discovery."[36] But the mere fact that Apple did not present all of its witnesses at

2    trial does not mean that those it omitted were not necessary to its case.[37] Taken to its logical

3    conclusion, such a requirement would incent parties to put on as many witnesses as possible at trial

4    merely to ensure they could recoup costs upon prevailing. Even if that made sense, Emblaze has

5    failed to show that in fact Apple found them "merely useful for discovery." Considering that

6    nearly all of the 14 non-testifying witnesses were named on one or both of the parties' initial trial

7    witness lists, Apple has established that the 14 depositions were necessarily obtained.

8         Emblaze fares better when it comes to the issue of deposition-related costs above and

9    beyond standard costs for deposition transcripts and video costs. Numerous courts in this district

10   have found that costs for expedited deposition transcripts are not recoverable.[38] And other courts

11   have found that shipping charges related to deposition transcripts cannot be taxed.[39] Unfortunately,

12   the information provided by Apple in support of its deposition charges does not differentiate

13   between the cost of an expedited deposition transcript and the cost of a standard deposition

14   transcript. As a result, this court has nothing on which to base a measured reduction of the over

15   $80,000 in costs it seeks for depositions. Although it would be within the discretion of the court to

16   deny costs for all deposition expenses here, Emblaze only raised objections as to the 14 non-

17   _____

18   [36] *TransPerfect Global, Inc.*, 2014 WL 1364792 at *4 (quoting *Indep. Iron Works, Inc. v. U.S. Steel Corp.*, 322 F.2d 656, 678 (9th Cir. 1963)).

19   [37] *See Manildra*, 76 F.3d at 1184 (Fed. Cir. 1996) ("Although use at trial is direct evidence of

20   necessity, an item may still be reasonably necessary for use in the case even if unused at trial.");
     *Apple Inc.*, 2014 WL 4745933, at *6 ("Although depositions that are merely useful for discovery

21   are not taxable, the fact that a party took the deposition of an individual who ultimately did not
     testify at trial or who testified on an issue on which the party ultimately did not prevail does not

22   mean that the deposition was therefore merely useful for discovery." (internal citation and
     quotation marks omitted)).

23   [38] *See, e.g.*, *Apple Inc.*, 2014 WL 4745933, at*6-7; *Plantronics, Inc. v. Aliph, Inc.*, Case No. 09-cv-

24   01714, 2012 WL 6761576, at *6 (N.D. Cal. Oct. 23, 2012); *City of Alameda v. Nuveen Mun. High
     Income Opportunity Fund*, Case No. 08-cv-04575, 2012 WL 177566, at *3 (N.D. Cal. Jan. 23,
     2012).

25   [39] *See, e.g.*, *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, Case No. 09-cv-5939, 2012 U.S.

26   Dist. LEXIS 64555, at *6 (N.D. Cal. May 8, 2012) ("[T]he court finds that the charge for 'shipping
     and handling' can reasonably be viewed as part of 'the cost of an original and one copy of any

27   deposition.'"); *In re Ricoh Co.*, Case No. 03-cv-02289, 2010 U.S. Dist. LEXIS 144033, at *17
     (N.D. Cal. Sept. 29, 2010) (holding "shipping costs for deposition transcripts are taxable.").

28

9

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS

United States District Court
For the Northern District of California

1    testifying witnesses. The court therefore will exclude only the deposition costs associated with

2    those 14 witnesses—$28,137.69.[40] The remaining deposition costs will stand in full.

3          Apple also raises issues with the award of costs. In particular, Apple seeks review of the

4    Clerk's denial of $219,544.66 of its requested $220,644.66 in exemplification costs. Under our

5    rules, "[t]he cost of reproducing disclosure or formal discovery documents when used for any

6    purpose in the case is allowable," and "[t]he cost of preparing charts, diagrams, videotapes, and

7    other visual aids to be used as exhibits is allowable if such exhibits are reasonably necessary to

8    assist the jury or the Court in understanding the issues at the trial."[41] Apple's requested costs break

9    down into three primary categories: reproduction of necessary documents, trial graphics and

10   demonstratives and electronic discovery file processing and uploads. The court will address each

11   category in turn.

12         As to reproduction of necessary documents, the primary issue is whether reproduction was

13   indeed necessary and whether the information that Apple provided the court in support of its bill of

14   costs is sufficient to establish necessity. The court finds that—for the most part—these costs are

15   appropriately recoverable. While Emblaze points to *Apple v. Samsung* to support its contention

16   that Apple's identification of "blowbacks" is insufficient because it does not specify whether the

17   copies were made for formal discovery, for the convenience of the court or for the purposes of trial,

18   the situation here is different. In *Apple v. Samsung*, Judge Koh was presented with documents that

19   were identified only as having been used in discovery, and in that scenario—without more—there

20   was no way for the court to determine whether the blowbacks properly fell within the bounds of

21   Local Rule 54-3(d).[42] Here, Apple clearly seeks recovery for blowbacks created for trial. The

22   invoices that Apple submitted identify the projects as ones associated with trial preparation, such as

23

24   _____

     [40] Apple's request in this category—$81,678.06—is reduced by the cost of the 14 non-testifying
25   witnesses—$28,137.69—for a total cost award of $53,540.37. *Cf.*, *TransPerfect Global, Inc.*, 2014
     WL 1364792 at *5.

26   [41] Civ. L.R. 54-3(d)(2), (5).

27   [42] *See Apple Inc.*, 2014 WL 4745933, at *9.

28
                                        10
     Case No. 5:11-cv-01079-PSG
     ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
     COSTS

United States District Court
For the Northern District of California

1  "Apple Trial Exhibits" and "Emblaze Trial Exhibits."[43]  Plus, the invoices date from just a few

2  weeks before trial, through trial itself.[44]  There is no plausible argument that these blowbacks were

3  created for any other reason.

4        As to delivery charges that Apple tried to squeeze into its reimbursement under Civ. L.R.

5  54-3(d), the court finds that deliveries to the court for a "Bench Brief" and "Mtn for Judgment,

6  Amended" are not within the ambit of trial exhibits and are therefore not taxable.[45]  But the

7  delivery charge associated with the lodging of deposition designations with the court is necessarily

8  related to trial and trial exhibits and thus permissible under the local rule.  In all, the court

9  awards costs to Apple associated with reproduction for trial in the amount of $67,996.71.[46]

10        Apple also seeks costs for creation of trial graphics and demonstratives.  Although the

11  parties dispute the timeliness of Apple's submission of certain invoices *in camera* for review, the

12  court has no problem with Apple's good-faith attempt to provide the court with all information

13  necessary to make a reasoned determination about whether to tax costs.  Further, the court is

14  unpersuaded by Emblaze's unsupported argument that Apple should not be able to recover based

15  on invoices that it will not share-in-full with Emblaze due to attorney-client privilege.[47]  This case

16  is exactly the type of complex litigation that requires high-quality demonstratives for the

17  edification of the jury.[48]

---

18  [43] *See* Docket No. 623-5 (as determined upon review of unredacted invoices submitted *in camera*
19  per Docket Nos. 638, 641).

20  [44] *See Am. Color Graphics, Inc. v. Travelers Prop. Cas. Ins. Co.*, Case No. 04-cv-03518, 2007 WL
    832935, at *5 (N.D. Cal. Mar. 19, 2007) (allowing recovery of costs associated with trial exhibits
21  and necessary witness binders where "[t]his Court does expect that counsel will provide the Court
    with a copy of such materials and a copy to be furnished to opposing counsel.").

22  [45] Civ. L.R. 54-3(d)(3) ("[t]he cost of reproducing copies of motions, pleadings, notices, and other
23  routine case papers is not allowable.").

24  [46] Apple's request in this category—$68,097.96—is reduced by the cost of delivery of courtesy
    copies to the court ($48.75 plus $52.50).

25  [47] Emblaze's attempt to parallel taxation of costs with an award of attorney's fees is equally
26  unpersuasive.

27  [48] *See, e.g.*, *Computer Cache Coherency Corp. v. Intel Corp.*, Case No. 05-cv-01766, 2009 WL
    5114002 (N.D. Cal. Dec. 18, 2009) (allowing recovery of costs for animated presentations where
28  "[t]he court finds that the animated presentations were useful and reasonably necessary given the

11

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
COSTS

United States District Court
For the Northern District of California

1    That being said, upon review of the unredacted versions of the invoices that Apple

2  submitted *in camera*, the court is not convinced that reimbursement is required for the full amount

3  of $68,180.00 that Apple seeks.  Specifically, included in the invoice itemization is time spent

4  delivering materials to the courthouse and time spent meeting with individuals about

5  demonstratives.  Because our local rules only support "the physical preparation and supplication of

6  documents[,] and not the intellectual effort involved in their production[,]" time spent in meetings

7  related to these documents cannot be taxed.  And Apple has offered no reasonable justification for

8  how the $400.95 delivery charge from First Legal Support for picking up rolling carts and boxes

9  from the courtroom can readily be included as a cost under reproduction and exemplification.  The

10  court finds that this type of delivery charge is not warranted under Civ. L.R. 54-3 as it was incurred

11  as a convenience rather than out of necessity for trial.  In all, the court grants Apple $66,005.00 for

12  trial graphics and demonstratives.[49]

13    This leaves the court with whether Apple can seek reimbursement for its in-court

14  technician.  As a rule, in complex patent litigations in this district, "[t]he in-court technician time

15  and the equipment costs associated therewith are . . . permitted" when "the Court acknowledges

16  that the demonstratives could not have been presented without the appropriate technical

17  resources."[50]  There are two sets of costs itemized on the invoice—charges for pre-trial services

18  and on-site services during trial.  But based on the invoices themselves, the court cannot determine

19  exactly what the technician was doing for the collective 309 hours he consulted for Apple.  At

20  most, the court can presume that the time he spent in the courtroom during trial was related to the

21  presentation of demonstrative exhibits for which reimbursement is allowed.  In this trial, where the

22

23  complexity of the issues in this case."); *Competitive Techs. v. Fujitsu Ltd.*, Case No. 02-cv-01673,
2006 WL 6338914, at *9 (N.D. Cal. Aug. 23, 2006) (granting an award of costs for demonstratives

24  where "[g]iven the potential financial impact of this lawsuit, the cost of the demonstratives was
reasonable in light of their usefulness.").

25  [49] Apple's request in this category—$68,180.00—is reduced by time spent in meetings and time

26  spent delivering materials to the court house ($25.00 plus $350.00 plus $18,00.00) plus the First
Legal Support delivery charge ($400.95).

27  [50] *Shum v. Intel Corp.*, 682 F. Supp. 2d 992, 1000 (N.D. Cal. 2009).

28
12

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
COSTS

United States District Court
For the Northern District of California

jury commenced deliberations on day eight,[51] the court can only reasonably assume that services for eight days from 9:00AM to 4:30PM[52] fall within the statutory requirement.[53]  Absent more specificity, the court can make no further determination.  At the technician's rate of $225.00 per hour, the court grants Apple costs related to this work in the amount of $11,700.00.[54]

The final dispute concerns what aspects of "e-discovery" can be appropriately taxed.  Apple seeks $23,710.75, which it argues is based solely on the costs associated with electronic documents actually produced to Emblaze in response to discovery requests.  Cost recovery for e-discovery is generally slated under exemplification and copies costs[55]—the idea being that electronic discovery and production costs are recoverable only to the extent analogous to an exchange of hardcopy information.[56]  And in the Northern District, only costs incurred specifically to produce documents to the opposing party are recoverable.[57]  The challenge in calculating e-discovery costs tends to

---

[51] *See* Docket No. 605.

[52] The court will consider the length of the trial day for these purposes to be six and one-half hours—to account for a daily one-hour lunch break.

[53] *See* Docket No. 539.

[54] Apple's request in this category—$60,225.00—is reduced to time spent in trial (6.5 hours per day times 8 days) at the rate of $225.00 per hour.

[55] *See* 28 U.S.C. § 1920(4) (allowing recovery of costs for "exemplification and copies of papers necessarily obtained for use in the case"); Civ. L.R. 54-3(d)(2) (allowing recovery of costs for "[t]he cost of reproducing disclosure or formal discovery documents when used for any purpose in the case").

[56] *See In re Online DVD-Rental Antitrust Litig.*, Case Nos. 11-cv-18034, 12-cv-16160, 12-cv-16183, 2014 WL 845842, at *8 (9th Cir. Feb. 27, 2015) (adopting a "narrow construction of § 1920(4)"); *eBay Inc. v. Kelora Sys., LLC*, Case No. 10-cv-04947 et al., 2013 WL 1402736, at *5 (N.D. Cal. Apr. 5, 2013) (awarding e-discovery costs analogous to "making copies" but not for the parties' convenience or related to the "intellectual effort" involved in document production); *Petroliam Nasional Berhad*, 2012 WL 1610979, at *4 (allowing recovery of e-discovery costs that were "necessary to convert computer data into a readable format"), *aff'd*, 737 F.3d 546 (9th Cir. 2013); *see also Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 171 (3d Cir. 2012); Preston Register, *How Much Do I Owe You for That Copy? Defining Awards Under 28 U.S.C. § 1920(4)*, 65 Ala. L. Rev. 1087, 1102 (2014).

[57] *See* Civ. L.R. 54-3(d)(2); *see also Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, Case No. 12-03762, 2014 WL 1860298, at *5 (N.D. Cal. May 8, 2014) (rejecting all e-discovery costs associated with unproduced documents); *In re Ricoh Comp., Ltd.*, 661 F.3d 1361, 1368 (Fed. Cir. 2011) (rejecting costs when it was unclear which party received the claimed production).

13

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS

United States District Court
For the Northern District of California

1  arise from how to allocate overall e-discovery costs without having to parse—document by

2  document—what went where.  Other courts in this district have approved a method that calculates

3  what percentage of overall documents were produced to the opposing party and then applies that

4  percentage to production-related costs in the vendor's invoices.[58]

5  Following their lead, Apple calculated that approximately eleven percent of the records its

6  document vendor hosted were actually produced to Emblaze in response to its discovery requests.

7  The court approves this calculus for charges associated with Fast Track upload and work to prepare

8  upload files.[59]  But the court cannot grant costs for the Variable License Fee—even at the modest

9  eleven percent that Apple has put forth.  The law in this district is clear that "the court does not tax

10  hosting fees."[60]  Apple—in its opening brief—describes the "variable license fee" as "the monthly

11  storage cost for storing data (i.e. documents for review and production in response to Emblaze's

12  discovery requests.)"[61]  No authority suggests that there is any exception for denial of hosting fees

13  simply because the fees are associated with document production to the other party—indeed all

14

15

16

17  [58] *See, e.g.*, *Apple Inc.*, 2014 WL 4745933, at *12 (calculating the approximate percentage of
18  e-discovery costs that were spent on document production to opposing party and awarding costs
    accordingly).

19  [59] *See Kwan Software Eng'g, Inc.*, 2014 WL 1860298, at *4 (finding recoverable fees for ".TIFF
20  and OCR conversion, Bates stamping, load file and other physical media generation" (citing
    *Alzheimer's Inst. of Am., Inc. v. Elan Corp. PLC*, Case No. 10-cv-00482, 2013 U.S. Dist. LEXIS
21  31952, at *16 (N.D. Cal. Jan. 31, 2013))); *eBay Inc.*, 2013 WL 1402736, at *7 (finding recoverable
    fees related to "scanning paper documents, electronic scanning and conversion to PDF, TIFF
22  conversion, OCR, image endorsement/Bates stamping, slip sheet preparation, blowback scanning
    paper documents, media hardware used for production, electronically stamping Bates numbers,
    slipsheet preparation, blowback preparation, and OCR conversion.").

23  [60] *eBay Inc.*, 2013 WL 1402736, at *17; *see Kwan Software Eng'g, Inc.*, 2014 WL 1860298, at *4
24  ("[T]he Ninth Circuit and the courts of this district have long held that costs compensable under
    section 1920 are only permitted for preparation and duplication of documents, not the efforts
25  incurred in assembling, collecting, or processing those documents.  Therefore, e-discovery storage
    costs are non-compensable under Section 1920." (internal quotation marks omitted) (citing *Ancora
26  Techs., Inc. v. Apple, Inc.*, Case No. 11-cv-06357, 2013 U.S. Dist. LEXIS 121225, at *7-8 (N.D.
    Cal. Aug. 26, 2013))).

27  [61] Docket No. 658 at 9-10.

28
                                          14
    Case No. 5:11-cv-01079-PSG
    ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF
    COSTS

1  hosting fees are so associated.  Ultimately, the court awards Apple $8,511.24 in e-discovery

2  costs.[62]

3                                              **IV.**

4          The court awards Apple $199,184.09 in costs based on the following adjustments:

5

| **Original Clerk's Taxation of Costs:** | **$73,108.83** |
|---|---|
| Trial Transcripts | $0 |
| Deposition Transcripts | ($28,137.69) |
| Document Reproduction | $67,996.71 |
| Trial Graphics/Demostratives | $66,005.00 |
| Court Technician | $11,700.00 |
| E-Discovery | $8,511.24 |
| **TOTAL COSTS TAXED:** | **$199,184.09** |

15  SO ORDERED.

16  Dated: March 20, 2015

17  _Paul S. Grewal_

18  PAUL S. GREWAL
    United States Magistrate Judge

United States District Court
For the Northern District of California

---

[62] Apple's request in this category—$23,710.75—is reduced by 11% of the variable license fee ($15,199.51).

Case No. 5:11-cv-01079-PSG
ORDER GRANTING-IN-PART MOTIONS SEEKING REVIEW OF CLERK'S TAXATION OF COSTS



US006389473B1

(12) **United States Patent**
Carmel et al.

(10) **Patent No.:** **US 6,389,473 B1**
(45) **Date of Patent:** **May 14, 2002**

(54) **NETWORK MEDIA STREAMING**

(75) Inventors: **Sharon Carmel; Tzur Daboosh**, both of Giv'atayim; **Eli Reifman**, Rishon le Zion; **Naftali Shani; Ziv Eliraz**, both of Tel Aviv; **Dror Ginsberg**, Karkur; **Edan Ayal**, Kfar Saba, all of (IL)

(73) Assignee: **Geo Interactive Media Group Ltd.**, Givatayim (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/275,703**

(22) Filed: **Mar. 24, 1999**

(30) **Foreign Application Priority Data**

Mar. 24, 1998 (IL) ................................................ 123819

(51) **Int. Cl.**[7] ............................................... **G06F 13/00**
(52) **U.S. Cl.** ....................................................... **709/231**
(58) **Field of Search** ...................... 707/500.1; 709/200, 709/231, 236, 246, 247; 382/236, 239; 375/240.12

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,267,334 A    11/1993   Normille et al. ............ 382/236
5,404,446 A    4/1995    Bowater et al. ............ 345/537
5,841,432 A    11/1998   Carmel et al. ........... 707/500.1

*Primary Examiner*—Robert B. Harrell
(74) *Attorney, Agent, or Firm*—Ladas & Parry

(57) **ABSTRACT**

A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, including providing at the transmitting computer a data stream having a given data rate, and dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith. The slices are encoded in a corresponding sequence of files, each file having a respective index, and the sequence is uploaded to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

**41 Claims, 11 Drawing Sheets**

Microfiche Appendix Included
(2 Microfiche, 138 Pages)



PTX 1



**FIG. 1**
PRIOR ART



FIG. 2



FIG. 3A

TIME

FIG. 3B

SLICE N          52

MESSAGE          54

50

FIG. 3C

56

| J | J+1 | J+2 | J+3 |  |  |  | • • • | N |

58

55

FIG. 3D





FIG. 4

FIG. 5



FIG. 6A



FIG. 6B



A00190

# FIG. 7



FIG. 8





FIG. 9

US 6,389,473 B1

1

## NETWORK MEDIA STREAMING

A computer printout is attached hereto as an appendix in microfiche form and is incorporated herein by reference. The printout comprises executable program files in hexadecimal format. This appendix includes 2 microfiches, containing a total of 138 frames.

### FIELD OF THE INVENTION

The present invention relates generally to network data communications, and specifically to real-time multimedia broadcasting over a network.

### BACKGROUND OF THE INVENTION

In network broadcasting, data are transmitted over a network in real time from a single transmitting computer to a plurality of clients simultaneously. The network may be a LAN, a WAN, an intranet or a public network such as the Internet. Network broadcasting is most commonly used to stream multimedia data, typically comprising images and sound.

FIG. **1** is a schematic illustration showing a real-time broadcasting system **20**, as is known in the art. One or more input devices **22** (for example, a video camera and/or microphone) are used to generate a multimedia data stream representing an entertainment or informational program to be transmitted to a plurality of clients **30** via a network **28**. Because of bandwidth limitations of the network, the data stream from host **22** must first be compressed by a real-time encoder **24** and then routed to appropriate clients **30** by a broadcast server **26** (since not all clients on the network are necessarily intended to receive the broadcast).

Encoder **24** and server **26** typically comprise high-cost, dedicated computer systems, such as a Sun Station (produced by Sun Microsystems) or a Windows NT server, running suitable RealSystem 5.0 software (produced by RealNetworks Inc., Seattle, Wash.). These dedicated systems are required in order to ensure that the data stream is distributed and received by clients **30** in real time. Similarly, host **22** must typically be connected directly to encoder **24** by a high-speed data link or LAN, and not via the Internet or other narrowband network. Therefore, real-time broadcasting is normally possible only for hosts having a suitable, dedicated encoder and broadcast server and cannot be offered by Internet service providers (ISPs) to their general clientele.

### SUMMARY OF THE INVENTION

It is an object of some aspects of the present invention to provide substantially continuous, high-bandwidth data streaming over a network using common, existing server and network infrastructure.

It is a further object of some aspects of the present invention to provide data broadcasting capability, particularly for multimedia data, without the need for a dedicated broadcast computer system.

It is a further object of some aspects of the present invention to provide apparatus and methods for data broadcasting at reduced cost by comparison with systems known in the art.

It is still another object of some aspects of the present invention to enable a personal computer to remotely broadcast a multimedia program through an Internet service provider (ISP) using common, universally-supported Internet communication protocols.

2

In preferred embodiments of the present invention, a transmitting computer generates a data stream and broadcasts the data stream via a network server to a plurality of clients. The data stream is divided into a sequence of segments or slices of the data, preferably time slices, wherein the data are preferably compressed. Each slice is preferably assigned a respective slice index. The transmitting computer uploads the sequence of slices to the server substantially in real time, preferably using an Internet protocol, most preferably the File Transfer Protocol (FTP), as is known in the art. The clients download the data stream from the server, preferably using an Internet protocol, as well, most preferably the Hypertext Transfer Protocol (HTTP), or alternatively, using other protocols, such as UDP or RTP, which are similarly known in the art. The clients use the slice indices of the frames to maintain proper synchronization of the playback. The division of the data stream into slices and the inclusion of the slice indices in the data stream to be used by the clients in maintaining synchronization allows the broadcast to go on substantially in real time without the use of special-purpose hardware.

Preferably, each segment or slice is contained in a separate, respective file. Alternatively, the segments or slices may all be contained in a single indexed file, which is streamed to the client in a series of packets, each covering a range of one or more indices. HTTP version **1**.1 supports this sort of file streaming. Other protocols may also be used for this purpose.

In some preferred embodiments of the present invention, the data stream comprises multimedia data captured or generated by the transmitting computer. The term "multimedia" as used in the context of the present patent application and in the claims refers to images or sound or to data representative of images or of sound or a combination thereof. Multimedia image data may include still images, video, graphics, animation or any combination thereof, including text displayed in conjunction therewith. It will be appreciated, however, that the principles of the present invention may similarly be applied to streaming of other data types.

Preferably, the transmitting computer compresses the frames in the data stream, most preferably using methods of image and audio compression such as those described in U.S. patent application Ser. No. 08/919,027, which is assigned to the assignee of the present patent application and incorporated herein by reference. Alternatively, any suitable methods of compression known in the art may be used. The compressed data are conveyed to the server and thence to the clients, which decompress the data.

In some preferred embodiments of the present invention, the transmitting computer and the clients monitor the uploading and downloading of data to and from the server, respectively, in order to determine the amount of time required to convey each slice and to verify that the slices are conveyed at a sufficient rate. When the data stream comprises multimedia data, the data rate should be generally equal to or faster than the rate at which the data are generated at the transmitting computer.

In some of these preferred embodiments, the transmitting computer and/or the clients each open a plurality of FTP or HTTP links, respectively, with the network server. The slices are transferred over different ones of the links in alternation. Although typically none of the plurality of links has sufficient bandwidth on its own to convey the entire data stream in real time, the combined bandwidths of the plurality of links is generally sufficient for this purpose. Preferably,

US 6,389,473 B1

3

each of the links is monitored to determine its specific data transfer rate. If the transfer rate of any of the links is below a predetermined minimum, that link is preferably closed, and a new link is opened in its place.

In other preferred embodiments, the slices are provided by the server at multiple resolution or quality levels. Each such level has a different degree of data compression, and thus corresponds to a different data bandwidth requirement. The client or the server monitors the data transfer rate of a data link opened therebetween and selects the level that is appropriate to the link bandwidth. If the monitored data transfer rate changes during transmission, the quality level is preferably reselected accordingly.

Preferably, the transmitting computer monitors the bandwidth of the data stream that it is uploading to the server, and compares the data stream bandwidth to a known or estimated bandwidth of the link or links between the transmitting computer and the server. The transmitting computer preferably compresses the data stream at a compression ratio that is adjusted so as to match the data stream bandwidth to the available link bandwidth, using methods described, for example, in the above-mentioned U.S. patent application Ser. No. 08/919,027.

There is therefore provided, in accordance with a preferred embodiment of the present invention, a method for real-time broadcasting from a transmitting computer to one or more client computers over a network, including:

providing at the transmitting computer a data stream having a given data rate;

dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;

encoding the slices in a corresponding sequence of files, each file having a respective index; and

uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Preferably, dividing the stream into the sequence of slices includes dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith.

Preferably, uploading the sequence includes comparing the upload rate to the data rate and adjusting the upload rate responsive to the comparison. Further preferably, encoding the stream includes compressing data in the stream at a desired compression ratio, and adjusting the upload rate includes changing the compression ratio. Alternatively or additionally, adjusting the upload rate includes adjusting the size of one or more of the slices.

Preferably, uploading the sequence includes opening a plurality of file transfer links between the transmitting computer and the server, each link characterized by a respective link data rate, and uploading different files in the sequence over different ones of the plurality of links. Further preferably, opening the plurality of links includes opening links such that the data rates of the links taken together are sufficient to upload the sequence at the upload rate generally equal to the data rate.

Preferably, uploading the sequence includes uploading a sequence using an Internet Protocol, most preferably using FTP.

Preferably, the method includes downloading the sequence using an Internet protocol, most preferably HTTP, or alternatively, UDP or RTP, over the network from the server to the one or more client computers. Preferably, the one or more client computers decode the sequence and play

4

back the data stream responsive to the indices of the files, at a replay rate generally equal to the data rate.

Preferably, uploading the sequence includes uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded, and the one or more client computers read the index file to play back the sequence. In a preferred embodiment, downloading the sequence includes selecting a file in the sequence earlier than the file whose index is contained in the index file and downloading at least a portion of the sequence of files beginning with the selected file.

Preferably, the one or more client computers include a plurality of client computers, and downloading the sequence includes downloading to the plurality of client computers substantially simultaneously.

Preferably, downloading the sequence includes opening a plurality of download links between one of the client computers and the server, each link characterized by a respective link data rate, and downloading different files in the sequence over different ones of the plurality of links. Most preferably, opening the plurality of links includes opening links such that the data rates of the links taken together are sufficient to download the sequence at the download rate generally equal to the data rate.

Preferably, opening the plurality of links includes monitoring the data rates of the links and opening a new link in place of one of the links having a data rate lower than a predetermined level.

In one preferred embodiment, opening the new link includes retransmitting at least one of the files in the sequence, wherein the at least one of the files was incompletely transmitted over the one of the links having the data rate lower than the predetermined level.

In another preferred embodiment, opening the new link includes dropping at least one file out of the sequence, wherein the at least one of the files was incompletely transmitted over the one or more of the links having the data rate lower than the predetermined level.

In still another preferred embodiment, encoding the slices includes encoding slices at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels. Preferably, downloading the sequence includes determining a data bandwidth of the network between the server and the client computer and selecting one of the quality levels responsive to the determined bandwidth.

Preferably, the data stream includes multimedia data.

There is further provided, in accordance with a preferred embodiment of the present invention, apparatus for real-time broadcasting of a data stream having a given data rate over a network, including:

a transmitting computer, which divides the stream into a sequence of slices, each slice having a predetermined data size associated therewith, and encodes the slices in a corresponding sequence of files, each file having a respective index, and

which uploads the sequence to a server at an upload rate generally equal to the data rate, such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Preferably, the transmitting computer compares the upload rate to the data rate and adjusts the upload rate responsive to the comparison. Most preferably, the transmitting computer compresses the data at a compression ratio which is varied responsive to the comparison. Additionally

US 6,389,473 B1

5

or alternatively, the transmitting computer adjusts the size of one or more of the slices responsive to the comparison.

Preferably, the transmitting computer opens a plurality of links between the transmitting computer and the server, each link characterized by a respective data rate, and transmits different ones of the sequence of files over different ones of the plurality of links. Most preferably, the transmitting computer opens the plurality of links such that the data rates of the links taken together are sufficient to upload the sequence at the upload rate generally equal to the data rate. Further preferably, the transmitting computer monitors the data rates of the links and opens a new link in place of one of the links whose data rate is lower than a predetermined level.

In a preferred embodiment, the slices are encoded at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels.

Preferably, the transmitting computer uploads the sequence using an Internet upload protocol, most preferably FTP.

Preferably, the one or more client computers decode the sequence and play back the data stream responsive to the indices thereof, at a data replay rate generally equal to the data rate. Preferably, the one or more client computers download the encode sequence using an Internet download protocol, most preferably HTTP or alternatively, UDP or RTP.

Preferably, the one or more client computers include a plurality of client computers, which download the sequence substantially simultaneously.

Preferably, the network includes the Internet.

Further preferably, the data stream includes multimedia data, and the predetermined data size of each of the slices corresponds to a time duration of the slice.

The present invention will be more fully understood from the following detailed description of the preferred embodiments thereof, taken together with the drawings in which:

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of a computer broadcast network, as is known in the art;

FIG. 2 is a schematic illustration of a computer broadcast network, in accordance with a preferred embodiment of the present invention;

FIG. 3A is a block diagram that schematically illustrates a data structure of a broadcast sequence, in accordance with a preferred embodiment of the present invention;

FIG. 3B is a block diagram that schematically illustrates an index file associated with the data structure of FIG. 3B, in accordance with a preferred embodiment of the present invention;

FIG. 3C is a schematic illustration of a user interface graphic, for use in conjunction with the data structure of FIG. 3A, in accordance with a preferred embodiment of the present invention;

FIG. 3D is a block diagram that schematically illustrates a data structure of a broadcast sequence, in accordance with another preferred embodiment of the present invention;

FIG. 4 is a block diagram that schematically illustrates a network connection between a transmitting computer and a network server, for use in broadcasting of a data sequence, in accordance with a preferred embodiment of the present invention;

FIG. 5 is a flow chart that schematically illustrates a method of uploading broadcast data from a transmitting

6

computer to a server, in accordance with a preferred embodiment of the present invention;

FIG. 6A is a flow chart that schematically illustrates a method of downloading broadcast data from a server to a client, in accordance with a preferred embodiment of the present invention;

FIG. 6B is a flow chart that schematically illustrates a method of downloading broadcast data from a server to a client, in accordance with another preferred embodiment of the present invention;

FIG. 7 is a flow chart that schematically illustrates a method for preparing data files for transmission, in accordance with a preferred embodiment of the present invention;

FIG. 8 is a flow chart that schematically illustrates a method of file transfer, in accordance with a preferred embodiment of the present invention; and

FIG. 9 is a flow chart that schematically illustrates a method for monitoring network links, in accordance with a preferred embodiment of the present invention.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Reference is now made to FIG. 2, which is a schematic illustration of a computer system 32 for remote broadcasting of a multimedia sequence over a network 28, in accordance with a preferred embodiment of the present invention. System 32 comprises a transmitting computer 34, which generates the sequence, a plurality of clients 30, and a network server 36, all of which communicate over network 28, preferably using the well-known Internet Protocol (IP). Computer 34 preferably receives audiovisual input from input devices 22, although data inputs of other types may be generated at or by computer 34 using any suitable means known in the art.

Network 28 preferably comprises the Internet, although it may equally comprise a LAN, WAN, intranet or other computer network as is known in the art. Computer 34 and clients 30 preferably comprise conventional personal computers or workstations. Server 36 may comprise any suitable type of computer or computer system, for example, a Sun Microsystems UltraSPARC station or a Windows NT server, as are commonly used by Internet Service Providers (ISPs) . In any case, it is noted that transmitting computer 34 can be remotely located relative to server 36, and that the server need not be equipped with any special-purpose hardware or software for real-time data broadcasting, unlike broadcast systems known in the art, such as the real-time encoder and broadcast server shown in FIG. 1.

After preparing the multimedia sequence, computer 34 uploads the sequence over network 28, preferably using the Internet File Transfer Protocol (FTP). Alternatively, other Internet protocols may be used, such as the TCP/IP, UDP or RT(x) protocols, which are known in the art. Preferably, the data in the sequence are compressed, although compression is not essential to implementation of the present invention. The sequence is preferably generated and compressed in real time, and could comprise, for example, an interview program or an entertainment or sports event, although a prerecorded sequence may similarly be broadcast in this manner. Computer 34 is preferably equipped with suitable software for preparing and compressing the multimedia sequence. For example, for audio data, the computer may typically run GSM 6.10 standard audio compression software, operating at a sample rate of 8 kHz, with 16 bits/sample. Some useful techniques for preparing, compressing and transmitting multimedia sequences are described in U.S. Pat. No. 5,841,432

US 6,389,473 B1

7

8

and in the above-mentioned U.S. patent application Ser. No. 08/919,027, both of which are incorporated herein by reference.

Clients **30** connect to server **36** and receive the multimedia sequence, substantially in real time. Clients **30** preferably download the sequence using the Hypertext Transfer Protocol (HTTP), although other Internet protocols may also be used, such as UDP or RTP, as noted hereinabove with reference to uploading by computer **34**. Since FTP and HTTP are supported by substantially all network servers, server **36** need not include any special-purpose broadcasting hardware or software, as noted above. Similarly, because HTTP is supported by substantially all modern Web browsers, clients **30** will typically need only add a Java applet or plug-in to their existing Web browsers, as described further hereinbelow, in order to receive and play back the broadcast.

FIG. 3A is a block diagram that schematically illustrates the structure of a stream of broadcast data **40** produced by computer **34**, typically corresponding to a multimedia data sequence, in accordance with a preferred embodiment of the present invention. Data stream **40** comprises a series of data slices **42**, **44**, **46**, **48**, etc. Each slice contains a segment of video and/or audio data, corresponding to a respective, successive time interval labeled $T_1$, $T_2$, $T_3$, etc. The data are preferably compressed, as described further hereinbelow. Computer **34** stores each slice as a corresponding file, having a running slice index **1**, **2**, **3** . . . N. Preferably, each file also includes one or more time stamps, indicating a real time at which the data in the file were recorded or an elapsed time relative to the beginning of stream **40**. The files are uploaded to server **36**, such that while any given slice (other than first slice **42**) is being created, one or more preceding slices are in the process of being uploaded.

Computer **34** monitors the time codes as file **40** is transmitted, and clients **30** similarly monitor the time codes as the file is received, in order to ensure that the transmission or reception is "keeping up" with the input of the data to the computer. In the event that a lag is detected, steps are taken to increase the data transmission or reception rate, as described further hereinbelow. For example, as shown in FIG. 3A, time intervals $T_1$, $T_2$, $T_3$, are not all equal, but rather are adjusted by computer **34** in response to the transmission rate. Alternatively or additionally, the compression level of the data is varied, as is likewise described below, so as to adjust the data streaming rate to the available bandwidth over one or more channels between computer **34** and server **36**, and/or between server **36** and client **30**.

Computer **34** continues to upload files **42**, **44**, **46**, etc., until data stream **40** is finished or terminated by a user of computer **34**. All of the files in the data stream may be saved on server **36** for any desired period of time, as long as the server has sufficient free memory that is accessible to computer **34**. Typically, however, the memory available on server **36** is limited, and files **42**, **44**, **46**, etc., will be stored on the server and erased therefrom in a "first-in-first-out" sequence.

FIG. 3B is a block diagram that schematically illustrates an index file **50**, which is created by computer **34**, and is uploaded to server **36**, in accordance with a preferred embodiment of the present invention. The index file comprises a slice ID **52**, indicating the index of the file in data stream **40** that was most recently uploaded by computer **34**. Each time a new file **42**, **44**, **46**, etc., is uploaded, ID **52** in file **50** on server **36** is updated. Preferably, ID **52** holds the file name of the new file, wherein the name typically

comprises a string followed by the index of the file. When one of computers **30** connects to server **36** and begins to download the data stream, it first reads the index file in order to identify at what point in stream **40** to begin and to start receiving the data stream substantially in real time, preferably with only a minimal lag, as it is transmitted from computer **34**. Alternatively, a user of one of computers **30** may choose to begin downloading data stream **40** from an earlier point in time than that indicated by ID **52**. Further alternatively, stream **40** may be multicast to clients **30**, as is known in the art, typically without the use of an index file.

Index file **50** may further include a message **54**, which is read by computers **30** when they connect to server **36** to download data stream **40** or, alternatively or additionally, at any time the message is updated by computer **34**. The message contains parameters relating generally to the data stream and/or instructions to computers **30**, for example, "transmission paused." FIG. 3C is a schematic representation of a user interface graphic "slider" **55**, available to users of computers **30**, in accordance with a preferred embodiment of the present invention. Slider **55**, which is preferably displayed on the screens of computers **30**, includes a bar **56** and a movable indicator **58**. The symbols J, J+1, J+2, . . . N in the figure are the indices of the slices of stream **40** that are stored on server **36**, wherein N is the index of the most recent slice, and J is the index of the earliest stored slice. J may indicate the first slice in the sequence, if all of the files are stored on server **36**, or it may be the earliest file not yet erased. (The indices are marked in the figure on bar **56** for clarity, and need not actually be shown on the computer screen.)

When one of computers **30** reads index file **50** and begins to download stream **40**, indicator **58** preferably marks the most recent slice, as shown in FIG. 3C. This is the point at which the download will begin, unless the user of the computer chooses otherwise. If the user wishes to begin the download at an earlier point, he may move indicator **58** to the left along bar **56** to that point, preferably using a mouse or other pointing device, as is known in the art. Indicator **58** may be moved back and forth along bar **56** to jump back and forth along stream **40**.

FIG. 3D is a block diagram that schematically illustrates a file format of a multi-level data stream **41**, in accordance with another preferred embodiment of the present invention. The data stream is divided into audio slices **45**, **47** and video slices **49**, **51**, and may also include other data formats, such as a text slice **53** and/or a URL slice **55**. Each slice is preferably identified by a level identifier **57**, a presentation time stamp (PTS) index **59** and, as appropriate, a size identifier **61**. The function of these identifiers and indices is described further hereinbelow. A header **43** includes data such as the title, author, copyright and formats of the data in the stream; the duration of the multimedia sequence represented by the stream; and a description of the available stream levels and associated data sizes.

Each time slice in stream **41** includes multimedia data at multiple quality levels. There are two such levels in the example shown in FIG. 3D, identified as level #1 and level #2, but a larger number of levels may also be used. Typically, the audio and video data in level #1, contained in slices **45** and **49**, are more highly compressed relative to the data in slices **47** and **51** of level #2. In consequence, the level #1 slices have smaller data volume than the level #2 slices and can therefore be transmitted over a lower-bandwidth data link, while maintaining the required slice timing indicated by time stamps **59**. The lower data-rate transmission generally comes at the expense of inferior sound and/or image

A00197

US 6,389,473 B1

9     10

quality. Size identifier **61** describes the size of those slices in stream **41** that have a fixed size associated therewith, wherein typically the size (or the corresponding resolution) of the level #1 video slices is smaller than that of the level #2 slices.

Each of clients **30** chooses or is assigned the quality level appropriate to the bandwidth of its link on network **28** to server **36**. A method for selecting and, as required, varying the level is described hereinbelow with reference to FIG. 6B.

FIG. **4** is a block diagram that schematically illustrates communication between computer **34** and server **36** over network **28**, in accordance with a preferred embodiment of the present invention. Computer **34** should preferably ensure that there is sufficient communication bandwidth between the computer and the server, particularly when network **28** includes an Internet connection, which may be slow and subject to bottlenecks. For this purpose, the computer preferably opens a plurality of links, each link having its own URL (Uniform Resource Locator). Preferably, five links **60, 62, 64, 66** and **68** are opened and operate simultaneously over a single modem line. Alternatively, each link may be routed differently from the other links, over a different telephone line and/or through different Internet nodes. Files **42, 44, 46, 48**, etc., in stream **40** are transmitted respectively over links **60, 62, 64, 66** and **68** in successive alternation, so that at any given time (except at the very beginning of the sequence) up to five files are transmitted in parallel. Alternatively, more than five links may be opened, so that more than five files may accordingly be transmitted in parallel.

Preferably, computer **34** monitors the rate of data being transmitted over each of links **60, 62, 64**, etc., and allocates files **42, 44, 46, 48**, etc., according to the data rates. The sizes of the files may be varied by adjusting slice durations $T_1$, $T_2$, $T_3$, etc., and a relatively greater volume of data may be transmitted through links exhibiting relatively greater data rates. The bandwidth open for transmission between computer **34** and server **36** is effectively roughly equal to a sum of the bandwidths of the plurality of open links. The number of links that are actually opened between computer **34** and server **36** may be less than or greater than the five links shown in the example of FIG. **4**, depending on the available data rates of the open links, compared with the rate of data in stream **40**. Preferably at least two links are opened, so that preparation and transmission of files **42, 44, 46, 48**, etc., may be toggled back and forth between the links. A similar technique is preferably employed by clients **30**.

Alternatively or additionally, the link bandwidth may be accommodated using the multi-level transmission concept illustrated by FIG. 3D, over either a single link or over multiple simultaneous links with server **36**.

FIG. **5** is a flow chart that schematically shows an overview of operations of computer **34** in preparing and transmitting data stream **40** over network **28**, in accordance with a preferred embodiment of the present invention. Details of some of the steps in the operation are shown in FIGS. **7–9** and described further with reference thereto. Exemplary programs for carrying out the functions illustrated in FIG. **5** are incorporated herein in a software appendix, which is described further hereinbelow.

To begin the broadcast, computer **34** connects to server **36**, optionally opening the plurality of links shown in FIG. **4**. Broadcast data are then input to the computer, for example, from input devices **22**, or from a video, audio or animation sequence stored on disk or tape. The data are compressed at step **80**, and are then "sliced" at step **82** into files **42, 44, 46, 48**, etc., as shown in FIG. 3A. Computer **34** conveys file **40** to server **36** over links **60, 62, 64, 66** and **68**, as described above, preferably using FTP, at step **84**. Each time a new file is uploaded to the server, index file **50** (FIG. 3B) is updated, at step **86**.

For each of the one or more links that is open, computer **34** checks the link function at step **88**, preferably by timing the transfer of the respective files being transmitted over the link. In the event that one of the links, for example, link **60** as shown in FIG. **4**, is not responding or is responding unacceptably slowly, computer **34** breaks the link. The file being transmitted over the broken link may be retransmitted over another link. Alternatively, the file may be dropped from the transmission, in the case of a real-time multimedia broadcast, in which data arriving at one of computers **30** will generally tend to disrupt reception of the broadcast. When link **60** is broken, a new link, for example, link **70**, is opened in its stead, as described further hereinbelow with reference to FIG. **8**. Alternatively or additionally, the encoding/quality level (step **80**) or slicing (step **82**) of the data may be adjusted, as described hereinbelow with reference to FIG. **7**. This process continues until the broadcast program is completed.

FIG. 6A is a flow chart illustrating the operation of clients **30** in downloading and playing back data stream **40** (FIG. 3A) transmitted by computer **34**, in accordance with a preferred embodiment of the present invention. The operation of client is controlled by a Java applet, which may be downloaded from server **36**, and includes facilities for carrying out the steps shown in FIG. 6A, as well as for error detection and, optionally, correction in communications received by the clients and for other functions known in the art. A sample applet of this sort is incorporated herein in the software appendix, as further described hereinbelow.

Each client **30** connects to server **36**, optionally using multiple HTTP links, in a manner similar to that shown and described above with reference to FIG. **4**. Typically, client **30** opens one or two HTTP links, over which files **42, 44, 46**, etc., are downloaded in successive alternation, but as in the case of transmitting computer **34**, a greater number of links may similarly be opened. The client first reads index file **50** (FIG. 3B), and graphic **36** (FIG. 3C) is displayed by the client, so that a user can decide and indicate at which slice of data stream **40** to begin downloading. Responsive to a user input, client **30** selects an appropriate starting slice and begins to download and decode (decompress) files **42, 44, 46**, etc. In the case of a multimedia stream, client **30** reconstructs and outputs the multimedia data for the appreciation of a user. Time stamps in the data stream are used to synchronize the data, so that the multimedia sequence is played back just as it was input at computer **34**, preferably with only a minimal necessary transmission and decoding delay.

Client **30** preferably monitors the rate of data coming in over each of its links with server **36**. If any of the links is non-operative or is operating unacceptably slowly, that link is closed, and a new link is opened in its place, as described above. Further preferably, the client compares the times stamped in the data stream to a local real-time clock and, if it determines that there is a significant lag in the time codes relative to the real-time clock, opens additional links with server **36** in order to increase the overall data rate.

FIG. 6B is a flow chart illustrating the operation of clients **30** in downloading and playing back multi-level data stream **41** (FIG. 3D) transmitted from server **36**, in accordance with another preferred embodiment of the present invention. As

US 6,389,473 B1

11

in the method of FIG. 6A, each client 30 connects to the server, generally using a single HTTP link. After reading header 43 and, preferably, making an initial assessment of the link bandwidth, the client selects one of the available quality levels in the stream. Responsive to the selection, server 36 begins to transmit data slices at the chosen quality level. The slices are received, decoded and output by the client.

Periodically, client 30 makes an assessment of the rate of data transfer over the link from the server and, if necessary, changes the quality level accordingly. For example, if the rate is low, such that time stamps 59 indicate that the slices need to be played as fast as or faster than they are being received, the client will preferably select a lower quality level if one is available. On the other hand, if the rate is substantially higher than what is needed to receive the successive slices on time, the client may select a higher quality level to take advantage of the available bandwidth. Preferably, upper and lower data rate thresholds, or watermarks, are set dynamically in response to the data rate and are used in determining when a new quality level should be selected.

FIG. 7 is a flow chart that schematically illustrates details of encoding step 80 and slicing step 82 in the method of FIG. 5, in accordance with a preferred embodiment of the present invention. In encoding data stream 40, computer 34 preferably compresses the data using any suitable compression method known in the art. For example, if data stream 40 comprises audio data, GSM 6.10 standard encoding may be used, as is known in the art, to compress the data by about 10:1. Alternatively or additionally, for video data, H.263 standard compression, similarly known in the art, may be used. These compression standards are advantageous in that common personal computers can perform such compression in real time, in parallel with the other operations illustrated in FIG. 5. Other compression methods known in the art, such as MPEG data compression, may similarly be used, as long as computer 34 is sufficiently powerful.

Computer 34 determines a compression ratio by which to compress the data, based on the collective bandwidth of its open links with server 36. Preferably, computer 34 receives an indication of the bandwidths of the links, determined at step 88 in FIG. 5, and adjusts the compression ratio accordingly, at a set compression step 90. For example, the compression ratio may be adjusted by changing compression coefficients (e.g., MPEG coefficients) so as to match the data stream bandwidth to the available link bandwidth. Methods of adaptively varying the compression ratio of a multimedia data stream that can be used for this purpose are described, for example, in the above-mentioned U.S. patent application Ser. No. 08/919,027.

Similarly, at a set duration step 92, slice durations $T_1$, $T_2$, $T_3$, etc., are optionally adjusted responsive to the link bandwidths. Initially, duration $T_1$ of slice 1 for file 42 is set to a default value, typically between 1 and 5 sec. For example, to transfer compressed audio data at 2 Kbytes/sec, file 42 may be assigned a file size of 10 Kbytes, with $T_1$=5 sec. Assuming that computer 34 communicates over network 28 through a 28.8 Kbaud modem and maintains a typical FTP upload rate of 2 Kbytes/sec (allowing for moderate Internet bottlenecks), data stream 40 will be uploaded to server 36 over link 60 (FIG. 4) substantially at the rate that the audio data are input to computer 34.

Frequently, however, this will not be the case, and the FTP upload rate over link 60 will fluctuate and may be slower than 2 Kbyte/sec. At step 88 (FIG. 5), the time required to

12

upload file 42 is measured and compared to $T_1$, at the same time as file 44 (slice 2) is being encoded and prepared. Responsive to this measurement of upload time, the duration of subsequent slices, for example, times $T_3$ and $T_4$ for files 46 and 48, respectively, is adjusted. Thus, as illustrated in FIG. 3A, $T_3$ and $T_4$ are less than $T_1$ and $T_2$. The shorter files 46, 48, etc., that result from the change in slice duration are more likely to reach server 36 in the proper sequence, without being held up by extended bottlenecks. Furthermore, when the slice durations are shorter, the effect of "drop-out" of a slice due to failure of the corresponding link is less marked.

On the other hand, if it is determined that the upload time for file 42 (or a subsequent file) is substantially shorter than duration $T_1$, the duration of subsequent files may be extended, and/or the compression ratio may be decreased, so as to take better advantage of the available bandwidth.

FIG. 8 is a flow chart that schematically illustrates details of FTP step 84 in the method shown in FIG. 5, in accordance with a preferred embodiment of the present invention. To begin the process of FTP transfer to server 36, a FTP OPEN command is issued to the server by computer 34 at step 94, thus opening link 60 (FIG. 4). The computer then issues a FTP SEND command to send file 42, corresponding to slice 1, over the link. These steps are repeated for each of a first group of links 62, 64, 66 and 68 and for a corresponding first group of files 44, 46, 48, etc., up to a maximum initial number of links $J_{MAX}$. In the current example, $J_{MAX}$=5, since the inventors have found that five FTP links provide a reliable upload path with a sufficient overall bandwidth when transferring data over the Internet. A larger or smaller number of links could be used, however, and $J_{MAX}$ may also be assigned the value 1, in which case the steps of the method of FIG. 5, and the details thereof shown in FIGS. 7, 8 and 9, are carried out over a single FTF link.

As described above, links 60, 62, 64, 66 and 68 continue to operate until and unless it is determined that one of the links (for example, link 60 in FIG. 4) is operating at an unacceptably slow data transfer rate. Assuming all of the links to be functioning properly, after the first five slices of stream 40 have been allocated in succession to the five links, a file corresponding to a sixth slice of the stream is then allocated again to link 60, or to whichever of the open links was the first to have completed transmission of its initial file. This process continues in alternation for all of the slices of stream 40, until transmission is completed.

If link 60 has not completed transmission of file 42 by the time the sixth file is ready for transmission, link 60 will be timed out, and a time-out indication will be received from step 88 (FIG. 5). In this case, link 60 is terminated and is replaced by link 70. Preferably, a "socket" opened for link 60 by a WINSOCK program running on computer 34 is simply reinitialized to open link 70. Optionally, file 42 is retransmitted over link 70 or over one of the other links, although in the case of a live broadcast transmission, it may be preferable simply to drop the file rather than send it after such a long delay.

FIG. 9 is a flow chart that schematically illustrates details of check link step 88 in the method of FIG. 5, in accordance with a preferred embodiment of the present invention. As noted above, for each file 42, 44, 46, etc., computer 34 measures a slice transmission time $T_{SL}$, corresponding to the time required to transmit the entire file to server 36. If $T_{SL}$ is greater than a maximum permissible time $T_{MAX}$, it is then determined that the link over which the file was transmitted is not functioning adequately. In this case, a command is sent

**A00199**

to open a new FTP link at step **94**, as described above. $T_{MAX}$ is preferably set to be a predetermined multiple of $T_{SL}$, depending on the length of possible transmission delay that can be tolerated. Typically, $T_{MAX}$ is set to an initial value of about 20 sec, although when the slice durations are changed (at step **92**), $T_{MAX}$ is preferably adjusted accordingly.

For optimal, reliable functioning of the upload process from computer **34** to server **36**, $T_{SL}$ should desirably be close to or less than a predetermined minimum time $T_{MIN}$. Typically, $T_{MIN}$ is set to be approximately equal to the slice duration $T_1$, $T_2$, etc., i.e., about 5 sec initially. If the measured value of $T_{SL}$ is greater than $T_{MIN}$, although still less than $T_{MAX}$, then it will generally be desirable to either increase the compression ratio, at step **90**, or decrease the slice duration, at step **92**, or both. The reasons and methods for changing the compression ratio and slice duration were described hereinabove with reference to FIG. **7**. Preferably, computer **34** calculates optimal values of the compression ratio and slice duration, depending inter alia on the relative values of $T_{SL}$, and $T_{MIN}$.

If $T_{SL}$ is substantially less than $T_{MIN}$, then the slice duration may optionally be increased, as noted hereinabove.

The process shown in FIG. **5**, including the interdependent steps of encoding **80**, slicing **82**, FTP upload **84**, updating **86** and checking link function **88** thus continues until the entire data stream **40** is uploaded (except for any of files **42**, **44**, **46**, **48**, etc., that may be dropped due to excessive transmission delay, as described above), or until the transfer is terminated by a user of computer **34**. Although details of these steps have been described primarily with reference to the uploading process of FIG. **5**, it will be understood that similar methods are applicable, mutatis mutandis, to the method of downloading the files from server **36** to clients **30**, as shown in FIG. 6A.

Although the preferred embodiments described hereinabove refer primarily to broadcasting multimedia data over the Internet, in other preferred embodiments of the present invention, network **28** may comprise substantially any suitable sort of network, such as a LAN, WAN or intranet, and the data may comprise substantially any type of continuously streaming data. It will be understood in this case that the slices of the data stream corresponding to files **42**, **44**, **46**, etc., will not necessarily be time slices as described hereinabove, but may rather have an appropriate, preferably variable, data size associated therewith. Furthermore, it will be appreciated that the principles of the present invention may similarly be applied in other areas of real-time multimedia data streaming, such as video teleconferencing.

It will thus be understood that the preferred embodiments described above are cited by way of example, and the full scope of the invention is limited only by the claims.

## Software Appendix

An appendix is attached hereto as an integral part of the present patent application, including the following computer-readable files, which exemplify aspects of the operation of system **32** (FIG. 2) and of the file structures and methods described hereinabove. This appendix contains material covered by copyright, belonging to Geo Interactive Media Group Ltd.:

1. LiveFeedClient.exe

2. LFRec.dll

3. Jsdec.class

4. EmblazeAudio.class

5. CyclicDecoderStream.class

6. RandomAccessStream.class

7. Xbuttons.jpg

8. ALF.HTML

9. Addresses.dat

The above files should be entered into a personal computer, preferably a desktop PC (Pentium 166 MHz, with 32 MB RAM), with a Windows 95 or Windows NT operating system installed. The files should be stored on disk in a common folder or directory, together with a Microsoft Basic DLL file named Msvbvm50.dll, available from Microsoft Inc., Redmond, Wash. The computer should be equipped with a Sound Blaster sound card, with a microphone connected to the line-in input jack thereon. The computer should also be connected to the Internet via a standard modem or LAN, and should have an FTP account with an Internet Service Provider (ISP).

What is claimed is:

**1**. A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:

providing at the transmitting computer a data stream having a given data rate;

dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;

encoding the slices in a corresponding sequence of files, each file having a respective index; and

uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

**2**. A method according to claim **1**, and comprising downloading the sequence using an Internet protocol over the network from the server to the one or more client computers.

**3**. A method according to claim **2**, wherein downloading the sequence comprises opening a plurality of download links between one of the client computers and the server, each link characterized by a respective link data rate, and downloading different files in the sequence over different ones of the plurality of links.

**4**. A method according to claim **3**, wherein opening the plurality of links comprises monitoring the data rates of the links and opening a new link in place of one of the links having a data rate lower than a predetermined level.

**5**. A method according to claim **4**, wherein opening the new link comprises retransmitting at least one of the files in the sequence, wherein the at least one of the files was incompletely transmitted over the one of the links having the data rate lower than the predetermined level.

**6**. A method according to claim **4**, wherein opening the new link comprises dropping at least one file out of the sequence, wherein the at least one of the files was incompletely transmitted over the one or more of the links having the data rate lower than the predetermined level.

**7**. A method according to claim **3**, wherein opening the plurality of links comprises opening links such that the data rates of the links taken together are sufficient to download the sequence at the download rate generally equal to the data rate.

**8**. A method according to claim **2**, wherein the one or more client computers decode the sequence and play back the data stream responsive to the indices of the files, at a replay rate generally equal to the data rate.

**9**. A method according to claim **8**, wherein uploading the sequence comprises uploading and updating an index file containing the index of the file in the sequence that was most

A00200

US 6,389,473 B1

| 15 | 16 |

recently uploaded, and wherein the one or more client computers read the index file to play back the sequence.

**10.** A method according to claim **9,** wherein downloading the sequence comprises selecting a file in the sequence earlier than the file whose index is contained in the index file and downloading at least a portion of the encoded sequence of files beginning with the selected file.

**11.** A method according to claim **2,** wherein encoding the slices comprises encoding slices at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels.

**12.** A method according to claim **11,** wherein downloading the sequence comprises determining a data bandwidth of the network between the server and the client computer and selecting one of the quality levels responsive to the determined bandwidth.

**13.** A method according to claim **2,** wherein downloading the sequence comprises downloading the sequence using a protocol selected from a group consisting of HTTP, UDP and RTP.

**14.** A method according to claim **2,** wherein the one or more client computers comprise a plurality of client computers, and wherein downloading the sequence comprises downloading to the plurality of client computers substantially simultaneously.

**15.** A method according to claim **1,** wherein uploading the sequence comprises comparing the upload rate to the data rate and adjusting the upload rate responsive to the comparison.

**16.** A method according to claim **15,** wherein encoding the stream comprises compressing data in the stream at a desired compression ratio, and wherein adjusting the upload rate comprises changing the compression ratio.

**17.** A method according to claim **15,** wherein adjusting the upload rate comprises adjusting the size of one or more of the slices.

**18.** A method according to claim **1,** wherein uploading the sequence comprises opening a plurality of file transfer links between the transmitting computer and the server, each link characterized by a respective link data rate, and uploading different files in the sequence over different ones of the plurality of links.

**19.** A method according to claim **18,** wherein opening the plurality of links comprises opening links such that the data rates of the links taken together are sufficient to upload the sequence at the upload rate generally equal to the data rate.

**20.** A method according to claim **18,** wherein opening the plurality of links comprises monitoring the data rates of the links and opening a new link in place of one of the links having a data rate lower than a predetermined level.

**21.** A method according to claim **1,** wherein uploading the sequence comprises uploading a sequence using an Internet Protocol.

**22.** A method according to claim **21,** wherein uploading the sequence comprises uploading a sequence using FTP.

**23.** A method according to claim **1,** wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith.

**24.** A method according to claim **1,** wherein the data stream comprises multimedia data.

**25.** Apparatus for real-time broadcasting of a data stream having a given data rate over a network, comprising:

a transmitting computer, which divides the stream into a sequence of slices, each slice having a predetermined

data size associated therewith, and encodes the slices in a corresponding sequence of files, each file having a respective index, and

which uploads the sequence to a server at an upload rate generally equal to the data rate, such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

**26.** Apparatus according to claim **25,** wherein the one or more client computers decode the sequence and play back the data stream responsive to the indices thereof, at a data replay rate generally equal to the data rate.

**27.** Apparatus according to claim **26,** wherein the one or more client computers download the sequence using an Internet download protocol.

**28.** Apparatus according to claim **27,** wherein the Internet download protocol is selected from a group consisting of HTTP,UDP and RTP.

**29.** Apparatus according to claim **26,** wherein the one or more client computers comprise a plurality of client computers, which download the sequence substantially simultaneously.

**30.** Apparatus according to claim **25,** wherein the transmitting computer compares the upload rate to the data rate and adjusts the upload rate responsive to the comparison.

**31.** Apparatus according to claim **30,** wherein the transmitting computer compresses the data at a compression ratio which is varied responsive to the comparison.

**32.** Apparatus according to claim **30,** wherein the transmitting computer adjusts the size of one or more of the slices responsive to the comparison.

**33.** Apparatus according to claim **25,** wherein the transmitting computer opens a plurality of links between the transmitting computer and the server, each link characterized by a respective data rate, and transmits different ones of the sequence of files over different ones of the plurality of links.

**34.** Apparatus according to claim **33,** wherein the transmitting computer opens the plurality of links such that the data rates of the links taken together are sufficient to upload the sequence at the upload rate generally equal to the data rate.

**35.** Apparatus according to claim **33,** wherein the transmitting computer monitors the data rates of the links and opens a new link in place of one of the links whose data rate is lower than a predetermined level.

**36.** Apparatus according to claim **25,** wherein the data stream comprises multimedia data.

**37.** Apparatus according to claim **36,** wherein the predetermined data size of each of the slices corresponds to a time duration of the slice.

**38.** Apparatus according to claim **25,** wherein the transmitting computer uploads the encoded sequence using an Internet upload protocol.

**39.** Apparatus according to claim **38,** wherein the Internet upload protocol comprises FTP.

**40.** Apparatus according to claim **25,** wherein the slices are encoded at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels.

**41.** Apparatus according to claim **25,** wherein the network comprises the Internet.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,389,473 B1                                          Page 1 of 1
DATED            : May 14, 2002
INVENTOR(S)  : Sharon Carmel et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [75], "**Ginsberg**" should read -- **Ginzberg** --.

Signed and Sealed this

Ninth Day of July, 2002

Attest:

JAMES E. ROGAN
*Attesting Officer*          *Director of the United States Patent and Trademark Office*

## <u>CERTIFICATE OF SERVICE</u>

*Emblaze Ltd. v. Apple Inc.*, 2014-1734, 2015-1400, 2015-1557

I hereby certify that, on May 28, 2015, I electronically filed the foregoing **Brief For Plaintiff-Appellant Emblaze Ltd.** with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit and served it on counsel of record by using the Court's CM/ECF system.

Dated: May 28, 2015                     */s/ Martin B. Pavane*
                                        Martin B. Pavane

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that the foregoing **Brief for Plaintiff-Appellant Emblaze Ltd.** complies with the relevant type-volume limitation of Federal Rules of Appellate Procedure 28.1(e)(2), 28.1(e)(3), 32(a)(7)(B) and 32(a)(7)(C).  This brief is typed in Times New Roman (14-point) and contains 13,822 words according to the Microsoft Word system.

Dated: May 28, 2015                    */s/ Martin B. Pavane*
                                       Martin B. Pavane